## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                                      :

                                                            :          **Chapter 11**

**TIDEWATER INC.**, *et al.*,                               :

                                                            :          **Case No. 17– _____ (      )**

                                                            :

Debtors.[1]                                                 :          **(Joint Administration Requested)**

------------------------------------------------------------ x

### DECLARATION OF QUINN P. FANNING IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

I, Quinn P. Fanning, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am an Executive Vice President and Chief Financial Officer of Tidewater Inc. ("**Tidewater Parent**"), and an authorized representative of the affiliated debtors (collectively, the "**Debtors**" or "**Tidewater**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I have been employed by Tidewater since 2008 and have more than 20 years' experience in the financial services industry. Prior to joining Tidewater, I served as a Managing Director with Citigroup Global Markets, Inc. During my 12-year investment banking career, I focused primarily on the energy industry, particularly the oilfield services and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Tidewater Inc. (7776), Tidewater Marine Western, Inc. (1064), Tidewater Corporate Services, L.L.C. (7776), Tidewater Marine, L.L.C. (7779), Cajun Acquisitions, LLC (2365), Gulf Fleet Supply Vessels, L.L.C. (2194), Hilliard Oil & Gas, Inc. (4727), Java Boat Corporation (0278), Pan Marine International Dutch Holdings, L.L.C., Point Marine, L.L.C. (9586), Quality Shipyards, L.L.C. (2335), S.O.P., Inc. (3464), Tidewater Marine Alaska, Inc. (7549), Tidewater Marine International Dutch Holdings, L.L.C. (2289), Tidewater Marine Sakhalin, L.L.C. (7779), Tidewater Mexico Holding, L.L.C. (8248), Tidewater Venture, Inc. (7694), Twenty Grand (Brazil), L.L.C. (7730), Twenty Grand Marine Service, L.L.C. (7730), Zapata Gulf Marine, L.L.C. (5513), Tidewater GOM, Inc. (2799), Tidewater Subsea, L.L.C. (2022), Tidewater Subsea ROV, L.L.C. (3832), Tidewater Marine Fleet, L.L.C., Tidewater Marine Hulls, L.L.C., Tidewater Marine Ships, L.L.C., and Tidewater Marine Vessels, L.L.C. The Debtors' principal offices are located at 601 Poydras Street, Suite 1500, New Orleans, Louisiana 70130.

midstream/pipeline sectors.  My responsibilities at Citigroup included providing client coverage and leading the execution of a wide variety of M&A, strategic advisory, and capital markets transactions for clients across all sectors of the global energy complex.  I earned a Bachelor of Business Administration from the University of Notre Dame in 1985 and a Master of Business Administration from the University of Chicago Graduate School of Business in 1994.

2.      I submit this declaration (the "**Declaration**") in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and the motions and pleadings filed on the date hereof (the "**Petition Date**") seeking various types of "first day" relief (collectively, the "**First Day Motions**").  The First Day Motions seek relief intended to preserve the value of the Debtors and maintain continuity of operations by, among other things, (i) preserving the Debtors' relationships with their customers, vendors, suppliers, and employees; (ii) ensuring continued employee morale; (iii) maintaining the Debtors' cash management systems and other business operations without interruption; and (iv) establishing certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, these Chapter 11 Cases.  This relief is critical to the Debtors' restructuring efforts and, without it, the Debtors' businesses would suffer immediate and irreparable harm.

3.      I am generally familiar with the Debtors' day-to-day operations, books and records, and business and financial affairs.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with other members of the Debtors' senior management and professionals,[2] information provided to me by employees working under my supervision, or my opinion based

---

[2] The Debtors' professionals include Weil, Gotshal & Manges LLP ("**Weil**"), as restructuring counsel; Lazard Frères & Co. LLC ("**Lazard**"), as investment banker; and AlixPartners LLP, as restructuring advisor.

upon experience, knowledge, and information concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

## Preliminary Statement

4.     The Debtors commenced these Chapter 11 Cases to implement a fully negotiated, comprehensive, and consensual restructuring (the "**Restructuring**") that will position them to survive an extended market downturn, exploit potential growth opportunities in the future, and continue to provide customers with high-quality, dependable services.  The terms of the Restructuring are set forth in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Tidewater Inc. and its Affiliated Debtors* (the "**Prepackaged Plan**")[3] filed contemporaneously with this Declaration.

5.     Pursuant to the Prepackaged Plan, which is supported by holders of Class 3 Claims (the only class of unsecured claims that is impaired and entitled to vote under the Prepackaged Plan), the Debtors' proposed Restructuring will, among other things, provide for:

- Full and final satisfaction of the Debtors' obligations under (i) the Credit Agreement, (ii) the Note Purchase Agreements, and (iii) the Sale Leaseback Agreements (each as defined below), in exchange for (a) $225 million in cash, (b) $350 million of new secured notes, and (c) approximately 95% of the new equity of the Reorganized Debtors (subject to dilution) to be distributed pro rata to the holders of such interests;

- Amendment and Reinstatement of the Troms Credit Agreement, which will provide for a grant of first priority mortgages on certain vessels, deferment of 50% of the amortization payments payable thereunder during fiscal years 2018 and 2019, and an increase of 100 basis points to the interest rates otherwise in effect through fiscal year 2023;

- Payment in full, in the ordinary course, of the Debtors' trade and other general unsecured creditors; and

---

[3] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms in the Prepackaged Plan.

- Full and final satisfaction of the Debtors' existing common equity in exchange for (i) 5.0% of the new equity of the Reorganized Debtors (subject to dilution) and (ii) warrants to purchase an additional 15% of the new equity of the Reorganized Debtors (subject to dilution) to be distributed pro rata to the holders of such interests.

6.     Tidewater's creditors throughout its capital structure overwhelmingly support the Restructuring.  Pursuant to that certain restructuring support agreement, dated as of May 11, 2017 (as may be amended from time to time and including all exhibits thereto, the "**RSA**"), annexed to the Prepackaged Plan as **Schedule 1**, a substantial majority of the holders of claims entitled to vote on the Prepackaged Plan — including (a) holders of more than sixty percent (60%) of the outstanding principal amount of the Credit Agreement Claims, and (b) holders of more than ninety-nine percent (99%) of the outstanding principal of the Notes Claims — have already agreed, subject to the terms and conditions of the RSA, to vote in favor of the Prepackaged Plan.

7.     To reap the full benefits of the Restructuring, the Debtors must exit these Chapter 11 Cases quickly.  Under the RSA, the Debtors have agreed to use commercially reasonable efforts to meet certain milestones for the restructuring process set forth in the RSA, including that entry of the order confirming the Prepackaged Plan (the "**Confirmation Order**") occur no later than seventy-five (75) calendar days after the Petition Date, and that the Prepackaged Plan becomes effective no later than thirty (30) calendar days after entry of the Confirmation Order.  To meet these deadlines, the Debtors have proposed the following key dates and deadlines related to the Restructuring:

| Proposed Restructuring Timeline | |
|---|---|
| Voting Record Date | May 8, 2017 |
| Commencement of Solicitation of Prepackaged Plan | May 12, 2017 |
| Petition Date | May 17, 2017 |
| Distribution of Combined Notice | May 22, 2017 |
| Deadline to File Plan Supplement | June 5, 2017 |
| Deadline to Vote to Accept or Reject Prepackaged Plan | June 12, 2017 |
| Deadline to File Objections to Prepackaged Plan | June 23, 2017 |
| Deadline to Respond to Objections (if any) to Prepackaged Plan | June 27, 2017 |
| Confirmation Hearing | On or about June 29, 2017 |

8.     This Declaration has been organized into four sections. The *first* section provides background information on the Debtors and their business operations. The *second* section provides detailed information on the Debtors' capital structure. The *third* section describes the events leading to the commencement of these Chapter 11 Cases and the Debtors' prepetition restructuring efforts, including the circumstances leading to the execution of the RSA, the Prepackaged Plan, and solicitation of votes on the Prepackaged Plan. The *fourth* section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

<u>**Background on the Debtors and Business Operations**</u>

**A.     The Debtors' Organizational Structure**

9.     The Debtors are entities organized in Texas, Delaware, Louisiana, Nevada, and Alaska. Tidewater Parent is a Delaware Corporation and the direct or indirect parent of each of the other Debtors in these Chapter 11 Cases. A chart illustrating the Debtors' organizational structure is annexed hereto as <u>**Exhibit A**</u>.

5

**B.      Senior Management**

10.      Tidewater Parent's current senior management team is comprised of the following individuals:

| Name | Position |
|------|----------|
| Jeffrey M. Platt | President and Chief Executive Officer |
| Jeffrey A. Gorski | Executive Vice President and Chief Operating Officer |
| Quinn P. Fanning | Executive Vice President and Chief Financial Officer |
| Bruce D. Lundstrom | Executive Vice President, Secretary, and General Counsel |
| Joseph M. Bennett | Executive Vice President and Chief Investor Relations Officer |

**C.      The Debtors' Business**

11.      The Debtors are a leading provider of offshore service vessels and marine support services to the global offshore energy industry through the operation of a diversified fleet of marine service vessels.  The Debtors' vessels and related vessel services support all phases of offshore exploration, field development and production, including towing of, and anchor handling for, mobile offshore drilling units; transporting supplies and personnel necessary to sustain drilling, workover, and production activities, offshore construction, remotely operated vehicle ("**ROV**") operations, and seismic and subsea support; and a variety of specialized services such as pipe and cable laying.  As of the Petition Date, the Debtors own or charter, under sale-leaseback agreements, 262 vessels and 8 ROVs available to serve the global energy industry.

12.      The Debtors have one of the broadest geographic operating footprints in the offshore energy industry, with operations in most of the world's significant offshore crude oil and natural gas exploration and production offshore regions.  The Debtors' fleet is deployed in the major global offshore oil and gas areas of the world.  The principal areas of operations include the U.S. Gulf of Mexico, the Arabian Gulf, the Mediterranean Sea, and areas offshore

Brazil, Canada, India, Malaysia, Myanmar, Mexico, Norway, the United Kingdom, Thailand, Trinidad, and West Africa.

13.    The Debtors' principal customers are large, international oil and natural gas exploration, field development and production companies; select independent exploration and production companies; foreign government-owned or government-controlled organizations, and other companies that explore for, develop and produce oil and natural gas; drilling contractors; and other companies that provide various services to the offshore energy industry including, but not limited to, offshore construction companies, diving companies, and well stimulation companies.

14.    The Debtors classify their vessels in three groups — "deepwater vessels," "towing supply vessels," and "other vessels."

### i.    *Deepwater Vessels*

15.    Deepwater vessels, in the aggregate, have been the Debtors' largest contributor to consolidated vessel revenue and vessel operating margin in recent years.  Included in this vessel class are large platform supply vessels ("**PSVs**"), which are typically greater than 230 feet and/or with greater than 2,800 tons in deadweight cargo-carrying capacity; large, higher-horsepower anchor handling towing supply ("**AHTS**") vessels, which generally have greater than 10,000 horsepower; and one specialty vessel that is capable of supporting light construction as well as inspection, maintenance, and repair work.

**PSV**                **AHTS**

7

16.    Deepwater vessels are generally chartered to customers for use in transporting supplies and equipment from shore bases to deepwater and intermediate water depth offshore drilling rigs and production platforms, and for otherwise supporting intermediate water depth and deepwater drilling, production, construction, and maintenance operations.

17.    Deepwater PSVs generally have large cargo-carrying capacities, both below deck (liquid mud tanks and dry bulk tanks) and above deck.  Deepwater AHTS vessels are equipped to tow drilling rigs and other marine equipment, as well as to set anchors for positioning and mooring drilling rigs that generally do not have dynamic positioning capabilities. Deepwater vessels also include specialty vessels that can support offshore well stimulation, construction work, subsea services, and/or serve as remote accommodation facilities.

**Specialty Vessel**



ii.    *Towing Supply Vessels*

18.    Towing supply vessels are currently the Debtors' largest fleet class by number of vessels.  Included in this class are non-deepwater AHTS vessels with horsepower below 10,000 BHP,[4] and non-deepwater PSVs that are generally less than 230 feet.  The vessels in this class perform the same respective functions and services as deepwater AHTS vessels and deepwater PSVs, except that towing supply vessels are generally chartered to customers for use in intermediate depth and shallow waters.

---

[4] BHP is the measure of an engine's horsepower before the loss in power caused by the gearbox, alternator, differential, water pump, and other auxiliary components such as the power steering pump, muffled exhaust system, etc.

### iii.    *Other Vessels*

19.    Other vessels include crew boats, utility vessels, and offshore tugs.  Crew boats and utility vessels are chartered to customers for use in transporting personnel and supplies from shore bases to offshore drilling rigs, platforms, and other installations.  These vessels are also often equipped for oil field security missions in markets where piracy, kidnapping, or other potential violence presents a concern.  Offshore tugs are used to tow floating drilling rigs and barges; to assist in the docking of tankers; and to assist pipe laying, cable laying, and construction barges.

**<u>Offshore Tug</u>**                  **<u>Utility Vessel</u>**



### iv.    *Additional Vessels Under Construction*

20.    In addition to the Debtors' current fleet, as of the Petition Date, the Debtors also have approximately $10 million in unfunded capital commitments for two deepwater PSVs under construction, which range between 4,700 and 5,400 deadweight tons of cargo capacity.  The vessels are being constructed pursuant to a contract between Tidewater Marine, L.L.C. ("**Tidewater Marine**"), an operating subsidiary of Tidewater Parent, and LEEVAC Shipyards Jennings, L.L.C. ("**LEEVAC**").  The contract was subsequently assigned by LEEVAC to Gulf Island Shipyards, L.L.C. ("**Gulf Island**") in January 2016.

21.    Prior to the scheduled delivery of the first PSV in January 2017, Tidewater Marine rejected delivery for failure of the vessel to meet certain important contract specifications and withheld the final milestone payment.  Tidewater Marine provided Gulf Island with formal

RLF1 17566977V.1

notice of default and demanded that Gulf Island cure the deficiencies, after which Gulf Island declared Tidewater Marine in default for failing to accept delivery and filed a notice of claim of lien with the U.S. Coast Guard.  Subsequently, Tidewater Marine demanded that Gulf Island refund all amounts paid to date, totaling approximately $43 million, plus accrued contractual interest.

22.     On March 10, 2017, Gulf Island filed a notice of arbitration before the Houston Maritime Arbitrator's Association alleging breach of contract with respect to Tidewater Marine's rejection of the first PSV and anticipatory breach of contract based on Tidewater Marine's anticipated rejection of the second PSV.  Gulf Island seeks to require Tidewater Marine to take delivery of both vessels and an award for damages for costs incurred by Gulf Island.  A date for arbitration has not yet been set.

23.     In October 2016, the Debtors cancelled options on four additional PSVs under construction, which resulted in a refund of approximately $14 million of prior installment payments.  In April 2017, the Debtors entered into a novation agreement with a new purchaser to take their place in a shipbuilding contract and accept one PSV under construction, which resulted in a net payment of $5.27 million.  The new purchaser assumed the contract obligations of the Debtors to pay the remaining balance of $27.15 million upon delivery of the PSV.

24.     Revenues for services rendered from the Debtors' vessels are derived primarily from vessel time charter or similar contracts that are generally three months to four years in duration as determined by customer requirements and, to a lesser extent, from vessel time charter contracts on a "spot" basis, which is a short-term (one day to three months) hire to provide offshore marine services to a customer for a specific short-term job.  The base rate of

RLF1 17566977V.1

hire for a term contract is generally a fixed rate, though some charter arrangements allow the company to recover specific additional costs.

### D.    Regulation of the Debtors' Business

25.    The Debtors' business operations are subject to various United States federal, state, and local statutes and regulations governing the operation and maintenance of vessels.  The Debtors' U.S.-flag vessels are subject to the jurisdiction of the United States Coast Guard, the United States Customs and Border Protection, and the United States Maritime Administration.  The Debtors are also subject to international laws and conventions and the laws of international jurisdictions where Tidewater and its offshore vessels operate.

### Capital Structure and Prepetition Indebtedness

### A.    The Debtors' Capital Structure

#### i.    *Equity Ownership*

26.    Tidewater Parent is a Delaware corporation that files annual reports with, and furnishes other information to, the Securities & Exchange Commission.  Tidewater Parent's common stock is currently traded on the New York Stock Exchange under the symbol "TDW."  As of April 30, 2017, 125 million shares of TDW $0.10 par value common stock had been authorized with 47,121,304 shares of common stock issued and outstanding.

#### ii.    *Prepetition Indebtedness*

27.    As of the Petition Date, the Debtors have outstanding, unsecured prepetition funded debt obligations totaling approximately $2.04 billion, consisting of (i) $900 million in borrowings under the Credit Agreement; (ii) $500 million in principal amount of 2013 Notes; (iii) $165 million in principal amount of 2011 Notes; (iv) $382.5 million in principal

amount of 2010 Notes; and (v) approximately $92 million of U.S. dollar-equivalent ("**USD**") debt under the Troms Credit Agreement (each as defined below).

(a)    *The Credit Agreement*

28.    Tidewater Parent, as borrower, and each of the other Debtors, as co-borrowers, are parties to that certain Fourth Amended and Restated Revolving Credit Agreement, dated as of June 21, 2013 (as amended, modified, or supplemented from time to time, the "**Credit Agreement**"), with the lenders and issuing banks party thereto from time to time (the "**Tidewater Lenders**"), Bank of America, N.A., as administrative agent, and certain other parties thereto.  The Credit Agreement provides for a $900 million facility consisting of (i) a $600 million revolving credit facility and (ii) a $300 million revolving term loan facility.  The Credit Agreement matures on June 21, 2019.

29.    As of the Petition Date, the aggregate principal amount outstanding under the Credit Agreement is approximately $900 million, plus any applicable interest, fees, and other amounts.

(b)    *The Senior Unsecured Notes*

*The 2013 Notes*

30.    Tidewater Parent issued $300 million of senior unsecured notes in September 2013, and an additional $200 million of senior unsecured notes in November 2013, to certain institutional investors, with each of the other Debtors as named issuers or guarantors (collectively, the "**2013 Notes**"), pursuant to that certain Note Purchase Agreement dated as of September 30, 2013 (the "**2013 Notes Purchase Agreement**").  Interest on the 2013 Notes is payable semi-annually on May 15 and November 15.  Below is a list of the 2013 Notes with the applicable interest rate and maturity date.

- Series 2013-A, $123 million 4.26% Senior Notes, due November 16, 2020

- Series 2013-B, $250 million 5.01% Senior Notes, due November 15, 2023
- Series 2013-C, $127 million 5.16% Senior Notes, due November 17, 2025

31.    As of the Petition Date, the aggregate principal amount outstanding under the 2013 Notes is $500 million, plus any applicable interest, premiums, fees, and other amounts.

*The 2011 Notes*

32.    Tidewater Parent issued $165 million in aggregate principal amount of senior unsecured notes in August 2011 to certain institutional investors, with each of the other Debtors as named issuers or guarantors (collectively, the "**2011 Notes**"), pursuant to (i) a certain Note Purchase Agreement dated as of August 15, 2011 (the "**2011 Notes Purchase Agreement**"), for $100 million in aggregate principal senior notes and (ii) a certain Note Purchase Agreement dated as of August 15, 2011, for $65 million in aggregate principal senior notes.

33.    Interest on the 2011 Notes is payable quarterly on March 31, June 30, September 30, and December 31.  Below is a list of the 2011 Notes with the applicable interest rate and maturity date.

- Series 2011-A, $50 million 4.06% Senior Notes, due March 31, 2019
- Series 2011-B, $50 million 4.64% Senior Notes, due June 30, 2021
- Series 2011-C, $65 million 4.54% Senior Notes, due June 30, 2021

34.    As of the Petition Date, the aggregate principal amount outstanding under the 2011 Notes is $165 million, plus any applicable interest, premiums, fees, and other amounts.

*The 2010 Notes*

35.    Tidewater Parent issued $425 million in aggregate principal amount of senior unsecured notes in September 2010 to certain institutional investors, with each of the other Debtors as named issuers or guarantors (collectively, the "**2010 Notes**," and together with

the 2013 Notes and 2011 Notes, the "**Notes**"), pursuant to a certain Note Purchase Agreement dated as of September 9, 2010 (the "**2010 Notes Purchase Agreement**," and together with the 2013 Notes Purchase Agreement and the 2011 Notes Purchase Agreement, the "**Notes Purchase Agreements**").

36.     Interest on the 2010 Notes is payable semi-annually on June 30 and December 30.  Below is a list of the 2010 Notes with the applicable interest rate and maturity date.

- Series B, $44.5 million 3.90% Senior Notes, due December 30, 2017
- Series C, $25 million 3.95% Senior Notes, due December 30, 2017
- Series D, $25 million 4.12% Senior Notes, due December 30, 2018
- Series E, $25 million 4.17% Senior Notes, due December 30, 2018
- Series F, $50 million 4.33% Senior Notes, due December 30, 2019
- Series G, $100 million 4.51% Senior Notes, due December 30, 2020
- Series H, $65 million 4.56% Senior Notes, due December 30, 2020
- Series I, $48 million 4.61% Senior Notes, due December 30, 2022

37.     As of the Petition Date, the aggregate principal amount outstanding under the 2010 Notes is approximately $382.5 million, plus any applicable interest, premiums, fees, and other amounts.

(c)     *Troms Offshore Debt*

38.     Non-Debtor Affiliate Troms Offshore Supply AS ("**Troms Offshore**"), as borrower, and Tidewater Parent and each of the other Debtors, as guarantors (collectively, the "**Corporate Guarantors**"), are parties to that certain Amended and Restated Term Loan Facility Agreement, dated as of May 25, 2012 (as amended, modified, or supplemented from time to time, the "**Troms Credit Agreement**"), with Eksportkreditt Norge AS ("**EKN**") and Kommunal Landspensjonskasse Gjensidig Forsikringsselskap ("**KLP**") as lenders (collectively, the "**Troms**

14

Lenders"), DNB Bank ASA, New York Branch, as Agent, DNB Bank ASA, Grand Cayman Branch, as Bank Guarantor (the "**Bank Guarantor**"), the Norwegian Guarantee Institute for Export Credits, as guarantor ("**GIEK**"),[5] and DNB Markets, Inc., as arranger and bookrunner (collectively, the "**Troms Finance Parties**").  The Troms Credit Agreement provides for the following four tranches of unsecured debt.

- The "Troms Hera Tranche:" a $31.3 million USD-denominated, 12-year unsecured borrowing that matures in April 2027, guaranteed by, among others, Tidewater Parent and the other Corporate Guarantors.[6] The Troms Hera Tranche requires semi-annual principal payments of $1.3 million (plus accrued interest) and bears interest at a fixed rate of 2.92% plus a premium based on Tidewater Parent's consolidated funded indebtedness to total capitalization ratio (currently equal to 1.5% for a total all-in rate of 4.42%).

  As of the Petition Date, the aggregate principal amount outstanding under the Troms Hera Tranche is approximately $26.1 million, plus any applicable interest, fees, and other amounts.

- The "Troms Mira Tranche:" a $29.5 million, USD-denominated, 12-year unsecured borrowing that matures in January 2027, guaranteed by, among others, Tidewater Parent and the other Corporate Guarantors.[7] The Troms Mira Tranche requires semi-annual principal payments of $1.2 million (plus accrued interest) and bears interest at a fixed rate of 2.91% plus a premium based on Tidewater Parent's consolidated funded indebtedness to total capitalization ratio (currently equal to 1.5% for a total all-in rate of 4.41%).

  As of the Petition Date, the aggregate principal amount outstanding under the Troms Mira Tranche is approximately $24.6 million, plus any applicable interest, fees, and other amounts.

- The "Troms Arcturus Tranche:" a 300 million Norwegian Kroner ("***NOK***") denominated, 12-year unsecured borrowing that matures in January 2026, guaranteed by, among others, Tidewater Parent and the other Corporate

---

[5] GIEK is a public-sector enterprise that reports to the Royal Norwegian Ministry of Trade, Industry and Fisheries. GIEK promotes Norwegian exports by issuing guarantees on behalf of the Norwegian state.

[6] Troms Offshore's obligations and liabilities under the Troms Hera Tranche are also guaranteed by unconditional, irrevocable, on demand guarantees in the amount of $2,908,127 (securing 10% of the Troms Hera Tranche) and $26,173,143 (securing 90% of the Troms Hera Tranche) executed by Bank Guarantor and GIEK, respectively, in favor of KLP.

[7] Troms Offshore's obligations and liabilities under the Troms Mira Tranche are also guaranteed by unconditional, irrevocable, on demand guarantees in the amount of $2,948,830 (securing 10% of the Troms Mira Tranche) and $26,539,202 (securing 90% of the Troms Mira Tranche) executed by Bank Guarantor and GIEK, respectively, in favor of EKN.

Guarantors.[8]    The Troms Arcturus Tranche requires semi-annual principal payments of 12.5 million NOK (plus accrued interest) and bears interest at a fixed rate of 2.31% plus a premium based on Tidewater Parent's consolidated funded indebtedness to total capitalization ratio (currently equal to 2.0% for a total all-in rate of 4.31%).

As of the Petition Date, the aggregate principal amount outstanding under the Troms Arcturus Tranche is approximately 225 million NOK (approximately $26.5 million USD-equivalent), plus any applicable interest, fees, and other amounts.

- The "Troms Sirius Tranche:" a 204.4 million NOK-denominated borrowing agreement that matures in May 2024, guaranteed by, among others, Tidewater Parent and the other Corporate Guarantors.[9]    The Troms Sirius Tranche requires semi-annual principal payments of 8.5 million NOK (plus accrued interest), and bears interest at a fixed rate of 3.88% plus a premium based on Tidewater Parent's consolidated funded indebtedness to total capitalization ratio (currently equal to 2.0% for a total all-in rate of 5.88%).

As of the Petition Date, the aggregate principal amount outstanding under the Troms Sirius Tranche is approximately 127.8 million NOK (approximately $15 million USD-equivalent), plus any applicable interest, fees, and other amounts.

### iii.    *Cash and Cash Equivalents*

39.    On March 15, 2016, Tidewater Parent borrowed the full $600 million available under the Credit Agreement to ensure adequate liquidity and financial flexibility during the current industry downturn.  As of the Petition Date, the Debtors hold approximately $700 million in cash and cash equivalents.

### Key Events Leading to Chapter 11

### A.    Collapse in Commodity Prices

40.    As a result of decisions of members of the Organization of the Petroleum Exporting Countries not to curtail supply, growth of unconventional production in the United

---

[8]  Troms Offshore's obligations and liabilities under the Troms Arcturus Tranche are also guaranteed by unconditional, irrevocable, on demand guarantees in the amount of 150,000,000 NOK (securing 50% of the Troms Arcturus Tranche) and 150,000,000 NOK (securing 50% of the Arcturus Tranche) executed by Bank Guarantor and GIEK, respectively, in favor of EKN.

[9]  Troms Offshore's obligations and liabilities under the Troms Sirius Tranche are also guaranteed by unconditional, irrevocable, on demand guarantees in the amount of 89,460,000 NOK (securing 50% of the Troms Sirius Tranche) and 89,460,000 NOK (securing 50% of the Troms Sirius Tranche) executed by Bank Guarantor and GIEK, respectively, in favor of EKN.

States, and weakening demand in emerging markets, the prices of crude oil and natural gas have declined dramatically since mid-year 2014.  In early 2016, crude oil and natural gas spot prices reached multi-year lows of approximately $26 per Bbl[10] and $1.50 per MMBtu,[11] respectively.  During the last nine months of 2016, prices were volatile but generally increasing.  In March 2017, crude oil was trading between approximately $50 and $52 per Bbl.  While those prices represent significant improvement over the record lows of 2016, oil prices remain approximately 50% lower than the mid-year 2014 high of more than $105 per Bbl.

41.    The recent trend in crude oil prices and the current pricing outlook could lead to increased exploration, development, and production activity, as current prices for crude oil are approaching the range at which some surveys have indicated that, if sustainable, exploration and production ("**E&P**") companies would begin to increase spending.  However, a recovery in onshore exploration, development, and production activity and spending, particularly in North America, is expected to precede a recovery in offshore activity and spending, much of which takes place in international markets.  Thus, a further decrease in offshore spending is likely during calendar year 2017 and any improvements in offshore E&P activity likely will not occur until late calendar year 2017 or in 2018, the timing of which is generally consistent with the projected trend for global working offshore rigs.

42.    In addition, the production of unconventional gas resources in North America and the commissioning of a number of new, large, liquefied natural gas export facilities around the world have also contributed to an oversupplied natural gas market.  Generally high levels of onshore gas production and the prolonged downturn in natural gas prices experienced

---

[10] "*Bbl*" refers to one stock tank barrel, or 42 U.S. gallons liquid volume, used herein to reference to crude oil or other liquid hydrocarbons.

[11] "*MMBtu*" refers to one million BTU or British thermal units, which is the heat required to raise the temperature of a one-pound mass of water from 58.5 to 59.5 degrees Fahrenheit.

17

over the previous several years, however, have had a negative impact on the offshore exploration and development plans of energy companies and the demand for offshore support vessel services.

43.    Notwithstanding recent increases in pricing, the significant decline in crude oil and natural gas prices that began in 2014 caused many of the Debtors' customers to significantly reduce drilling, completion, and other production activities and related spending on the Debtors' products and services.  Primarily as a result of the decline in oil and gas prices, the Debtors' revenue for fiscal year ended March 31, 2016 was approximately $979 million — approximately 35% less than the approximately $1.5 billion revenue for fiscal year ended March 31, 2015.  Further, the Debtors' revenue for the nine (9) months ending on December 31, 2016, declined to approximately $440.8 million, or a reduction of approximately 45%, as compared to $794.9 million for the same period ending on December 31, 2015.

**B.    Prepetition Negotiations with Creditors**

44.    With reduced demand for offshore support vessels, along with increased supply resulting from vessels built by the Debtors and other operators of offshore support vessels, the Debtors experienced a significant decline in the utilization of its vessels, average day rates received, and vessel revenue.  As a result, the Debtors implemented a number of significant cost reduction measures to mitigate the effects of significantly lower vessel revenue and, given the currently challenging offshore support vessel market and business outlook, other steps to improve its financial position and liquidity, including the January 2016 suspension of Tidewater Parent's common stock dividend, the March 2016 $600 million draw on the Tidewater Credit Agreement, and the renegotiation or termination of vessel construction contracts in order to reduce capital expenditures.

RLF1 17566977V.1

45.     Despite efforts to undertake transactions to reduce long-term debt and reduce spending, the Debtors determined that, with their current capital structure, they were unable to withstand the ongoing and precipitous decline in oil and gas prices and the corresponding decline in the Debtors' revenues and cash flows.   Based on current market conditions, the Debtors determined that a reduction in long-term debt and cash interest obligations was required to improve their financial position and flexibility.   As such, the Debtors retained Weil, as restructuring counsel, and Lazard, as investment banker, to assist in developing and implementing a comprehensive restructuring plan.

46.     On June 30, 2016, the Debtors failed to meet a 3.0x minimum interest coverage ratio covenant contained in the Credit Agreement, the Troms Credit Agreement, and the 2013 Notes Purchase Agreement (collectively, the "**Funded Debt Agreements**").   Failure to meet the minimum interest coverage ratio requirement would have resulted in covenant noncompliance that would have allowed the respective lenders and/or the noteholders to declare the Debtors to be in default under each of the Funded Debt Agreements, and accelerate the indebtedness thereunder.   Because the Debtors were expected not to meet the minimum interest coverage ratio requirement, a report provided by the Debtors' independent registered public accounting firm that accompanied the company's audited consolidated financial statements for the fiscal year ended March 31, 2016 (the "**Audit Opinion**") contained an explanatory paragraph regarding the Debtors' ability to continue as a going concern.   The failure to receive an unqualified Audit Opinion, in and of itself, is an event of default under the Credit Agreement that would allow the lenders to accelerate the indebtedness thereunder.

47.     To avoid an acceleration of indebtedness under the Funded Debt Agreements, the Debtors negotiated and obtained limited waivers from the necessary lenders and

noteholders to extend the waiver of the unqualified audit opinion requirement and/or waive the minimum interest coverage ratio requirement until August 14, 2016 and subsequent, further extensions until September 18, 2016, October 21, 2016, November 11, 2016, January 27, 2017, March 3, 2017, March 13, 2017, March 27, 2017, and April 7, 2017.  When the final waiver expired in accordance with its terms on April 7, 2017, negotiations with the Bank Lender Steering Committee and the Unofficial Noteholder Committee (each defined below) regarding the terms of a restructuring were substantially complete, and, therefore, the Debtors did not seek a further extension of the waiver.

48.    As early as January 2016, the Debtors, with assistance from their advisors, were actively engaged in discussions and negotiations regarding restructuring alternatives with (i) a steering committee comprised of certain Tidewater Lenders (the "**Bank Lender Steering Committee**"), (ii) the Troms Lenders, and (iii) an unofficial committee of certain unaffiliated holders of the 2013 Notes (the "**Unofficial 2013 Noteholder Committee**").  For several months, the Debtors, the Bank Lender Steering Committee, the Troms Lenders, and the Unofficial 2013 Noteholder Committee engaged in negotiations regarding the terms of a potential out-of-court restructuring.  During the course of those discussions, however, it became clear to the Debtors, the Bank Lender Steering Committee, the Troms Lenders, and the Unofficial 2013 Noteholder Committee that the substantial deleveraging desired by all parties would most effectively be accomplished through an in-court transaction.  Accordingly, in November 2016, the Debtors, the Bank Lender Steering Committee, the Troms Lenders, and an unofficial committee of certain unaffiliated holders of the Notes (the "**Unofficial Noteholder Committee**") began negotiations regarding the terms of a chapter 11 restructuring to be achieved through a consensual prepackaged plan.

20

49.     In the months leading up to the signing of the RSA, the Debtors, the Bank Lender Steering Committee, the Troms Lenders, and the Unofficial Noteholder Committee exchanged proposals and counterproposals regarding the terms of a comprehensive restructuring of Tidewater's existing debt.  During the same period, the Board of Directors of Tidewater Parent (the "**Tidewater Board**") met periodically to consider proposals to be provided to, and counterproposals received from, the Bank Lender Steering Committee and the Unofficial Noteholder Committee, to discuss updates and general restructuring strategy and considerations, and to approve and/or authorize actions related thereto.

50.     After several rounds of negotiations, the Debtors, the Bank Lender Steering Committee, and the Unofficial Noteholder Committee reached an agreement in principle regarding the terms of, and processes to document, the Restructuring embodied in the Prepackaged Plan.  The Debtors also reached an agreement in principle with the Troms Lenders regarding an amendment of the Troms Credit Agreement to be executed in conjunction with the Prepacked Plan.

**C.     Solicitation of Votes on the Prepackaged Plan**

51.     The Debtors began soliciting votes on the Prepackaged Plan before filing their chapter 11 petitions for relief.  On May 12, 2017, the Debtors served the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Reorganization of Tidewater Inc. and Its Affiliated Debtors* (the "**Disclosure Statement**") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code on holders of impaired claims entitled to vote and have requested the voting creditors to submit their ballots by the voting deadline of June 12, 2017, at 5:00 p.m. (prevailing Eastern Time).  The Debtors expect that the votes tabulated and received from the voting creditors will, consistent with the RSA, overwhelmingly support confirmation of the Prepackaged Plan.

21

## First Day Motions[12]

52.      Below is an overview of the First Day Motions.  The First Day Motions seek relief intended to facilitate a smooth transition for the Debtors into these Chapter 11 Cases and minimize disruptions of the Debtors' business operations.

### A.      Joint Administration Motion

53.      By this motion (the "**Joint Administration Motion**"), the Debtors request entry of an order directing joint administration and consolidation of the Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the jointly administered cases under the case of Tidewater Parent, and that the Court administer the cases under a consolidated caption.  The Debtors also request an entry on the docket of Tidewater Parent to reflect the joint administration of the Chapter 11 Cases.

54.      I believe joint administration of the Chapter 11 Cases will save the Debtors and their estates substantial time and expense because it will remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders.  Further, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  Joint administration of these Chapter 11 Cases will not, however, adversely affect creditors' rights because the Joint Administration Motion requests only the administrative consolidation of the Debtors' estates rather than the substantive consolidation thereof.

55.      Based upon the foregoing, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

---

[12] Capitalized terms used but not otherwise defined in the summaries of the First Day Motions provided below shall have the meanings ascribed to such terms in the relevant First Day Motion.

B.      **Cash Management Motion**

56.     Pursuant to this motion (the "**Cash Management Motion**"), the Debtors request (i) entry of interim and final orders authorizing the Debtors to:  (a) continue their existing cash management system; (b) continue using their existing business forms and bank accounts; (c) continue their intercompany arrangements; (d) continue their current Debit/Credit Card Program (as defined herein); and (e) pay certain prepetition obligations related thereto; and (ii) waiver of the requirements of section 345(b) of the Bankruptcy Code to the extent necessary. The Debtors also request that the Court authorize the banks to continue to charge bank fees and to charge back returned items to the bank accounts, whether such items are dated before, on, or after the commencement of these Chapter 11 Cases.

57.     Prior to the Petition Date, the Debtors utilized a centralized cash management system (the "**Cash Management System**") to operate their businesses in the ordinary course.  The majority of the Debtors' revenue is generated from vessel charter agreements between the Debtors or non-debtor affiliates (who generate revenue and provide the Debtors with operational support) (collectively, the "**Non-Debtor Affiliates**") on the one hand and counterparties throughout the world on the other.  The Cash Management System has several main components: (i) cash collection, including the collection of payments made to the Debtors and certain Non-Debtor Affiliates from revenue generated in the ordinary course of business; (ii) cash transfers among the Debtors and Non-Debtor Affiliates; and (iii) cash disbursements that fund the Debtors' and Non-Debtor Affiliates' business operations and debt obligations.

58.     It is my understanding that the Cash Management System is comprised of a total of 132 bank accounts (each, a "**Bank Account**" and, collectively, the "**Bank Accounts**") maintained at various banks (each, a "**Bank**" and, collectively, the "**Banks**") in the United States

23

(24 Bank Accounts) and internationally (108 Bank Accounts).[13]  Funds are transferred between Debtor and Non-Debtor Affiliate Bank Accounts in the ordinary course of business to satisfy accounts payable, including taxes, employee payroll, and other important operational expenses. A list of the Bank Accounts — for both the Debtors and the Non-Debtor Affiliates — is annexed as Schedule 1 to the proposed interim and final orders approving the Cash Management Motion.

59.    <u>Domestic Operations</u>.  Tidewater Parent serves as the "central banker" in the Debtors' Cash Management System, and Tidewater Parent's senior management is primarily responsible for administration of the Cash Management System.

60.    <u>Collection</u>.    Generally,  revenue  generated  by  the  Debtors'  domestic operations (and, as discussed herein, certain Non-Debtor Affiliates' international operations) is deposited into a Bank Account ending in 7517 (the "**Global Master Account**") owned by Tidewater Parent and maintained at JPMorgan Chase Bank ("**JPM**").

61.    <u>Disbursements</u>.  Funds required to pay the Debtors' operational expenses are transferred from the Global Master Account:  (i) directly to the ultimate payee; (ii) to other Bank Accounts owned by Tidewater Parent; or (iii) Bank Accounts owned by Debtor operating subsidiary, Tidewater Marine.  For example, funds required to pay certain operating expenses of the Debtors, including accounts payable, are initially transferred from the Global Master Account to the Bank Account ending in 3440 owned by Tidewater Parent and maintained at JPM.

---

[13] As of the Petition Date, 20 international Bank Accounts owned by various Non-Debtor Affiliates are considered inactive, reflect little or no account activity, and maintain minimal balances (collectively, the "**Inactive Accounts**"). The Inactive Accounts are maintained because, among other things, repatriating the funds would be costly and inefficient, the costs to maintain the accounts are *de minimis*, and/or the accounts may be useful to business operations in the future.  In addition to the Inactive Accounts, (i) Debtor Tidewater Marine International Dutch Holdings L.L.C. owns the Bank Account ending in 5233 and maintained at JPM, and (ii) certain Non-Debtor Affiliates own various international Bank Accounts (collectively, the "**Legal Accounts**"), solely to maintain a legally-required presence in a country where they currently conduct business or may do so in the future.  Although the Legal Accounts contain relatively small balances, when circumstances require additional funds be deposited into one of the Legal Accounts, such funds are generally distributed from the Global Master Account.

24

62.     Amounts required to fund certain payroll-related obligations arising in connection with the Debtors' domestic, onshore[14] operations—including payroll and payroll taxes paid via ACH transfer and/or wire transfer—are initially transferred from the Global Master Account to the Bank Account ending in 1694 (the "**Payroll Master Account**") owned by Tidewater Parent and maintained at JPM.[15]  In addition, the Bank Account ending in 1128 owned by Tidewater Marine and maintained at JPM, along with the Bank Account ending in 8342 (the "**Whitney Account**") owned by Tidewater Parent and maintained at Whitney Hancock National Bank ("**Whitney Bank**"), are used to satisfy a limited number of payroll obligations that require the issuance of a paper check.  The Whitney Account is also used to pay fees for swift services provided by Whitney Bank in connection with, among other things, refundment guarantees required under certain vessel construction contracts.[16]

63.     Additionally, Tidewater Parent owns two Bank Accounts that hold cash collateral securing certain letters of credit (collectively, the "**LC Collateral Accounts**"), including (i) the Bank Account ending in 7808 maintained at JPM (the "**JPM LC Account**") and (ii) the Bank Account ending in 2838 maintained at Northern Trust (the "**Northern LC Account**").  The JPM LC Account must maintain a minimum balance of $2 million to secure a letter of credit facility that enables the Debtors to provide letters of credit in support of bid and performance bonds required by certain contract counterparties and potential contract

---

[14] As discussed more fully herein, employees who provide services to both the Debtors and Non-Debtor Affiliates aboard offshore vessels are employed and paid in the ordinary course of business by Non-Debtor Affiliate Tidewater Crewing Limited.

[15] Payroll taxes owed to various international taxing authorities on account of payroll obligations related to international operations of certain Debtors and Non-Debtor Affiliates are also paid with funds from the Payroll Master Account.

[16] In addition to the payroll obligations described above, amounts owed to the Debtors' domestic employees on account of phantom stock awards are initially transferred from the Global Master Account to the Bank Account ending in 7639 (the "**Equity Award Account**") owned by Tidewater Parent and maintained at Bank of America Merrill Lynch.

25

counterparties.[17]  The Northern LC Account must maintain a minimum balance of approximately $1.06 million to secure a letter of credit issued by Northern Trust against the Debtors' obligations under a reinsurance policy issued by Everest Reinsurance Company many years ago.

64.    Intercompany Transactions and Claims.    Intercompany transactions (collectively, "**Intercompany Transactions**," and each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**") occur when, among other things, (i) funds are transferred between and among the Debtors and the Non-Debtor Affiliates; (ii) customers of Non-Debtor Affiliates make payments directly to Tidewater Parent; and (iii) Tidewater Parent settles liabilities on behalf of Non-Debtor Affiliates.  I am informed that the Debtors can, in the ordinary course of business, account for all Intercompany Transactions that are recorded in the Debtors' books and records.

65.    It is my understanding that inclusion of domestic and foreign Bank Accounts owned by both the Debtors and the Non-Debtor Affiliates in the Cash Management System supports the Debtors' global operations by facilitating the movement of funds by and among Debtors and Non-Debtor Affiliates, thereby increasing the Debtors' operational efficiency, facilitating the creation of prompt and accurate status reports identifying the locations and amounts of funds, and ensuring compliance with local laws and regulations in various countries.  Moreover, because the Non-Debtor Affiliates are subsidiaries of the Debtors, I believe continuing to keep those entities financially secure generally inures to the benefit of the Debtors' estates and creditors.

66.    International Operations.    Revenue, including customer payments, generated by Tidewater's international operations may initially be deposited into (i) a Bank

---

[17] Certain premium payments made by former employees for retiree medical benefits and COBRA healthcare benefits are also deposited directly into the JPM LC Account.  Cash deposited into the JPM LC Account in excess of the required $2 million minimum balance is periodically transferred to the Global Master Account.

Account owned by the Non-Debtor Affiliate generating the revenue or (ii) the Global Master Account.   Likewise, funds required to pay operating expenses incurred in connection with international operations may be distributed from a Bank Account owned by the obligated Non-Debtor Affiliate or via the Global Master Account.   The cash management processes used to receive revenue and distribute funds in connection with Non-Debtor Affiliate international operations are generally comprised of (i) the "**Corporate Process**," (ii) the "**Owner-Operator Process**," and (iii) the "**Split Contract Process**," each of which are discussed more fully below.

67.   <u>Corporate Process</u>.   Generally, under the Corporate Process, revenue, in the form of customer payments generated by Tidewater's operations and/or subsidiaries based in the United Kingdom, West Africa, Romania, Trinidad, India, Singapore, Qatar, and the UAE, is initially deposited into the Global Master Account rather than any of the Bank Accounts owned by the Non-Debtor Affiliate operating subsidiaries contractually entitled to such funds (each a "**Corporate Operator**" and, collectively, the "**Corporate Operators**").[18]   To satisfy operating expenses payable to local individuals or entities, the Corporate Operators submit funding requests to Tidewater Parent, generally on a monthly basis, which result in fund transfers from the Global Master Account to one or more Bank Accounts (each a "**Corporate Operating Account**") owned by the requesting Corporate Operator and maintained in the country where operations are conducted.   Corporate Operators receive invoices from suppliers that require payment to be made in different currencies.   The Corporate Operators generally maintain a separate Corporate Operating Account denominated in the local currency required to pay local currency operating expenses.[19]   After cash is transferred from the Global Master Account,

---

[18] Although uncommon, customers may occasionally remit payments directly to a Bank Account owned by a Corporate Operator.

[19] As discussed more thoroughly herein, when funds are transferred to or from the Global Master Account in a currency other than USD, Tidewater Parent uses a standard currency exchange process (the "**FX Bank Process**") to

amounts owed to local employees and contractors (who are citizens of the country in which they are employed or provide services), local vendors, and taxing authorities, and other expenses payable locally are paid from the Corporate Operating Account that received the requested funds. Operating expenses payable to individuals or entities not located in the same country as the obligated Corporate Operator are generally paid by Tidewater Parent, on behalf of the Corporate Operator, with funds from the Global Master Account, which are converted to the required currency via the FX Bank Process.

68.     In addition to Corporate Operators engaged in providing offshore service vessels and marine support services, Non-Debtor Affiliates, Tidewater Crewing Limited, a Cayman Islands company ("**Tidewater Crewing**"), and Tidewater Support Services Limited, an England company ("**Tidewater Support**"), each provide operational and administrative support to both Debtors and Non-Debtor Affiliates and are subject to cash management processes very similar to the Corporate Process.

69.     Tidewater Crewing employs Tidewater employees who work outside of the United States, including employees who provide services aboard offshore vessels operated by both the Debtors and Non-Debtor Affiliates (the "**Offshore Employees**").  To facilitate payroll for foreign Offshore Employees, Tidewater Crewing owns the Bank Account ending in 1630 (the "**International Crewing Payroll Account**") and maintained at Royal Bank of Scotland ("**RBS**").  The International Crewing Payroll Account is a multi-currency account containing separate balances denominated in British Pounds ("**GBP**") and Euros.  Payroll obligations for U.S. citizens working outside the United States, including American Offshore Employees, are effected through the Bank Accounts ending in 6924 (ACH and wire transfers) and 4864 (paper

---

convert the funds to the appropriate currency prior to depositing such funds in the Global Master Account or distributing such funds to a non-USD-denominated Bank Account.

RLF1 17566977V.1

checks) (the "**Domestic Crewing Payroll Accounts**" and, together with the International Crewing Payroll Account, the "**Offshore Payroll Accounts**"), each of which is owned by Tidewater Crewing, denominated in USD, and maintained at JPM.  Cash required to fund payroll-related obligations for all Offshore Employees is initially transferred from the Global Master Account to the appropriate Offshore Payroll Account.  Thereafter, the funds are transferred to the Offshore Employee accounts on record and/or the appropriate taxing authorities, as applicable.

70.    Tidewater Support is the employer of all employees based in the Aberdeen, Scotland office (collectively, the "**Aberdeen Employees**"), which provides operational support for both Debtors and Non-Debtor Affiliates, including management of the procurement process for operations based in the United Kingdom and the African continent. Cash required to fund payroll-related obligations for the Aberdeen Employees is initially transferred from the Global Master Account to the Bank Account ending in 4752 (the "**Aberdeen Account**"), owned by Tidewater Support, denominated in GBP, and maintained at RBS.  Thereafter, funds are distributed from the Aberdeen Account to the Aberdeen Employees, taxing authorities, and/or suppliers of goods, as applicable.

71.    <u>Owner-Operator Process</u>.  Generally, under the Owner-Operator Process, revenue, in the form of customer payments generated by Non-Debtor Affiliates based in Norway, Mexico, Canada, and Saudi Arabia, is deposited directly into a Bank Account (each an "**International Operating Account**") owned by the individual Debtor or Non-Debtor Affiliate contractually entitled to the funds (each an "**Owner-Operator**" and, collectively, the "**Owner-Operators**").[20]  Operating expenses incurred by each Owner-Operator including, among others,

---

[20] Although uncommon, customers may occasionally remit payments directly to the Global Master Account rather than an International Operating Account.

amounts owed to local employees and contractors, local vendors, and local taxing authorities, are then paid with funds distributed from an International Operating Account owned by the same Owner-Operator.[21]  In some instances, funds from the relevant International Operating Account are transferred directly to the ultimate payee.  Alternatively, the required funds may initially be transferred to another Bank Account owned by the obligated Owner-Operator or a Non-Debtor Affiliate with operations in the same country before such funds are distributed to the ultimate payee.

72.     Because Owner-Operators sometimes receive non-USD-denominated payments in excess of anticipated operating expenses payable in the same currency, excess non-USD funds are periodically exchanged for USD pursuant to the FX Bank Process and deposited into the Global Master Account.

73.     <u>Split Contract Process</u>.  The Split Contract Process is used in connection with Tidewater's operations based in Egypt, Thailand, Australia, Colombia, Brazil, Angola, and Nigeria.  Under the Split Contract Process, customer payments received by certain Non-Debtor Affiliates may be paid partially in USD and partially in a non-USD currency based upon the underlying contract.  Payments remitted in a foreign currency are deposited into a non-USD Bank Account owned by the Non-Debtor Affiliate that generated the revenue (each, a "**Split Contract Operating Account**" and, collectively, the "**Split Contract Operating Accounts**").  Payments remitted in USD are generally deposited into the Global Master Account.

74.     Operating expenses invoiced in the applicable local currency — including, among others, obligations owed to local employees and contractors (who are citizens of the country where they are employed and/or provide services), local vendors, and taxing authorities

---

[21] Operating expenses payable to individuals or entities not located in the same country as the obligated Owner-Operator may be paid from the Global Master Account.

RLF1 17566697V.1

— are paid with funds from the obligated Non-Debtor Affiliate's Split Contract Operating Account denominated in the same currency.[22]  If customer payments deposited into a Non-Debtor Affiliate's Split Contract Operating Account(s) are insufficient to cover all related operating expenses, the Non-Debtor Affiliate will submit a funding request to Tidewater Parent for the funds necessary to cover the deficiency, which results in a transfer of funds from the Global Master Account.[23]  If, however, non-USD-denominated deposits in a Split Contract Operating Account exceed the operating expenses payable therefrom, the excess funds are periodically transferred to Tidewater Parent, exchanged for USD, and deposited into the Global Master Account.

75.    FX Bank Process.  Foreign currency fluctuations may cause the value of the revenue and net assets associated with Tidewater's international operations to vary.  To minimize the financial impact of foreign currency fluctuations, Tidewater attempts to (i) match the currency of the operating costs with the currency of related revenue streams and (ii) avoid maintaining large non-USD-denominated cash balances.  Accordingly, the Debtors often utilize the FX Bank Process in the ordinary course of business to perform foreign currency spot trades ("**FX Spot Trades**") with foreign exchange banks (each an "**FX Bank**" and, collectively, the "**FX Banks**") to settle certain transactions between Tidewater Parent and Non-Debtor Affiliates and/or third-party vendors in foreign countries on behalf of Non-Debtor Affiliates.  For example, because certain Debtors and Non-Debtor Affiliates sometimes receive non-USD-denominated payments in excess of anticipated operating expenses payable in the same currency, excess non-USD funds are periodically exchanged for USD pursuant to the FX Bank Process and deposited

---

[22] In some circumstances, payments required to satisfy supplier invoices submitted to a Non-Debtor Affiliate subject to the Split Contract Process are distributed directly from the Global Master Account.

[23] If necessary, USD from the Global Master Account are exchanged for the applicable foreign currency prior to executing the fund transfer request.

31

into the Global Master Account.  Likewise, if, due to timing, non-USD denominated funds in Debtor and Non-Debtor bank accounts are not sufficient to cover payment of operating expenses in the local currency, a funding request is submitted to Tidewater Parent, and funds in the local currency are purchased and transferred to the applicable entity through the FX Bank Process.

76.    Pursuant to the FX Bank Process, currency exchange transactions are generally effected by Tidewater Parent to ensure greater control and limit the risks associated with the currency exchange process.  When a currency exchange is required, Tidewater Parent uses the Bloomberg Foreign Exchange platform to obtain bids from the FX Banks and executes FX Spot Trades to the FX Bank offering the best exchange rate.  The funds to be exchanged are transferred to (or from) Tidewater Parent from (or to) the FX Bank, as applicable.  Once the currency has been exchanged, the funds are transferred between the applicable FX Banks and the Global Master Account, a non-USD-denominated Non-Debtor Affiliate Bank Account, and/or the appropriate third party, as applicable.

77.    <u>Investment of Unencumbered Cash</u>.  Non-Debtor Affiliate Tidewater Marine International, Inc. owns two Bank Accounts used to invest the Debtors' excess cash, including the Bank Account ending in 8593 maintained at UBS (the "**UBS Investment Account**"), which, I am informed, holds approximately $508 million, and the Bank Account ending in 7504 maintained at RBC Royal Bank (the "**RBC Investment Account**" and, together with the UBS Investment Account, the "**Investment Accounts**"), which, I am informed, holds approximately $148 million.  The bulk of the cash in the Investment Accounts, approximately $600 million, represents borrowings under the Credit Agreement, which, along with the other funds held in the Investment Accounts, is unencumbered and not subject to any lien or third-party security interests.

32

78.     The Investment Accounts were chosen in accordance with the Tidewater Investment Policy (the "**Investment Policy**"), which is designed to achieve the maximum possible return while preserving capital and minimizing default risk.  The RBC Investment Account is a "time deposit" account that allows the Debtors to earn annual interest on the deposits in the RBC Investment Account.  Cash held in the UBS Investment Account is invested in a money market account that earns varying rates of interest through investments in high quality money market instruments; primarily comprised of short-term United States government securities.[24]  As of the Petition Date, the funds deposited into the Investment Accounts earn, on average, interest at an annual rate of approximately 0.7%.

79.     It is my understanding that the Debtors, in the ordinary course of business, monitor cash available in the Global Master Account relative to anticipated, near-term disbursements to be made from the account.  To maximize the return on available cash and ensure sufficient funds for operations, the Debtors typically maintain a daily ending balance of $1 million to $2 million in the Global Master Account.  To maintain the desired level of funds in the Global Master Account, funds are transferred to or from the Investment Accounts, as needed.

80.     In addition to the Investment Accounts, Tidewater Parent has established certain Rabbi trusts to fund benefits payable under the Tidewater Supplemental Savings Plan (the "**SSP**"), and the Tidewater Supplemental Executive Retirement Plan and Tidewater International Supplemental Executive Retirement Plan (collectively, the "**SERPs**").  To facilitate contributions by, and disbursement to, employees on account of the SSP, Tidewater Parent owns the Bank Account ending in 6D34 (the "**SSP Account**") and maintained at Bank of America, N.A. Tidewater Parent also owns (i) the Bank Accounts ending in 2042 and 2051 and maintained at

---

[24] Cash invested in the UBS Investment Account is invested in the Select (Cay) Government Preferred Fund Ltd. (the "**Treasury Fund**").  The Treasury Fund invests at least 80% of its total assets in cash, securities issued by the U.S. Treasury, and related repurchase agreements.

33

Comerica Bank ("**Comerica**") to receive contributions and make disbursements on behalf of the SERPs and (ii) one cash account ending in 2146 and maintained at UBS Financial Services Inc. ("**UBS**") to receive SERP contributions from Tidewater Parent, consolidate cash from the SERP Investment Accounts (as defined herein), and disburse funds to Comerica (the "**SERP Cash Accounts**").  Tidewater Parent also owns five investment accounts ending in 2102, 2103, 2104, 2114, and 2117 maintained at UBS that hold various fixed income, equity, and short-term investment securities that can be liquidated to fund disbursements made under the SERPs (collectively, the "**SERP Investment Accounts**").  As of the March 31, 2017, (i) the SSP Account and (ii) the SERP Cash Accounts and the SERP Investment Accounts held cash and investments totaling approximately $6.1 million and $8.7 million, respectively.

81.    Bank Fees.  In the ordinary course of business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts, certain service charges and other fees, costs, and expenses charged by the Banks (collectively, the "**Bank Fees**").  As a result of the Debtors' extensive need to use Bank Accounts in the ordinary course of business, I am informed that the Debtors pay, on average, approximately $15,000 per month on account of Bank Fees.

82.    Debit/Credit Card Program.    As of the Petition Date, approved procurement and business-related expenses for travel, goods, and services are billed directly to the Debtors on account of approximately five (5) Debtor-sponsored credit and debit cards administered by Whitney Bank (the "**Debit/Credit Card Program**").  All obligations owed to Whitney Bank on account of the Debit/Credit Card Program are unsecured.  As of the Petition Date, the Debtors do not believe any prepetition amounts are due to Whitney Bank on account of the Debit/Credit Card Program.  However, there is a possibility of prepetition amounts owing

34

because, among other things, charges by employees in various locations globally may not have been offset against the pre-funded balance due to processing delays by merchants.  To the extent any such amounts are due, the Debtors estimate such obligations should not exceed $30,000.  To avoid any disruptions to the Debit/Credit Card Program, and out of an abundance of caution, the Debtors request authority to satisfy up to an aggregate of $30,000 in prepetition obligations that may be owing to Whitney Bank on account of the Debit/Credit Card Program under the Proposed Interim Order and authority to pay all prepetition obligations that may be owing to Whitney Bank on account of the Debit/Credit Card Program under the Proposed Final Order.

83.     The Debtors also seek authority to continue utilizing the Debit/Credit Card Program postpetition in the ordinary course of business.  I believe discontinuing the Debit/Credit Card Program will disrupt the Debtors' administrative procedures related to certain employee business expenses, travel, and procurement processes.

84.     <u>Existing Business Forms and Checks</u>.  The Debtors utilize numerous preprinted business forms in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these Chapter 11 Cases, the Debtors respectfully request that the Court authorize the Debtors to continue to use all preprinted checks, correspondence, and other business forms (collectively, the "**Business Forms**") including, without limitation, business cards, letterhead, envelopes, expense reports, and invoices as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of

ordering entirely new Business Forms as required under the Operating Guidelines for Chapter 11

Cases (the "**UST Guidelines**") issued by the Office of the United States Trustee for Region 3.

85.     As a practical matter, because of the Debtors' corporate and financial

structure, I believe it would be extremely difficult, time consuming, and expensive to establish

and maintain a separate cash management system for each Debtor and Affiliated Non-Debtor.

Requiring the Debtors to adopt new cash management systems at this early and critical stage of

these cases would create unnecessary administrative burdens, and be extraordinarily disruptive to

the operation of their global network.  Based on the foregoing, I believe the relief requested in

the cash management motion is in the best interests of the Debtors, their estates, and all parties in

interest, and should be granted in all respects.

**C.     Employee Wages and Benefits Motion**

86.     Pursuant to this motion (the "**Employee Wages and Benefits Motion**"),

the Debtors request authority to: (a) pay, in their sole discretion, all obligations incurred, directly

or indirectly, under or relating to the Debtors' Base Compensation Obligations and Employee

Benefit Plans (each as defined below), all related expenses, and all fees and costs incident to the

foregoing, including amounts owed to third-party administrators; and (b) maintain and continue

to honor and pay, in their sole discretion, all amounts with respect to the Debtors' business

practices, programs, and policies for their employees.  The Debtors further request that the Court

direct financial institutions to receive, process, honor, and pay all checks presented for payment

and to honor all fund transfer requests related to such obligations.

87.     <u>Employee Obligations</u>.   For purposes of the Employee Wages and

Benefits Motion, the term "**Employees**" includes all persons, as of the Petition Date, entitled to

compensation, benefits, reimbursement, or any other similar payment as a consequence of being

employed by the Debtors.  As of the Petition Date, Tidewater employs approximately 328 full

36

time Employees.[25] The majority of Employees provide operational services on the Debtors' offshore vessels. The remaining Employees provide a variety of management, administrative, and other support services in Houston, Texas and New Orleans, Louisiana, along with various international locations as required.

88. <u>Base Compensation Obligations</u>. In the ordinary course of business, the Debtors incur and pay obligations relating to Employees' salaries and wages and, for certain eligible Employees, overtime, certain service premiums, and allowances (the "**Base Compensation Obligations**"). Base Compensation Obligations are paid on a monthly or semi-monthly schedule. As of the Petition Date, I understand the Debtors owe approximately $960,000 in Base Compensation Obligations to Employees. Under the Proposed Interim Order, no proposed payments to any individual Employee on account of Base Compensation Obligations would exceed $12,850.

89. <u>Payroll Taxes</u>. The Debtors are required by law to withhold from Employees' salaries and wages certain amounts related to federal, state, and local income taxes, social security taxes, Medicare taxes, and other taxes imposed by law (each, a "**Withholding Tax**") and to remit any such withheld amounts to the appropriate Taxing Authorities.

90. The Debtors are also required to make certain additional payments from their own funds in connection with the Withholding Taxes. In the United States, these payments include matching payments on account of social security and Medicare taxes and, subject to certain limitations, additional amounts based upon a percentage of gross payroll for, among other things, state and federal unemployment insurance (collectively, the "**Contribution Taxes**;" together with the Withholding Taxes, the "**Payroll Taxes**"). The Debtors remit federal

---

[25] Certain of the Debtors' Non-Debtor Affiliates also employ approximately 4,330 employees. The Debtors seek authority to pay certain of these employees under the Debtors' Cash Management Motion.

RLF1 17566977V.1

Contribution Taxes each payroll period and state Contribution Taxes at frequencies determined under applicable law.  I understand that, on account of Payroll Taxes, the Debtors withhold and contribute approximately $380,000 per month.

91.   As of the Petition Date, the Debtors estimate they owe approximately $159,000 in accrued and outstanding Payroll Tax obligations.

92.   Garnishments.  In the ordinary course of processing payroll checks for Employees, the Debtors may be required by law to withhold, from certain Employees' wages, amounts for garnishments including tax levies, child support, court-ordered garnishments, and allotments[26] (collectively, "**Garnishments**").  Amounts withheld on account of Garnishments are remitted to the appropriate state, federal, or non-U.S. authorities.  On average, approximately $6,000 per month is withheld from Employees' salaries and wages on account of Garnishments.

93.   Expense Reimbursements.   The Debtors' Employees incur various expenses (the "**Expenses**") in connection with their employment duties, such as travel and meal expenses.  A substantial portion of the Expenses are obligations related to crew travel costs that vary in amount depending on the number and location of vessels working at any time.  Because of the irregular nature of requests for reimbursements, I am informed that it is difficult to determine the amount of Expenses outstanding at any given time.  The Debtors, however, estimate the amount of outstanding Expenses, as of the Petition Date, is approximately $115,000.

94.   Employee Benefit Plans.  The Debtors have established certain benefit plans and policies for their Employees that provide, among other benefits, medical, dental, and vision plans, life insurance, short- and long-term disability insurance, retirement plans, severance, and paid time off (collectively, the "**Employee Benefits**").  The Debtors deduct

---

[26] Certain domestic and foreign laws require the Debtors to remit qualifying Employees' wages to requested persons at the Employees' elections.

RLF1 17566977V.1

specified amounts from the Employees' wages in connection with certain Employee Benefits. Most of the Employee Benefits are administered by third parties.

95.    <u>Medical, Vision, Dental and Prescription Drug Benefits</u>.    The Debtors administer the following health benefits plans through various insurers to eligible Employees and their families including, among other things: medical, vision, dental, and prescription drug benefits:

| **Eligible Employees** | **Type of Benefits** | **Benefit Providers** |
|---|---|---|
| Domestic Employees | Medical | UnitedHealthcare |
| | Dental | Delta Dental |
| | Vision | EyeMed |
| | Flex Plan / Health Savings Accounts | Optum Bank |
| Expatriate Employees | Medical | Aetna International |

96.    Several of the main benefit providers listed above (each, a "**Health Benefits Provider**") are preferred provider organizations under which improved benefits are available when using a doctor, dentist, or other healthcare provider within the network of preferred providers.  In the ordinary course of business, each Health Benefits Provider premium may vary as the number of Employees enrolled in the Health Benefits Provider plans changes and as the Health Benefits Provider administrators change their prices.

97.    I understand the Debtors' average monthly cost with regard to medical insurance premiums is approximately $70,000.  As of the Petition Date, the Debtors believe no payments for the Employees' medical insurance premiums are accrued and outstanding.

98.    In addition, the Debtors pay medical claims submitted by Employee participants under the UnitedHealthcare administered plan (the "**Health Benefit Claims**").  As a

self-funded plan, the Debtors withhold specified portions of Employee wages and apply such funds to the satisfaction of claims.  Health Benefit Claims are paid on a weekly basis, but are not always timely submitted by participants.  The average monthly amount of Health Benefit Claims is approximately $317,000.  I understand that the Debtors estimate approximately $475,500 of Health Benefit Claims are outstanding based on the Debtors' calculated monthly lag rate, including those which may not yet have been submitted.

99.    <u>Life Insurance, AD&D Insurance, and Long-Term Disability</u>.    The Debtors administer life insurance (the "**Life Insurance Plan**"), AD&D insurance (the "**AD&D Insurance Plan**"), and long-term disability benefits (the "**Long-Term Disability Plan**") to eligible Employees.   As of the Petition Date, the Debtors estimate they owe approximately $61,500 in outstanding liabilities related to Life Insurance, AD&D Insurance Plan, and Long-Term Disability Plan costs.

100.    <u>Health Savings Accounts</u>.  The Debtors provide eligible Employees with "seed money" and incentive contributions for their respective Health Savings Accounts ("**HSAs**").  The HSAs are administered by OptumBank and cost the Debtors approximately $150,000 annually.  Employer contributions into HSAs are made subsequent to each payroll.  As of the Petition Date, the Debtors estimate approximately $12,500 of outstanding prepetition contributions are owed pursuant to the HSA plan.

101.    <u>Savings and Retirement Plan</u>.  The Debtors participate in a Savings and Retirement Plan comprised of a 401(k) component and defined contribution component, for the benefit of certain eligible Employees (the "**S&R Plan**").  The S&R Plan is provided and administered by Bank of America Merrill Lynch with the assistance of Tidewater Parent.

RLF1 17566977V.1

102.    All Employee plan contributions, employer matching contributions, and related administration fees have been fully funded as of the Petition Date.    Accordingly, I understand that, as of the Petition Date, no prepetition amounts are due on account of the S&R Plan.

103.    <u>Employee Supplemental Savings Plan</u>.    As previously discussed, the Debtors also participate in the SSP administered by Bank of America Merrill Lynch.    The SSP allows eligible participants to defer up to 100% of their annual bonus and any amount returned from the S&R Plan for discrimination testing, and continues the S&R Contribution scheme above the statutory limit for S&R Plan Employee contributions (such contributions, "**Supplemental S&R Contributions**").    I am informed that, as of March 31, 2017, the Debtors hold approximately $6.1 million in a Rabbi trust for the benefit of the SSP participants and all Supplemental S&R Contributions and related administration fees have been fully funded.    The Debtors reserve the right to request authority to honor SSP-related obligations pursuant to a separate motion.

104.    <u>Tidewater Supplemental Executive Retirement Plans</u>.    Eligible participants of Tidewater Parent or Tidewater Corporate Services whose service began prior to March 31, 2010, participate in the SERPs.    I am informed that, as of March 31, 2017, the Debtors hold approximately $8.8 million in a Rabbi trust for the benefit of SERP participants.    The Debtors historically pay approximately $77,000 per month pursuant to the Tidewater Supplemental Executive Retirement Plan and approximately $13,000 per month pursuant to the Tidewater International Supplemental Executive Retirement Plan.    Pursuant to the Employee Wages and Benefits Motion, the Debtors request authority to continue to honor SERP obligations in the

ordinary course pursuant to a final order approving the Employee Wages and Benefits Motion up to $180,000 in the aggregate.

105.    Defined Benefit Plan.    The Debtors maintain a legacy Defined Benefit Plan, administered by Whitney National Bank, for the benefit of certain employees and officers employed prior to 1996.  The Debtors do not intend to further fund this program in fiscal year 2017.  While no employer funding is required into this plan, maintenance of the plan incurs certain administrative, advisory, and consultant fees totaling approximately $365,000 annually, the vast majority of which is paid from the trust account.  As of the Petition Date, no prepetition fees related to the Defined Benefit Plan are outstanding.  The Debtors seek authority, upon entry of a final order approving the Employee Wages and Benefits Motion, to make payments towards the Defined Benefit Plan in the ordinary course up to $100,000 in the aggregate.

106.    The Debtors' board of directors consists of 11 directors (the "**Directors**"), 10 of which are independent.  In the ordinary course of business, the Debtors reimburse reasonable out-of-pocket expenses ("**Director Expenses**"), including attorneys' fees to the extent permitted by section 145(e) of the Delaware General Corporation Law ("**Advancement Costs**"), on a quarterly basis (or as invoiced) to the Directors.  The Debtors do not believe there are any accrued and unpaid Director Expenses as of the Petition Date, however it is possible that certain Directors may have incurred prepetition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtors after the Petition Date. Historically, average Director Expenses for any given month are approximately $25,000 as calculated based on the year, and the Debtors estimate that the amount of postpetition Director Expenses will be consistent with past amounts.  The Debtors seek authority, upon entry of a final order approving the Employee Wages and Benefits Motion, to pay the actual amount of Director

RLF1 17566977V.1

Expenses, along with any other Director Expenses that have accrued but are unpaid as of the Petition Date, up to an aggregate cap of $150,000 and subject to the Review Procedure set forth in the Proposed Final Order.

107.    I believe that due to the specialized nature of the Debtors' businesses, and their small, but highly-skilled workforce, Employees of an equivalent level of skill and knowledge would be difficult and costly for the Debtors to find and integrate into their operations in an efficient manner.

108.    I also believe it is necessary to continue payment to the administrators of programs related to Employee Benefits.  Without the continued services of these administrators, the Debtors will be unable to continue to honor their Employee Obligations in an efficient and cost-effective manner.

109.    Based on the foregoing, I believe the relief requested in the Employee Wages and Benefits Motion is in the best interests of the Debtors, their estates, and all parties in interests and should be approved.

**D.     Insurance Motion**

110.    Pursuant to this motion (the "**Insurance Motion**"), the Debtors request entry of interim and final orders authorizing them to continue and/or renew their existing liability, property, and other insurance policies and programs (collectively, the "**Insurance Programs**"), continue and/or renew their existing surety and performance bond programs (collectively, the "**Surety Bond Program**"), and pay any undisputed prepetition obligations up to a cap of $405,000, as well as, on an ongoing basis, any postpetition obligations thereunder (the "**Insurance and Surety Bond Obligations**").

111.    The Debtors maintain various liability and property-related Insurance Programs from various insurance carriers ("**Insurance Carriers**").  The Debtors also enter into

RLF1 17566997V.1

relationships with affiliates and brokers necessary for maintaining the Insurance Programs at competitive rates.

112.    <u>Workers' Compensation, Liability, Property, and Other Insurance Programs and Policies</u>.    The Debtors maintain various liability and property-related Insurance Programs concerning, among other things, directors' and officers' liability, transportation, travel and commercial automotive claims, commercial property damage, maritime-related damage, umbrella and excess liability claims, and various other liabilities.    I believe continuation of these policies is essential to the ongoing operations of the Debtors' businesses and required under certain of the Debtors' prepetition agreements.    A list of Insurance Programs and respective Insurance Carriers is annexed to the Insurance Motion.

113.    The Debtors are required to pay premiums under the Insurance Programs (the "**Insurance Premiums**") based upon a fixed rate established and billed by the applicable Insurance Carrier.    The current coverage period for certain policies under the Insurance Programs ends on March 31, 2018.    The Debtors' respective premiums due under various Insurance Programs currently in place were paid in advance, either by the Debtors directly or by the Brokers (as defined below) on the Debtors' behalf.    It is my understanding that $70,000 in prepetition Insurance Premiums remains outstanding as of the Petition Date.

114.    Certain insurance policies under the Debtors' Marine Program impose loss retention obligations on the Debtors, which include deductibles and retention payments (collectively, the "**Loss Retentions**").    Loss Retentions are paid based on the amount of claims made against the applicable insurance policies (as calculated in accordance with such insurance policies) and may relate to covered claims that arose prior to the Petition Date.    The Debtors estimate Loss Retentions may be liquidated over a five to seven-year period and ultimately

44

aggregate between $20 million and $24 million. Failure to pay the Loss Retentions may result in the insurance companies seeking to either terminate or not renew coverage under an insurance policy.

115. <u>Insurance Brokers</u>. The Debtors employ certain insurance brokers and actuarial service providers (the "**Brokers**") to assist them with procuring and negotiating certain of the Insurance Programs, processing claims, and remitting payments to the Insurance Carriers on behalf of the Debtors. The Debtors pay the Brokers approximately $1,122,000 over the course of a two-year term ending April 1, 2019. The Debtors believe that all prepetition Brokers' fees have been paid in full.

116. <u>Surety Bond Program</u>. In the ordinary course of business, the Debtors are required to provide surety bonds, performance bonds, and letters of credit to certain third parties, including governmental units and other public agencies, to secure the Debtors' payment or enforcement of certain obligations. These obligations relate to, among other things, (i) performance of contracts in Mexico; (ii) customs duties; (iii) environmental obligations; (iv) taxes and regulations; and (v) contract bids. A list of Debtor surety bonds, performance bonds, and letters of credit in the Surety Bond Program is attached to the Insurance Motion.

117. The premiums for the Surety Bond Program (the "**Surety Premiums**" and, together with the related indemnity obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis, unless the performance or surety bond is put in place for a specific limited contract or bid. Payment is remitted by the Debtors when the bonds are issued and annually upon each renewal. In the 12 months preceding the Petition Date, the Surety Premiums totaled less than $55,000. As of the Petition Date, the Debtors have approximately $6 million in outstanding surety bonds.

RLF1 17566977V.1

118.    I believe the nature of the Debtors' business operations makes it essential for the Debtors to maintain their Insurance Programs and the Surety Bond Program on an ongoing, uninterrupted basis.   Continuation of these policies is essential to the ongoing operations of the Debtors' business, with certain coverage being required either by regulation or pursuant to certain of the Debtors' customer contracts.   The nonpayment of any Insurance Premiums, Loss Retentions, or related fees under the Insurance Programs and Surety Bond Program could result in a loss of future customer contracts and the Insurance Carriers attempting to terminate their existing policies, declining to renew their insurance policies, or refusing to enter into new insurance agreements with the Debtors in the future.   I believe that if the Insurance Programs and Surety Bond Program are allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and/or property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ability to successfully reorganize.   Furthermore, I am informed that the Debtors are required by the UST Operating Guidelines to maintain certain of the Insurance Programs.   Accordingly, the Debtors should continue the Insurance Programs and Surety Bond Program as such practices, programs, and policies were in effect as of the Petition Date and be authorized to satisfy any Insurance and Surety Bond Obligations as they come due.

119.    Based upon the foregoing, I believe the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

## E.    Utilities Motion

120.    To ensure the uninterrupted supply of water, electricity, natural gas, waste management, telephone, and other utility services (collectively, the "**Utility Services**"), which are critical to the operations of the Debtors' business, by this motion (the "**Utilities Motion**"),

the Debtors request entry of interim and final orders (i) approving the Debtors' proposed form of adequate assurance of payment for postpetition Utility Services; (ii) establishing procedures for resolving objections filed by providers of Utility Services ("**Utility Providers**") relating to the adequacy of the proposed adequate assurance; and (iii) prohibiting the Utility Providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of these Chapter 11 Cases or that a debt owed by the Debtors for Utility Services rendered before the Petition Date was not paid when due.

121.    To operate their businesses and manage their properties, the Debtors obtain Utility Services from a number of Utility Providers.  Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the success of the Debtors' reorganization.  Should any Utility Provider alter, refuse, or discontinue service, even briefly, the Debtors' business operations could be severely disrupted.  The Debtors operate a complex global business with significant operations in numerous countries around the world.  Interruption of the Utility Services provided at any of their locations would disrupt necessary communication and coordination between the Debtors' employees, vendors, customers, and various regulatory authorities, and would prevent the provision of necessary support to these same parties.  Such interruption would negatively impact the Debtors' reorganization efforts and all parties in interest.

122.    I believe and am advised that the proposed procedures are necessary to the success of the Chapter 11 Cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by Utility Providers for adequate assurance in a disorganized manner during the critical first weeks of the Chapter 11 Cases.  Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding — on or after the thirtieth (30th)

47

day following the Petition Date — that it is not adequately protected and threatening to discontinue service or making an exorbitant demand for payment to continue service. Discontinuation of Utility Service could disrupt operations and jeopardize the Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates, and creditor recoveries. I believe the relief requested in the Utilities Motion will ensure the continuation of the Debtors' business at this critical juncture as the Debtors transition into chapter 11 and that the relief requested provides the Utility Providers with a fair and orderly procedure for determining requests for additional adequate assurance.

123. Based upon the foregoing, I believe the relief requested in the Utilities Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

**F.      Taxes Motion**

124. By this motion (the "**Taxes Motion**"), the Debtors seek authority to remit and pay taxes, assessments, fees, and other charges in the ordinary course of business (without regard to whether such obligations accrued or arose before or after the Petition Date) including any such taxes, assessments, fees, and other charges subsequently determined, upon audit or otherwise, to be owed (collectively, the "**Taxes and Assessments**"). The Debtors also request that the Court authorize all applicable financial institutions, when the Debtors so request, to receive, process, honor, and pay any and all checks or electronic payment requests relating to Taxes and Assessments.

125. In the ordinary course of operating their business, the Debtors collect, withhold, and incur an assortment of Taxes and Assessments that they remit periodically to various federal, state, local, and foreign taxing, licensing, regulatory, and other governmental authorities (collectively, the "**Taxing Authorities**"). For example, the Debtors' U.S.-flag vessels

48

are required by law to pay certain custom duties on repairs performed overseas upon reentry into the United States.  The Debtors' U.S.-flag vessels are also required by law to obtain and maintain certain seaworthiness classifications and certifications from the American Bureau of Shipping. Without these classifications and certifications, the Debtors' U.S.-flag vessels are not permitted to operate in U.S. commerce.  The continued payment of the Regulatory Assessments, including any amounts due and owing on account of prepetition Regulatory Assessments, is crucial to the continued operation of the Debtors' business.

126.    The Taxes and Assessments generally fall into the following categories, each as more fully described in the Taxes Motion:  Franchise Taxes, Sales and Use Taxes, Property Taxes, State Taxes, Foreign Taxes, and Regulatory Assessments.  The Debtors pay the Taxes and Assessments on a monthly, quarterly, or annual basis as required by applicable laws and regulations.  In the twelve months ending January 31, 2017, the Debtors paid approximately $7.7 million in Taxes and Assessments.

127.    As of the Petition Date, the Debtors estimate that approximately $78,000 in Franchise Taxes, $3,000 in Sales and Use Taxes, $2,061,000 in Property Taxes, $91,000 in State Taxes, $2,960,000 million in Foreign Taxes, and $450,000 in Regulatory Assessments relating to periods prior to the Petition Date will become due and owing to the Taxing Authorities after the Petition Date.

128.    Pursuant to the Proposed Interim Order, the Debtors request authority to pay up to $3,000 in Sales and Use Taxes, $10,000 in Foreign Taxes, and $10,000 in Regulatory Assessments.  Pursuant to the Proposed Final Order, the Debtors request authority to pay all remaining prepetition amounts in the ordinary course of business.

129. The amounts of the Taxes and Assessments listed above are good faith estimates based on the Debtors' books and records and remain subject to potential audits and other adjustments. As such, the Debtors also seek authorization to pay any prepetition Taxes and Assessments due and owing following audit and review pursuant to the Proposed Final Order.

130. The Debtors believe that certain Taxes and Assessments collected prepetition are not property of the Debtors' estates but are instead held in trust for the Taxing Authorities. The Debtors also seek to pay certain prepetition Taxes and Assessments in order to, among other things, forestall the Taxing Authorities from taking actions that may interfere with the Debtors' administration of these Chapter 11 Cases including the commencement of personal liability actions against directors, officers, and other key employees (whose full-time attention to the Debtors' Chapter 11 Cases is required to avoid business disruptions and maximize the value of the Debtors' estates), asserting liens on the Debtors' property, and assessing penalties and/or significant interest on past-due taxes.

131. Based upon the foregoing, I believe the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

## G.    All Trade Motion

132. By this motion (the "**All Trade Motion**"), the Debtors request authority to pay in full, in the ordinary course of business, allowed prepetition claims of creditors that provide goods or services related to the Debtors' operations (each such claim, a "**Trade Claim**," and each holder of a Trade Claim, a "**Trade Creditor**") on the condition that the Trade Creditors continue to provide the Debtors with ordinary course trade terms.

133. In the ordinary course of business, the Debtors rely upon a variety of Trade Creditors to conduct operations. The Debtors incur numerous fixed, liquidated, and

undisputed payment obligations to the Trade Creditors in the ordinary course of business. During the twelve (12) months prior to the Petition Date the Debtors paid Trade Creditors, on average, approximately $4 million each month. As of the Petition Date, the Debtors estimate the total amount of Trade Claims outstanding is approximately $3.75 million, of which approximately $1.5 million will become due during the interim period.

134.    The goods and services provided by Trade Creditors are essential for the continued, uninterrupted operation of the Debtors' business. The Debtors anticipate that failure to pay the Trade Claims as they become due is likely to result in some Trade Creditors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms. Only some of the Trade Creditors have contracts with the Debtors that could be enforced if such Trade Creditors refuse to perform. Nonperformance by Trade Creditors could materially disrupt the Debtors' operations and adversely impact the value of the Debtors' business to the detriment of all parties in interest in these Chapter 11 Cases.

135.    As a result of the Debtors' efforts to build long-term relationships with vendors and service providers, the Trade Creditors are already familiar with the Debtors' assets and businesses and are in the best position to provide the Debtors with goods and services on commercially reasonable terms. Further, if the Trade Creditors refuse to perform their obligations, the Debtors may find it very difficult to locate replacement products and, even where it is possible to obtain replacement goods and services, doing so would likely cause substantial delays and increased costs.

136.    Trade Claims are unimpaired under the Prepackaged Plan and will be paid in full. Furthermore, I am informed that certain Trade Claims (a) will likely be entitled to

statutory priority under the Bankruptcy Code or (b) may give rise to maritime, shippers, warehouseman, mechanics, or other liens against the Debtors' property if the Debtors fail to satisfy such obligations.  Accordingly, because the relief requested herein seeks to alter only the timing, not the amount or priority, of such payments, granting the relief requested herein will not prejudice any other parties in interest.

137.    Based on the foregoing, I believe that the relief requested in the All Trade Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

**H.    NOL Motion**

138.    By this motion (the "**NOL Motion**"), pursuant to sections 105(a) and 362 of the Bankruptcy Code, the Debtors request entry of interim and final orders authorizing them to establish procedures (the "**Procedures**") to protect the potential value of the Debtors' consolidated net operating loss carryforwards ("**NOLs**") for use in connection with the Debtors' reorganization.  The Procedures apply to common stock of Tidewater Parent (the "**Common Stock**") and any options or similar rights (within the meaning of applicable U.S. Treasury regulations) to acquire such stock ("**Options**" and together with Common Stock, the "**Basic Stock**").  The Debtors are also seeking to expressly reserve the right, in the event the Prepackaged Plan is withdrawn, to seek amendments to the Procedures to also apply to claims against one or more of the Debtors.

139.    The Debtors have certain valuable tax attributes, which include, as of March 31, 2017, estimated NOLs in excess of $63.9 million (the "**Tax Attributes**").  Title 26 of the United States Code (the "**Tax Code**") generally permits corporations to carry forward their tax attributes to reduce future taxable income.  Accordingly, the Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter

11 plan, and potentially thereafter.  Accordingly, I believe the Tax Attributes could translate into future tax savings over time and any such savings could enhance the Debtors' cash position for the benefit of all parties in interest and contribute to the Debtors' efforts toward a successful reorganization.

140.   The Debtors' ability to use the Tax Attributes to reduce future tax liability is subject to certain statutory limitations.   Sections 382 and 383 of the Tax Code limit a corporation's use of its tax attributes to offset future income after that corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code ("**Section 382**" and such ownership change, an "**Ownership Change**").   Pursuant to section 382, an Ownership Change generally occurs when the percentage of a corporation's equity held by its "5-percent shareholders" (within the meaning of section 382) increases by more than 50 percentage points above the lowest percentage of ownership owned by such shareholder(s) at any time during the relevant testing period (usually three years).

141.   I believe that the Debtors' Tax Attributes would be adversely affected (and could be effectively eliminated) by an Ownership Change during the pendency of these cases.  If such an Ownership Change occurs, the valuation for determining the annual amount of useable Tax Attributes is expected to be at or close to zero, which may effectively eliminate the availability of such Tax Attributes.  It is therefore in the best interests of the Debtors and their stakeholders to restrict trading that could result in an Ownership Change before the effective date of a chapter 11 plan or other applicable bankruptcy court order.  This would protect the Debtors' ability to use the Tax Attributes during the pendency of these Chapter 11 Cases or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtors' sale or ownership of their assets, which may be significant in amount.  Although the

53

limitations imposed by Section 382 may be significantly lessened when an Ownership Change occurs pursuant to a confirmed chapter 11 plan (or applicable court order), the benefits of a confirmed plan (or court order) would not be applied retroactively to reduce limitations on tax attributes imposed by a previous Ownership Change.

142.    It is likely that any chapter 11 plan that contemplates a reorganization of the Debtors will involve the issuance of new common stock in the Debtors (or any successor to the Debtors) and the distribution of such stock to certain creditors in satisfaction, in whole or in part, of their respective claims against the Debtors.  This issuance and distribution likely would result in an Ownership Change.  In such event, it is possible that the special relief afforded by section 382(l)(5) of the Tax Code could be available to and beneficial for the Debtors, and that the Debtors would, therefore, seek to qualify the restructuring for such relief.  The Prepackaged Plan is not predicated on qualifying for such relief.  However, if the Prepackaged Plan is withdrawn, such relief may become unavailable if certain procedures and potential restrictions relating to the trading and accumulation of certain claims prior to the effective date of a chapter 11 plan are not effective *nunc pro tunc* to the Petition Date.  Accordingly, if the Prepackaged Plan is withdrawn, the Debtors expressly reserve the right to request a court order amending the Procedures.

143.    I believe the Procedures are necessary to preserve the Debtors' ability to use their Tax Attributes, while providing certain latitude for trading.  The Debtors' ability to preserve their Tax Attributes may be seriously jeopardized unless procedures are established immediately and *nunc pro tunc* to the Petition Date to ensure that trading in certain interests in is either precluded or closely monitored and made subject to Court approval.

**I.**     **Disclosure Statement and Prepackaged Plan Scheduling and Procedures Motion**

144.     By this motion (the "**Scheduling and Procedures Motion**"), the Debtors request that the Court enter an order (I) scheduling a combined hearing (the "**Combined Hearing**") to consider (a) the adequacy of the Disclosure Statement, (b) approval of the proposed procedures for soliciting votes on the Prepackaged Plan (the "**Solicitation Procedures**") including the deadline to vote to accept or reject the Prepackaged Plan (the "**Voting Deadline**"), and (c) confirmation of the Prepackaged Plan; (II) approving the procedures and deadline for objecting to the Prepackaged Plan and Disclosure Statement (the "**Objection Deadline**"); (III) approving the form and manner of notice (the "**Combined Notice**") of (x) the commencement of the Chapter 11 Cases, (y) deferral of the meeting of creditors under section 341 of the Bankruptcy Code (the "**341 Meeting**"), and (z) the Combined Hearing; (IV) extending the time for the Debtors to (i) file schedules of assets and liabilities and statements of financial affairs and (ii) convene the 341 Meeting, and conditionally waiving such requirements, subject to Debtors obtaining confirmation of the Prepackaged Plan within sixty (60) calendar days of the Petition Date.

145.     The table in paragraph 7 of this Declaration sets forth the relevant dates and deadlines related to the Restructuring as contemplated in the RSA and Prepackaged Plan including, among others, the deadline to mail the Combined Notice, the Voting Deadline, the Objection Deadline, and the anticipated date(s) of the Combined Hearing.

146.     Pursuant to the Prepackaged Plan, Class 3 (General Unsecured Claims) is the only class entitled to vote on the Prepackaged Plan.    Accordingly, on May 12, 2017, following execution of the RSA, the Debtors transmitted, through their claims and noticing agent, Epiq (as defined herein), a solicitation package ("**Solicitation Package**") to each holder of a Claim in Class 3.  The Solicitation Package includes the Disclosure Statement and the exhibits

thereto (including, among other things, the Prepackaged Plan, the RSA, and the Liquidation Analysis) and the Ballot (with instructions to properly vote to accept or reject the Prepackaged Plan). The Voting Deadline is June 12, 2017.

147. I have been informed by counsel that the Debtors' solicitation of the Prepackaged Plan is in compliance with the Bankruptcy Code and the Bankruptcy Rules. I also believe, based on discussion with counsel, that the proposed service of the Combined Notice will provide sufficient notice to all parties in interest of the commencement of the Chapter 11 Cases, the date, time, and place of the Combined Hearing, the procedures for objecting to the adequacy of the Disclosure Statement and/or Solicitation Package, and the procedures for objecting to confirmation of the Prepackaged Plan (including the release contained therein). Finally, I believe that scheduling the Combined Hearing to consider the Prepackaged Plan and Disclosure Statement, in combination with the aforementioned noticing and solicitation procedures, is necessary to allow the Debtors to prosecute the Chapter 11 Cases in an expeditious manner, thereby minimizing administrative costs and delays and avoiding operational disruptions to the Debtors' businesses.

148. Based on the foregoing, I believe the relief requested in the Scheduling and Procedures Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

## J.    Automatic Stay Motion

149. By this Motion (the "**Automatic Stay Enforcement Motion**"), the Debtors request entry of an order enforcing the protections of sections 362, 365, 525, and 541(c) of the Bankruptcy Code to aid in the administration of the Chapter 11 Cases and to help ensure the Debtors' global business operations are not disrupted. As previously noted, the Debtors, through their Non-Debtor Affiliates, conduct significant operations in foreign countries and, as a

result, incur obligations to foreign customers, employees, independent contractors, vendors, service providers, utility companies, taxing authorities, and other entities. Many of the Debtors' foreign creditors and contract counterparties do not transact business on a regular basis with companies that have filed for chapter 11 protection and, therefore, may be unfamiliar with the scope of a debtor in possession's authority to conduct its business and may be unaware of the protections of the automatic stay and other provisions of the Bankruptcy Code that assist debtors in possession during their chapter 11 cases and restructuring efforts.

150.    I have been informed that the protections afforded by sections 362, 365, 541, and 525 of the Bankruptcy Code are self-executing and global; however, not all parties affected or potentially affected by the commencement of a chapter 11 case are aware of these statutory provisions or their significance and impact. I believe it is prudent to obtain an order of the Court confirming and reinforcing the relevant sections of the Bankruptcy Code so the Debtors may advise such parties of the existence, reach, and effects of these sections of the Bankruptcy Code.

151.    I believe the requested relief is particularly appropriate in these Chapter 11 Cases because Tidewater operates in many foreign jurisdictions with different legal systems, including Rio de Janeiro and Macae, Brazil; Ciudad Del Carmen, Mexico; Port of Spain, Trinidad; Aberdeen, Scotland; Amsterdam, Holland; Cairo, Egypt; Luanda and Cabinda, Angola; Lagos and Onne Port, Nigeria; Douala, Cameroon; Singapore; Perth, Australia; Shenzhen, China; Al Khobar, Kingdom of Saudi Arabia; Dubai, United Arab Emirates, and Oslo and Tromso, Norway. In the course of operating their businesses, the Debtors engage with numerous foreign customers, suppliers, and other vendors, as well as foreign regulators and other governmental units. In addition, the Debtors' affiliates are incorporated under the laws of

numerous countries and some of the Debtors' key contracts are governed by the laws of foreign jurisdictions.

153. Based on the foregoing, I believe that the relief requested in the Automatic Stay Enforcement Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

## K.    Sale Leaseback Motion

153. The Debtors are parties to 16 bareboat charter agreements (collectively, the "**Leases**") for certain of their supply vessels (the "**Leased Vessels**"). The Leases were entered into through a series of sale-leaseback transactions whereby the Debtor or a nondebtor affiliate sold the vessel to a counterparty and leased back the vessel at a monthly charter rate. The Leased Vessels range from 3 to 15 years in age and constitute some of the oldest, least technologically advanced, and least desirable vessels in the Debtors' fleet.

154. Pursuant to the terms of the Leases, the Debtors pay monthly charter hire payments in the aggregate of approximately $2.6 million, as well as additional maintenance and other related costs (collectively, the "**Lease Obligations**"). The Leases were executed between 2013 through early 2015 and generally range from seven to ten years in original lease term. All Lease Obligations are guaranteed by Tidewater Parent  The owner-lessors of the Leased Vessels are BBVA Compass Financial Corporation, BofA (as defined below), Regions Commercial Equipment Finance, LLC, PNC Equipment Finance, LLC, MassMutual Asset Finance LLC, and Fifth Third Equipment Finance Company (collectively, the "**Lessors**").

155. By this motion (the "**Sale Leaseback Motion**"), pursuant to sections 105(a), 365(a), and 502(b) of the Bankruptcy Code and Bankruptcy Rules 3007, 3018, 6004 and 6006, the Debtors request entry of (i) an interim order (a) pursuant to Bankruptcy Rule 3018(a) temporarily allowing the Reserve Damages Claims in the amount of the Stipulated Reserve (each

as defined below), as set forth in **Exhibit 1** to the Proposed Interim Order, solely for purposes of voting on the Prepackaged Plan and establishing the Disputed Claims Reserve (as defined in the Prepackaged Plan) pursuant to Section 7.5 of the Prepackaged Plan, and (b) setting a briefing schedule relating to the Debtors' objection to the Reserve Damages Claims; and (ii) a final order (x) authorizing rejection of the Leases set forth on **Exhibit 1** to the Proposed Final Order pursuant to section 365 of the Bankruptcy Code, and (y) for purposes of final allowance and distribution under the Prepackaged Plan, limiting the rejection damages claims for each Lease in the amounts set forth on **Exhibit 2** to the Proposed Final Order.  Significant cost savings to the Debtors will be achieved by rejecting the Leases.

156.    The Debtors anticipate that the Lessors will claim entitlement to significant unsecured rejection damages claims based on the stipulated loss value (the "**SLV**") provisions in the Leases.  I believe the SLV provisions, if applied, would generate unreasonable damage claims.

157.    Prior to the Petition Date, one of the Lessors, Banc of America Leasing & Capital LLC ("**BofA**"), purported to terminate three leases (the "**BofA Leases**") and asserted damages claims based upon the SLV provisions of the BofA Leases.  The Debtors have agreed with BofA to establish a reserve amount for the maximum distribution of their respective damages claims based on the SLV *less* 25% of the low value appraisal (their "**Reserve Damages Claim**," or collectively for all the Leases, the "**Reserve Damages Claims**") in the amounts set forth on the annexed **Exhibit 1** to the Proposed Interim Order (the reserved amount in the aggregate, for all Leases, the "**Stipulated Reserve**").  The Debtors have also agreed to establish the Stipulated Reserve pursuant to Section 7.5 of the Prepackaged Plan in an amount equal to the maximum amount of potential damages claims available under each of the other Leases.

158.    The Debtors are also stipulating to temporarily allow the Reserve Damages Claims in the amount of the Stipulated Reserve solely for purposes of voting on the Prepackaged Plan.

159.    It is my understanding that the Consenting Creditors under the RSA have agreed to the amount of the Stipulated Reserve and the temporary allowance of the Reserve Damages Claims for the purposes of establishing the Disputed Claims Reserve and voting on the Prepackaged Plan.

160.    I believe that approving the Stipulated Reserve and temporarily allowing the Reserve Damages Claims in the full stipulated amounts set forth in **Exhibit 1** to the Proposed Interim Order solely for voting purposes will enable the Debtors to move expeditiously towards plan confirmation while allowing the Debtors and Lessors to resolve the disputed claims pursuant to a proposed briefing schedule, as agreed among the Debtors, BofA, and the Consenting Creditors, as set forth in the Proposed Interim Order.

161.    I also believe that the proposed briefing schedule set forth in the Proposed Interim Order would promote the efficient and expeditious resolution is in the best interests of the Debtors, their estates, and all parties in interests and should be approved.

## L.    Claims and Noticing Agent Application

162.    By this application (the "**Epiq Retention Application**"), the Debtors request authority to appoint Epiq Bankruptcy Solutions, LLC ("**Epiq**") as claims and noticing agent in these Chapter 11 Cases, in accordance with the terms and conditions of that certain services agreement dated as of February 23, 2017, effective *nunc pro tunc* to the Petition Date.

163.    Although the Debtors have not yet filed their schedules of assets and liabilities, I am informed there will be approximately 4,000 entities to be noticed on the Debtors' creditor matrix.  In view of the number of anticipated claimants and the complexity of the

Debtors' businesses, I believe the appointment of Epiq as claims and noticing agent is in the best

interests of the Debtors, their estates, and all parties in interests and should be approved.

I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge, information, and belief.

Dated:  May 17, 2017
        Houston, Texas

_/s/ Quinn P. Fanning_
Quinn P. Fanning
Executive Vice President and Chief Financial
Officer, Tidewater Inc.

# **EXHIBIT A**

**Corporate Organizational Chart**

# Tidewater Organizational Chart



Note: Chart includes only debtors and relevant non-debtor parents. Other non-debtor subsidiaries are not included.