**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re:* | : | |
| | : | **Chapter 11** |
| **TIDEWATER INC., *et al.*,** | : | |
| | : | **Case No. 17– 11132 (BLS)** |
| | : | |
| **Debtors.** [1] | : | **(Jointly Administered)** |
| | : | |
| | | **Related to Doc. No. 16** |

**OBJECTION OF THE OFFICIAL EQUITY COMMITTEE TO CONFIRMATION OF PREPACKAGED CHAPTER 11 PLAN OF TIDEWATER INC. AND OBJECTION TO MAKE-WHOLE CLAIM**

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Tidewater Inc. (7776), Tidewater Marine Western, Inc. (1064), Tidewater Corporate Services, L.L.C. (7776), Tidewater Marine, L.L.C. (7779), Cajun Acquisitions, LLC (2365), Gulf Fleet Supply Vessels, L.L.C. (2194), Hilliard Oil & Gas, Inc. (4727), Java Boat Corporation (0278), Pan Marine International Dutch Holdings, L.L.C., Point Marine, L.L.C. (9586), Quality Shipyards, L.L.C. (2335), S.O.P., Inc. (3464), Tidewater Marine Alaska, Inc. (7549), Tidewater Marine International Dutch Holdings, L.L.C. (2289), Tidewater Marine Sakhalin, L.L.C. (7779), Tidewater Mexico Holding, L.L.C. (8248), Tidewater Venture, Inc. (7694), Twenty Grand (Brazil), L.L.C. (7730), Twenty Grand Marine Service, L.L.C. (7730), Zapata Gulf Marine, L.L.C. (5513), Tidewater GOM, Inc. (2799), Tidewater Subsea, L.L.C. (2022), Tidewater Subsea ROV, L.L.C. (3832), Tidewater Marine Fleet, L.L.C., Tidewater Marine Hulls, L.L.C., Tidewater Marine Ships, L.L.C., and Tidewater Marine Vessels, L.L.C. The Debtors' principal offices are located at 601 Poydras Street, Suite 1500, New Orleans, Louisiana 70130.





# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

11 E. 36th LLC v. First Cent. Sav. Bank (In re 11 E. 36th LLC),
2014 WL 2903660 (Bankr. S.D.N.Y. June 26, 2014) .................................................... *passim*

In re Armstrong World Indus.,
348 B.R. 111 (D. Del. 2006) ..........................................................................................22

In re Boomerang Tube, Inc.,
Case No. 15–11247 (MFW) (Bankr. D. Del.)...............................................................2, 26, 27

Chartwell Litig. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.),
346 B.R. 621 (Bankr. E.D.N.Y. 2006) ..........................................................................11

In re Chemtura Corp.,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) .................................................................13, 26, 27

Cox Enter. v. News-Journal Corp.,
510 F.3d 1350 (11th Cir. 2007) ......................................................................................11

In re Duplan Corp.,
9 B.R. 921 (S.D.N.Y. 1980) ...........................................................................................12

In re Exide Techs.,
303 B.R. ...........................................................................................................................22

In re Exide Techs.,
303 B.R. 48 (Bankr. D. Del. 2003) .................................................................... *passim*

In re Genesis Health Ventures, Inc.,
266 B.R. ...................................................................................................................21, 33

Gillman v. Cont'l Airlines (In re Cont'l Airlines),
203 F.3d 203 (3d Cir. Del. 2000) ..................................................................................35

In re Global Ocean Carriers Ltd.,
251 B.R. 31 (Bankr. D. Del. 2000) .........................................................................35, 36

In re Granite Broad. Corp.,
369 B.R. 120 (Bankr. S.D.N.Y. 2007) ..........................................................................21

In re Hercules Offshore, Inc.,
565 B.R. 732 (Bankr. D. Del. 2016) ..............................................................................34

In re Johns-Manville Corp.,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ....................22

In re Linn Energy Finance Corp.,
Case No. 6:16-BK-60044 (DRJ) (Bankr. S.D. Tex.) ....................2

In re Mirant Corp.,
334 B.R. 800 (Bankr. N.D. Tex. 2005) ....................1, 2, 11, 28

Paloian v. LaSalle Bank N.A. (In re Doctors Hosp. of Hyde Park, Inc.),
508 B.R. 697 (Bankr. N.D. Ill. 2014) ....................34

Pike v. Texas EMC Mgmt., LLC,
No. 10-14-00274-CV, 2017 WL 2507783 (Tex. App. June 7, 2017) (accepting expert valuation that used "the EBITDA figures from 2006 through March of 2011 to forecast future earnings based on a seven-year business cycle.") ....................13

In re PTL Holdings LLC,
No. 11-12676 (BLS), 2011 WL 5509031 (Bankr. D. Del. Nov. 10, 2011) ....................11

In re Quigley Co., Inc.,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) ....................20

R.C.F. v. Denver & R.G.W. R. Co.,
328 U.S. 495 (1946) ....................4

In re Sacred Heart Hosp. of Norristown,
182 B.R. 413 (Bankr. E.D. Pa. 1995) ....................20

In re Vita Corp.,
380 B.R. 525 (C.D. Ill. 2008) ....................20

Walter E. Heller & Co. v. Am. Flyers Airline Corp.,
459 F.2d 896 (2d Cir. 1972)....................34

In re Washington Mut., Inc.,
442 B.R. 314 (Bankr. D. Del. 2011) ....................35, 36, 37

In re Zenith Elecs. Corp.,
241 B.R. 92 (Bankr. D. Del. 1999) ....................36, 37

**Statutes**

11 U.S.C. §1129(b) ....................22

11 U.S.C. § 1129(b)(2)(B) ....................21

Bankruptcy Code Sections 502 and 1129(b) ....................33

Bankruptcy Code Section 502(b) ....................34

Bankruptcy Code Section 502(b)(a) ....................34

Bankruptcy Code Section 1129 ....................21, 38

Bankruptcy Code Sections 1129(a)(3) and 502(b) ....................5

Bankruptcy Code Section 1129(a) and 1129(b)....................22

Bankruptcy Code Section 1129(b)(1) ....................32

Bankruptcy Code Section 1129(b)(2) ....................5

Jones Act .................... *passim*

**Other Authorities**

Anders J. Maxwell, CONTESTED VALUATION IN CORPORATE BANKRUPTCY: A COLLIER MONOGRAPH ¶ 12.04[1][d] (Robert J. Stark et al. eds., 2011) ....................27

Aswath Damodaran, INVESTMENT VALUATION 856 (2d ed. 2001) ....................27

Aswath Damodaran, INVESTMENT VALUATION at 487 (3d ed. 2012) ....................12

Aswath Damodaran, UPS AND DOWNS: VALUING CYCLICAL AND COMMODITY COMPANIES at 14 (2009) ....................12

Aswath Damodaran, Valuing Cyclical and Commodity Companies....................13

CONTESTED VALUATION IN CORPORATE BANKRUPTCY: A COLLIER MONOGRAPH ¶ 8.06 (Robert J. Stark et al. eds., 2011) ....................28

Fed. R. Evid. 702 ....................2

American Bankruptcy Institute Commission To Study The Reform of Chapter 11: 2012-2014 Final Report And Recommendations, at 207-211 ....................13, 14, 15

Jeffrey C. Hooke, Security Analysis on Wall Street: A Comprehensive Guide to Today's Valuation Methods (John Wiley & Sons, Inc., 1998) ....................12

Tim Koller, Marc Goedhart & David Wessels, Valuation: Measuring and Managing the Value of Companies at 76 (University Ed. 5th Edition, 2010) ....................12

The Official Committee of Equity Security Holders (the "Equity Committee") of Tidewater Inc., hereby submits its objection (the "Objection"), to confirmation of the Debtors' *Joint Prepackaged Chapter 11 Plan of Reorganization* (the "Plan") [Docket No. 16].[2] In support of its Objection, the Equity Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Plan should not be confirmed because it fails to satisfy the fair and equitable requirement of the Bankruptcy Code.[3] The Plan is premised upon an artificially depressed valuation, which, as a consequence, grossly overcompensates creditors to the detriment of shareholders, by distributing shares in the Reorganized Debtors and other consideration with a value far greater than the amount of their claims, while providing equity less value than it's legally entitled to.

2. The proffered justification of the Plan's treatment of creditors and equity holders is the Debtors' valuation encompassed in the Lazard Report.[4] However, as will be shown by the evidence at the Confirmation Hearing, it is completely unreliable. It represents a rehash of undue conservatism that Lazard has consistently applied to valuing the Debtors both pre-bankruptcy and herein, to drive a predetermined output of showing equity "out of the money."

3. Lazard has a history of this. In many cases, a debtor's valuation expert is found to significantly under-value the enterprise. In Mirant, such under-valuation was $5 billion, in

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[3] The Plan also has a number of other defects described herein.

[4] The Lazard Report was prepared by Lazard Frères & Co. LLC ("Lazard"). The Lazard Report is attached hereto as **Exhibit A**.

Boomerang, Lazard was off by fifty percent. Most recently in Linn Energy, Lazard's estimated plan value was a billion dollars short of current reorganized value.[5]

4. Here, even assuming the Lazard Report is admissible,[6] this Court should give it limited evidentiary weight because it contains inappropriate assumptions unsupported by the evidence.



[5] See In re Mirant Corp., 334 B.R. 800 (Bankr. N.D. Tex. 2005); In re Boomerang Tube, Inc., Case No. 15–11247 (MFW) (Bankr. D. Del.), *Transcript of Hearing Held 11/9/2015*; In re Linn Energy Finance Corp., Case No. 6:16-BK-60044 (DRJ) (Bankr. S.D. Tex.).

[6] The Equity Committee reserves its rights to file a motion to exclude portions of the Lazard Report from evidence pursuant to Fed. R. Evid. 702.



[8] Assuming disallowance of the Make-Whole Claim.

[9] The Miller Buckfire Report was prepared by Miller Buckfire & Co. LLC and Stifel, Nicolaus & Co., Inc. (collectively, "Miller Buckfire"). The Miller Buckfire Report is attached hereto as **Exhibit B**.

8. The basic question in a valuation for reorganization purposes is how much the enterprise can earn. Answering this question is by no means basic, and it is universally held that valuation is not an exact science. To quote the Supreme Court, "[m]ankind's foresight is limited. The uncertainties of future estimates are recognized." R.C.F. v. Denver & R.G.W. R. Co., 328 U.S. 495, 522 n.29 (1946). With such opacity comes a modicum of artistry, but there are some "bright line" rules in valuation that require utmost fidelity. Two major ones are that cash and cash equivalents count in calculating total distributable value, and that industry cyclicality must be appropriately accounted for. The Lazard Report fails to abide by these cardinal rules.





13. Accordingly, based on the fact that the Plan was structured to provide a windfall to the Debtors' creditors at the expense of shareholders, who are well "into-the-money" and legally entitled to a meaningful recovery greater than that under the Plan on account of such interests, the Debtors cannot establish that the Plan complies with Bankruptcy Code Section 1129(b)(2).

14. The Plan is also unconfirmable for the following reasons:

15. First, the Plan fails under Bankruptcy Code Sections 1129(a)(3) and 502(b) because it provides undue value to Noteholders on account of an undisclosed creditor arrangement providing value under the Plan for a Make-Whole Claim that should rightfully be disallowed. Disallowing the Make-Whole Claim adds an additional approximately $91 million of value available to equity.

16. Second, the Equity Warrants impermissibly discriminate against non-US holders. To ensure the Debtors remain in compliance with the Jones Act, the Debtors may deny non-US Citizens the right to exercise the Warrants. However, the Debtors have failed to provide standard alternatives that would allow non-US Citizens to receive the economic benefit of exercising the Warrants while keeping the Debtors in compliance with the Jones Act. The form New Existing Equity Warrant Agreement has several other structural deficiencies that may render their value illusory, as described herein.

17. Third, the Plan fails to treat the Equity Committee and its professionals fairly. The Equity Committee and its professionals are excluded from the releases, exculpations, and fee procedures under the Plan. The Plan must be modified to treat the Equity Committee and its professionals in the same manner as other case fiduciaries.

18. Fourth, the Releases contravene applicable Third Circuit law, as several of the Released Parties have not made a substantial contribution, nor are they necessary to the reorganization.

19. In sum, as discussed in further detail below, the Equity Committee will demonstrate at the Confirmation Hearing that confirmation must be denied because the Plan does not satisfy the plan confirmation requirements set forth in the Bankruptcy Code.

## BACKGROUND

### I. Summary Of The Debtors' Business.[10]

20. The Debtors are a leading provider of offshore service vessels and marine support services to the global offshore energy industry through a diversified fleet of marine service

[10] Facts in this section and in Section II are taken from the *Declaration of Quinn P. Fanning in Support of the Debtors Chapter 11 Petitions and Request for First Day Relief* [Docket No. 15] unless otherwise specified.

vessels. The Debtors' vessels and related vessel services support all phases of offshore exploration, field development, and production.

21. The Debtors are at the conclusion of a fifteen year vessel construction, acquisition, and replacement program aimed at allowing the company to operate in nearly all major oil and gas producing regions by replacing older vessels in the company's fleet with larger, more technologically sophisticated vessels. See Tidewater Annual Report, 2017. During that period, the Debtors purchased 290 vessels at a total cost of approximately $4.9 billion, and sold 41 of those vessels (which originally cost $331.1 million) in transactions other than sale-leaseback transactions. Id. This program was funded through operating cash flows, private debt placements, and borrowings under bank credit facilities, as well as the sale of older vessels and various vessel sale-leaseback arrangements. Id.

22. With 244 pro forma vessels and eight remotely operated vehicles, the Debtors have one of the largest fleets of offshore service vessels in its industry and a broad geographical operating footprint. The Debtors have one of the youngest fleets in the industry, with an average vessel age of only 9.8 years

23. ***Indeed, management has expressed great confidence that the Debtors are well-positioned to take advantage of improving market conditions.*** See *Declaration of Quinn P. Fanning in Support of the Debtors Chapter 11 Petitions and Request for First Day Relief* [Docket No. 15] ¶ 4.

24. Unfortunately, the cyclical market that the Debtors operate in is currently in a trough. Since mid-2014, the prices of crude oil and natural gas have declined dramatically,

reaching record lows in early 2016. Although oil prices have recovered somewhat, they remain below the highs of mid-2014. As a result of this market downturn, the Debtors' customers have reduced drilling and other activities that involve the Debtors' products and services, leading to significant declines in revenue.

25. This lead to the Debtors' non-compliance with certain debt coverage ratio covenants, waivers by the Debtors' Noteholders and Credit Agreement Agent, and ultimately the negotiation and filing of the prepackaged Plan, notwithstanding the Debtors having approximately $700 million in cash as of the Petition Date.

26. That cash balance has not dissipated since filing chapter 11 as the latest monthly operating report shows $696.6 million in cash. See *Debtor-In-Possession Monthly Operating Report for Filing Period May 18, 2017 through May 31, 2017* [Docket No. 299]. Indeed, looking at the Debtors' projections, they have almost weathered the storm, and are poised for growth post deleveraging.

## II. **Debtors' Earnings Projections.**[11]



[11]



## IV. The Restructuring Support Agreement And The Plan.

31. Despite having hundreds of millions of cash on the balance sheet, the Debtors entered into a Restructuring Support Agreement (the "RSA") and prepackaged Plan on May 12, 2017.

32. The Plan provides, among other things, for the following:

- Full and final satisfaction of the Debtors' obligations under (i) the Credit Agreement, (ii) the Note Purchase Agreements, and (iii) the Sale Leaseback Agreements, in exchange for (a) $225 million in cash, (b) $350 million of new secured notes, and (c) approximately 95% of the new equity of the Reorganized Debtors (subject to dilution) to be distributed pro rata to the holders of such interests;

- Amendment and Reinstatement of the Troms Credit Agreement, which will provide for a grant of first priority mortgages on certain vessels, deferment of 50% of the amortization payments payable thereunder during fiscal years 2018 and 2019, and an increase of 100 basis points to the interest rates otherwise in effect through fiscal year 2023;

- Payment in full, in the ordinary course, of the Debtors' trade and other general unsecured creditors; and

- Full and final satisfaction of the Debtors' existing common equity in exchange for (i) 5.0% of the new equity of the Reorganized Debtors (subject to dilution) and (ii) warrants to purchase an additional 15% of the new equity of the Reorganized Debtors (subject to dilution) to be distributed pro rata to the holders of such interests.

See id. ¶ 5.

33. The Debtors' existing equity holders in Class 7 were deemed impaired and presumed to reject the Plan. See Plan § 3.3.

34. The Plan also proposes to distribute new equity and warrants to the Debtors' management through a Management Incentive Plan (the "MIP). See Plan § 1.85. Under the MIP, the Debtors' management stand to receive 8% of the sum of the total number of: (a) shares of New Common Stock to be outstanding as of the Effective Date; and (b) shares of New Common Stock issuable upon exercise of the New Warrants as of the Effective Date.

35. At the Equity Committee's midpoint equity value, the MIP awards are worth up to $155 million.

36. The MIP is also in addition to approximately $3 million in bonuses handed out to senior management pre-filing as "retention bonuses." See Tidewater Inc. Form 8-K, May 11, 2017.

## V. Appointment Of The Equity Committee.

37. On June 20, 2017, the Office of the United States Trustee appointed the Equity Committee. See *Notice of Appointment of Committee of Equity Security Holders* [Docket No. 242].[12]

38. The Equity Committee and its professionals have worked around the clock analyzing the Plan and the appropriate value of the Debtors. Given its conclusions on valuation and other Plan defects, the Equity Committee files this objection.

[12] The Equity Committee members are: Alexandre Zyngier; David Eidelman; and Snow Capital Management.

## VALUATION

**I. Valuation Process.**

39. Both the Debtors and the Equity Committee intend to provide expert testimony regarding the valuation of the Debtors. Expert reports were exchanged on July 7, 2017.



**II. Legal Authority Regarding Valuation Methodology.**

41. While there are several accepted ways to conduct a valuation, value "gathers its meaning in a particular situation from the purpose for which a valuation is being made." 7 Collier on Bankruptcy ¶ 1129.06[2] (Lawrence P. King ed., 15th ed. rev. 2006). In evaluating the valuation reports, the Court must determine whether each expert properly and reliably applied generally accepted valuation methodologies.

42. As this Court has noted, the Supreme Court has said that valuations must "be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, … the past earnings record." In re PTL Holdings LLC, No. 11-12676 (BLS), 2011 WL 5509031, at *6 (Bankr. D. Del. Nov. 10, 2011) (quoting Consolidated Rock Prods. Co. v. DuBois, 312, U.S. 510, 526 (1941)); see also In re Mirant

[13]

Corp., 334 B.R. 800, 836 (Bankr. N.D. Tex. 2005) ("Use of historical data as well as projections is sanctioned by numerous valuation decisions."); In re Duplan Corp., 9 B.R. 921, 927-28 (S.D.N.Y. 1980) ("Certainly past earnings provide a useful reference point from which to calculate present value and develop projections.").

43. It is undisputed that the Debtors operate in a cyclical industry. To account for this, in analyzing the value of the Debtors it is necessary to look to their historic business cycle. See Contested Valuation in Corporate Bankruptcy: A Collier Monograph ¶ 3.03 at 3-17 (Robert J. Stark et al. eds., 2011) (noting need to normalize earnings when changes are transitory in nature, citing *In re Mirant Corp*, 334 B.R. 800, 838 (Bankr. N.D. Tex. 2005) discussion of the value of normalizing prices over a historical period rather than relying on a price at a fixed point in time); see, also Cox Enter. v. News-Journal Corp., 510 F.3d 1350, 1358-59 (11th Cir. 2007) (court "normalized" margins to enable a valuation comparison with other companies); Chartwell Litig. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.), 346 B.R. 621, 629-30 (Bankr. E.D.N.Y. 2006) (referencing normalized EBITDA to enable more accurate valuation).[14]

44. Indeed, leading scholars on valuation of cyclical businesses note that "trying to forecast the next cycle is not only futile but dangerous[,] and that it is far better to normalize earnings and cash flows across the cycle." Aswath Damodaran, UPS AND DOWNS: VALUING CYCLICAL AND COMMODITY COMPANIES at 14 (2009) (further noting that, in "economic cycles, even in mature economies like the United States, can range from short periods (2-3 years) to very long ones (more than 10 years)"); see also Jeffrey C. Hooke, Security Analysis on Wall Street: A Comprehensive Guide to Today's Valuation Methods,185, 210 (John Wiley & Sons, Inc., 1998)

[14] See also Aswath Damodaran, INVESTMENT VALUATION at 487 (3d ed. 2012) ("The dependence of PE ratios on current earnings makes them particularly vulnerable to the year-to-year swings that often characterize reported earnings. In making comparisons, therefore, it may make much more sense to use normalized earnings.").

("Given the ups and down of a cyclical business … the historical financial analysis should focus on the firm's earnings over the last full business cycle.); Aswath Damodaran, INVESTMENT VALUATION: THIRD EDITION at 487 (3d ed. 2012) ("For a cyclical firm, for instance, you would average the earnings per share across a cycle.").



46. [redacted] is a proper way to value businesses in cyclical industries under the case law. See In re Chemtura Corp., 439 B.R. 561, 582 (Bankr. S.D.N.Y. 2010) ("I didn't understand anyone in this case to question the view of NYU business professor Aswath Damodaran that for cyclical businesses, taking the business cycle into account makes for a better analysis"); see also Pike v. Texas EMC Mgmt., LLC, No. 10-14-00274-CV, 2017 WL 2507783 at *17 (Tex. App. June 7, 2017) (accepting expert valuation that used "the EBITDA figures from 2006 through March of 2011 to forecast future earnings based on a seven-year business cycle.").



[redacted]

## III. The Miller Buckfire Valuation.

[redacted]

[15] Recognizing that valuations that occur "during a trough in the debtor's business cycle . . . may result in a reallocation of the reorganized firm's future value in favor of senior stakeholders and away from junior stakeholders in a manner that is subjectively unfair and inconsistent with the Bankruptcy Code," the ABI Commission recommends that "the general priority scheme of chapter 11 should incorporate a mechanism to determine whether distributions to stakeholders should be adjusted due to the possibility of material changes in the value of the firm within a reasonable period of time after the plan effective date." See American Bankruptcy Institute Commission To Study The Reform Of Chapter 11: 2012-2014 Final Report And Recommendations, at 207-211.

[16] [redacted]







26

## IV. The Lazard Valuation.



56. The Lazard Report contains fundamental flaws and internal inconsistencies that lead to an unsupportable Total Distributable Value conclusion. Lazard consistently made overly

[27]

conservative judgment calls that resulted in arriving at a low-end understated value that this Court should not rely on.



61. Ultimately, Lazard fails to recognize that, although the Debtors are in the trough of the current cycle, this is not an unproven business. The Debtors are a proven entity in a

critical industry that is in a temporary trough, and the Lazard valuation conclusions are unduly pessimistic.



**LEGAL ARGUMENT**

**I. Legal Standard For Confirmation.**

63. Plan proponents bear the burden of proof that the Plan satisfies all requirements under the Bankruptcy Code. See In re Exide Techs., 303 B.R. 48, 58 (Bankr. D. Del. 2003); see also In re Quigley Co., Inc., 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010). This burden is a heavy one. See In re Vita Corp., 380 B.R. 525, 528 (C.D. Ill. 2008); In re Sacred Heart Hosp. of Norristown, 182 B.R. 413, 423 (Bankr. E.D. Pa. 1995).

64. The Debtors cannot satisfy their burden. As the evidence will show at trial, the Debtors' valuation cannot be sustained, and the Debtors cannot prove their treatment of equity interests under the Plan is fair and equitable. Accordingly, the Court should not confirm the Plan.

## I. THE PLAN SHOULD NOT BE CONFIRMED BECAUSE ITS ALLOCATION OF VALUE IS NOT FAIR AND EQUITABLE.

65. The Plan should not be confirmed because the Debtors have a Total Distributable Value that far surpasses the proposed equity distribution under the Plan, as set forth in the Miller Buckfire Report. Because the Plan denies equity its lawful recovery, it is not fair and equitable under Bankruptcy Code Section 1129.

66. Section 1129(b)(2)(B) describes how a plan may be "fair and equitable" to a class of impaired, non-accepting claims or interests. See 11 U.S.C. § 1129(b)(2)(B). The "fair and equitable" standard "can be seen to have at least two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed." 7 Collier on Bankruptcy ¶1129.03[4][a]. "Once the participant receives or retains property equal to its claim, it may receive no more." 7 Collier on Bankruptcy ¶ 1129.03[4][a][ii].

67. A plan that proposes to pay unsecured creditors value in excess of their allowed claim amounts is not "fair and equitable" under Bankruptcy Code Section 1129(b)(2)(B) and may not be confirmed. See In re Granite Broad. Corp., 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (citing New England Coal & Coke Co. v. Rutland Co., 143 F.2d 179, 186 (2d Cir. 1944)) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to the junior classes of debt or equity, as the case may be."); In re Exide Techs., 303 B.R. 48, 61, 81 (denying confirmation of a plan that afforded secured lenders value in excess of the amount of their claims); In re Genesis Health Ventures,

Inc., 266 B.R. at 612 ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.") (citation omitted).

68. As the Plan proponent, it is the Debtors' burden to prove by a preponderance of the evidence that the Plan does not afford any class of creditors value in excess of their claims amounts. See, e.g., In re Armstrong World Indus., 348 B.R. 111, 120 & n. 14 (D. Del. 2006) (plan proponent must establish by preponderance of the evidence the satisfaction of requirements of both Bankruptcy Code Section 1129(a) and 1129(b)) (citation omitted); 7 Collier on Bankruptcy ¶ 1129.02[4] ("If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met. In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence.").

69. The enterprise value of the Reorganized Debtors directly impacts whether the Plan's treatment of existing equity holders is fair and equitable. See In re Exide Techs., 303 B.R. at 60−61 ("A determination of [a] Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. §1129(b)."); In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) ("A valuation of the debtor's business is, by virtue of the statutory language, almost a prerequisite to a determination that a plan satisfies the fair and equitable test of §1129(b).").

70. The Debtors must therefore prove, under the high bar of preponderance of the evidence, that the valuation methodologies in the Lazard Report are appropriate and properly applied.

71. The Debtors cannot carry their burden. At emergence, the Plan transfers 95% of the equity value of the Reorganized Debtors to claimants that hold, at best $2.286 billion in

claims [30]— [redacted] In so doing, the Plan provides creditors a windfall and deprives equity holders of their rightful allocation of estate value. Such treatment is antithetical to the Bankruptcy Code's "fair and equitable" requirement. The Plan therefore cannot be confirmed.

[redacted]

72. [redacted] The midpoint materially exceeds the threshold of approximately $2.39 billion at which unsecured creditors receive more than 100% of the value of their claims. Under the Bankruptcy Code, the creditors should not receive a windfall at the expense of equity.

73. The Miller Buckfire Report is more credible than the Lazard Report for, *inter alia*, the following reasons:

[redacted]





77. This Court should therefore rely on the Miller Buckfire Valuation in determining whether the Plan satisfies the Bankruptcy Code's confirmation requirements.

**ii. The Lazard Report Suffers From Several Material Defects That Make Its Conclusions Of Value Unreliable.**

78. As set forth above, the discrepancy between the Miller Buckfire valuation and the Lazard valuation is similar to many contested valuations where there is an apparently wide delta in value conclusions. However, as the evidence will show at the Confirmation Hearing, here, like many other cases, the Debtors' valuation will ultimately be found to be selectively under cooked.

79. The Lazard Report suffers from a litany of defects identified herein, which in the aggregate artificially and massively depress the Reorganized Debtors' TEV.[31]

[31] The fundamental flaws contained in the Lazard Valuation discussed herein are non-exhaustive.



81. A chart detailing potential issues in Lazard's valuation and their economic impact is below:





85. In Chemtura, Lazard prepared a valuation report for a chemical company in a cyclical industry. Specifically, Lazard calculated a terminal value by applying multiples based on an analysis of 5–year and 3–year average EBITDA for its peer group as a "mid-cycle or

[32] See [redacted] for a representative graph.

normalized" EBITDAR. Id. at 575. While the Court accepted Lazard's attention to cyclicality, the Court criticized Lazard for "its failure to do so over a complete business cycle." Id.[33]

86. Failing to properly take an entire business cycle into account has been repeatedly identified in valuation academic literature as a meaningful error. See Aswath Damodaran, INVESTMENT VALUATION 856 (2d ed. 2001) ("The failure to adjust the base year's earnings for cyclical effects [in a DCF analysis] can lead to significant errors in valuation, since the earnings are likely to adjust as the economic cycle changes."); Anders J. Maxwell, CONTESTED VALUATION IN CORPORATE BANKRUPTCY: A COLLIER MONOGRAPH ¶ 12.04[1][d] (Robert J. Stark et al. eds., 2011) ("Changing the period over which performance is averaged can materially affect valuation.").

87. Accordingly, the Court should give this analysis little to no weight.



[33] This Court has also recently criticized Lazard's selective valuation methodology, resulting in a denial of plan confirmation in Boomerang Tube. See In re Boomerang Tube, LLC, Case No. 15-11247 (MFW) (Bankr. D. Del), *Transcript of Hearing Held 11/9/2015* at 7:11-16. ("[T]he Court concludes that the [Official Committee of Unsecured Creditor's report] … is the more credible opinion.").



34 *1*,







**iii. The Plan—Premised On The Flawed Lazard Valuation—Violates The Absolute Priority Rule And Therefore Is Not Fair And Equitable.**

104. In view of the foregoing, the Plan provides value to creditors well in excess of their asserted claims. This value transfer violates the "absolute priority rule" and therefore renders the Plan not "fair and equitable" under Bankruptcy Code Section 1129(b)(1).

105. [REDACTED] In other words, creditors under the Plan receive significantly more value than the amount of their claims. In this respect, these cases are analogous to In re Exide Technologies, in which this Court denied confirmation of a plan that sought to transfer all of the debtor's reorganized equity to its prepetition lenders. See 303 B.R. at 80. In Exide, the debtor's investment banker argued that the debtor's TEV was between $950 billion and $1.05 billion. Id. at 59. Because the debtor's funded debt hurdle was $1.285 billion, the debtor argued that its unsecured creditors were out of the money and proposed to hand the company's reorganized equity to its prepetition lenders and secured noteholders. Id. at 55. Unsecured creditors were stuck with a *de minimis* cash pool corresponding to a projected recovery of 1.4%. Id.

106. However, after identifying several flaws in the debtor's valuation analysis, the creditors' committee argued successfully that the accurate TEV for the company was closer to $1.5 billion—$1.7 billion. Id. at 66. This Court agreed with the committee that "the Plan undervalue[d] the Debtor; therefore, there may be sufficient value to pay the Prepetition Lenders' claims in full." Id. at 77. Accordingly, the Court found that the plan was not fair and equitable to the debtor's unsecured creditors, and therefore could not be confirmed. Id. at 80.

107. The facts of these Cases demand a similar result to that obtained in Exide—denial of confirmation. By providing creditors a windfall at the expense of equity holders, the Plan violates the corollary to the absolute priority rule. See Genesis Health, 266 B.R. at 612; MCorp Fin., 137 B.R. at 235. The Plan must therefore be denied. See Exide, 303 B.R. at 61.

**iv. The Plan Improperly Provides Value For A Make-Whole Claim That Should Be Disallowed.**

---

[35] This amount includes the $91 million in Make-Whole Claims, which the Equity Committee submits should be disallowed, as well as lease-rejection claims, which are currently in dispute.

108. The Plan violates Bankruptcy Code Sections 502 and 1129(b) because it provides consideration for the Noteholders' purported Make-Whole Claim. The Equity Committee hereby objects to this Claim, and for the reasons below, it should be disallowed on the merits.

109. Under the Debtors' Note Purchase Agreements, certain events trigger an alleged "make-whole" premium. See Note Purchase Agreements §§ 8.7, 11, and 12.1. The Note Purchase Agreements are governed under New York and Illinois law.

110. The evidence will show that the Make-Whole Claim is not allowable under the facts, governing documents and applicable law, as the Noteholders voluntarily entered into an RSA, granting them a fixed percentage of the equity in the Reorganized Debtors at a time when their debt was not in default and not accelerated, and a chapter 11 filing was expressly contemplated as a means of implementing the restructuring to which they had agreed.

111. The Debtors agreed to the inclusion of the Make-Whole Claim in the Noteholders' allowed claim as an incidental part of their overall allocation of equity value under the Plan. Upon information and belief, the inclusion of the Make Whole Claim did not affect the percentage equity interest in the Reorganized Debtors which the Noteholders received, but this amount was included only to increase the "hurdle" which equity holders would have to overcome to obtain their rightful recovery. Nothing in the express text of the Note Purchase Agreements triggers a Make Whole Claim where the Noteholders and Debtors enter into a consensual debt-for-equity exchange at a time when the Notes are neither in default or accelerated.

112. The Noteholders should not be rewarded with value for a Make Whole Claim (at the expense of equity) under their own debt-for-equity transaction entered into pre-bankruptcy. It is clear that the Noteholders chose to give up their cash stream for the upside of equity in the Reorganized Debtors. They cannot now have their proverbial cake and eat it too. Accordingly,

the Make-Whole Claim should be disallowed and $91 million of distributable value should be available to equity.

113. Furthermore, evidence will show that the Make-Whole Amounts are an unenforceable penalty against the Debtors because there was no acceleration under the debt-equity swap arranged between the Noteholders and Lenders pre-petition, before the Make-Whole Amounts could ever be due. See Walter E. Heller & Co. v. Am. Flyers Airline Corp., 459 F.2d 896, 899 (2d Cir. 1972). Moreover, it does not accord with controlling case law or equity to provide additional value to lenders under a pre-packaged Plan they negotiated for their benefit. See id.; In re Hercules Offshore, Inc., 565 B.R. 732, 762−63 (Bankr. D. Del. 2016) (noting that acceleration may be prohibited where default arranged by lender); 11 E. 36th LLC v. First Cent. Sav. Bank (In re 11 E. 36th LLC), 2014 WL 2903660, at *5 (Bankr. S.D.N.Y. June 26, 2014) (finding acceleration inequitable where lender caused default to procure acceleration).

114. Additionally, the Make-Whole Claim may be disallowed under Bankruptcy Code Section 502(b)(a) as unmatured interest that is not allowable under Bankruptcy Code Section 502(b). See Paloian v. LaSalle Bank N.A. (In re Doctors Hosp. of Hyde Park, Inc.), 508 B.R. 697, 705−06 (Bankr. N.D. Ill. 2014) (Make-whole premiums incurred as a result of bankruptcy filing are "in economic reality…a form of interest" and must be disallowed under Bankruptcy Code Section 502(b)).

## II. THE EQUITY WARRANTS MUST BE MODIFIED TO AVOID DISCRIMINATING AGAINST NON-US CITIZENS, AND TO PROTECT THEIR VALUE TO EQUITY HOLDERS.

115. The New Existing Equity Warrants (the "Equity Warrants") contain impermissible discrimination against non-US Citizens. The Equity Warrants contain a requirement that only US Citizens may exercise such Warrants and permit the Debtors to deny non-US Citizens the right to exercise the Warrants. However, the Debtors have failed to add a

clause that permits a non-US Citizen to obtain the economic benefit of the Warrants without receiving shares of the Debtors—a simple solution that would ensure Jones Act compliance without discrimination against equity holders who are not US Citizens. The Equity Warrants should be modified as such.

116. Further, the Equity Warrants have only limited protection against transactions that would allow the new shareholders of the Debtors to wrongfully strip away value from the current equity holders. To address these infirmities, the Equity Warrants should be modified as set forth in **Exhibit D**. Until such changes are made, the Plan should not be confirmed.

## III. THE PLAN FAILS TO PROVIDE CUSTOMARY FIDUCIARY PROTECTIONS TO THE EQUITY COMMITTEE AND ITS ADVISORS.

117. The Equity Committee and its professionals are not included as Released Parties or Exculpated Parties under the Plan. See Plan §§ 1.2 and 1.70. In addition, the Equity Committee's professionals must be included in the Plan's procedures for payment of professional fee claims. See Plan § 2.2. The Equity Committee and its advisors should be afforded these customary fiduciary protections under the Plan.

## IV. THE PLAN SHOULD NOT BE CONFIRMED BECAUSE IT INCORPORATES IMPERMISSIBLE RELEASES.

118. The Debtors bear the burden of proving that the Plan's proposed releases are appropriate under the Bankruptcy Code and applicable law in this Circuit. See Gillman v. Cont'l Airlines (In re Cont'l Airlines), 203 F.3d 203, 214 (3d Cir. Del. 2000) (proponent bears burden of establishing propriety of proposed releases); In re Global Ocean Carriers Ltd., 251 B.R. 31, 43 (Bankr. D. Del. 2000).

119. In this Circuit, releases of non-debtors are the exception, not the rule. See In re Washington Mut., Inc., 442 B.R. 314, 351 (Bankr. D. Del. 2011) ("While the Third Circuit has

not barred third party releases, it has recognized that they are the exception, not the rule."). For the reasons identified below (and in the objection filed by the U.S. Trustee [Docket No. 259]), the Debtors cannot meet their burden of proof that the releases are proper under applicable law. Therefore, the Plan cannot be confirmed.

120. Section 10.6 of the Plan includes the proposed releases. They are impermissible because the Debtors seek to release—for no consideration—the Credit Agreement Agent, the Noteholders, the Tidewater Lenders, the Sale Leaseback Parties, and the Debtors' current and former officers and directors.

121. Courts in this district apply the five-factor Zenith Electronics test to determine whether a debtor's release of a non-debtor under a chapter 11 plan is appropriate:

(1) An identity of interest between the debtor and the third party such that a suit against the non-debtor will deplete estate assets;

(2) A substantial contribution to the plan by the released party;

(3) The necessity of the release to the plan;

(4) The overwhelming acceptance of the plan and release by creditors and interest holders; and

(5) The payment of all or substantially all of the claims of the creditors and interest holders under the plan.

See In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999); see also Exide, 303 B.R. at 72.

122. The five Zenith factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." In re Washington Mut., Inc., 442 B.R. at 346. The Debtors have the burden of establishing that the releases satisfy the Zenith factors. See Global Ocean Carriers, 251 B.R. at 43.

123. Here, the proposed releases fail the Zenith Electronics test because: (i) the Released Parties have not made a substantial contribution to the Plan; and (ii) such releases are not necessary to the Plan.

124. In fact, the proposed releases of the Debtors' current and former directors and officers are similar to the debtors' proposed releases in In re Washington Mut., Inc., 442 B.R. at 351 ("WaMu"), which this Court denied. In WaMu, as here, the debtors sought to release their "current and former officers [and] directors." Id. at 349. Applying the five-factor Zenith test, this Court found that although an identity of interest existed between the debtors and their former officers and directors, that fact "alone is insufficient to justify the releases." Id. Turning to the remaining Zenith factors, the Court concluded there was "simply no basis" for the releases because the debtors could present no evidence to show: (i) a "substantial contribution" made to the case by the former directors and officers; or (ii) that such releases were necessary for the reorganization. Id. at 350.

125. The WaMu Court also rejected the debtors' proposed release of certain noteholders, ruling that the noteholders' self-interested participation in settlement negotiations with the debtors was an "insufficient contribution to warrant a release by the Debtors." Id. at 349. Likewise, the Noteholders' and Lenders' self-interested participation in the RSA and Plan negotiations does not constitute a sufficient contribution to the Plan to warrant a release. See id.

126. In view of the foregoing, the proposed releases are improper and render the Plan unconfirmable.

**RESERVATION OF RIGHTS**

127. The Equity Committee expressly reserves all of its rights to assert additional objections to the Plan before and at the Confirmation Hearing.

**CONCLUSION**

**WHEREFORE**, for the reasons set forth herein, and as will be further established through evidence presented by the Equity Committee at the Confirmation Hearing, the Plan does not satisfy the requirements set forth in Bankruptcy Code Section 1129, and confirmation should be denied.

Dated: July 10, 2017
Wilmington, Delaware

**SAUL EWING LLP**

*/s/ Mark Minuti*
Mark Minuti (DE bar No. 2695)
1201 North Market Street, Suite 1266
Wilmington, DE 19801
Telephone: (302) 421-6800
Facsimile: (302) 421-6813
mminuti@saul.com
-and-
Sharon L. Levine
1037 Raymond Boulevard, Suite 1520
Newark, NJ 07102
Telephone: (973) 286-6718
Facsimile: (937) 287-6821
slevine@saul.com

**BROWN RUDNICK LLP**
Steven D. Pohl
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8594
Facsimile: (617) 289-0433
spohl@brownrudnick.com
-and-
Howard S. Steel
Kenneth J. Aulet
Justin G. Cunningham
Seven Times Square, 47th Floor
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

*Proposed Counsel to the Equity Committee*