**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TIDEWATER INC., *et al.*,[1] | Case No. 17-11132 (BLS) (Jointly Administered) |
| Debtors. | Re: Docket Nos. 14, 129 and 217 |

**RESPONSE MEMORANDUM
IN SUPPORT OF LESSORS' DAMAGES CLAIMS**

Kurt F. Gwynne (No. 3951)
Emily Devan (No. 6104)
REED SMITH LLP
1201 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
Email: kgwynne@reedsmith.com
Email: edevan@reedsmith.com

*Attorneys for Fifth Third Equipment
Finance Company and Local Counsel
for all Lessors*

-and-

David Eades (admitted *pro hac vice*)
John A. Fagg, Jr. (admitted *pro hac vice*)
Luis M. Lluberas (admitted *pro hac vice*)
MOORE & VAN ALLEN PLLC
100 North Tyron Street
Charlotte, North Carolina 28202
Telephone: (704) 331-1044
Facsimile: (704) 378-2044
Email: davideades@mvalaw.com
Email: johnfagg@mvalaw.com
Email: luislluberas@mvalaw.com

*Attorneys for Banc of America
Leasing & Capital, LLC*

-and-

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: Tidewater Inc. (7776), Tidewater Marine Western, Inc. (1064), Tidewater Corporate Services, L.L.C. (7776), Tidewater Marine, L.L.C. (7779), Cajun Acquisitions, LLC (2365), Gulf Fleet Supply Vessels, L.L.C. (2194), Hilliard Oil & Gas, Inc. (4727), Java Boat Corporation (0278), Pan Marine International Dutch Holdings, L.L.C., Point Marine, L.L.C. (9586), Quality Shipyards, L.L.C. (2335), S.O.P., Inc. (3464), Tidewater Marine Alaska, Inc. (7549), Tidewater Marine International Dutch Holdings, L.L.C. (2289), Tidewater Marine Sakhalin, L.L.C. (7779), Tidewater Mexico Holding, L.L.C. (8248), Tidewater Venture, Inc. (7694), Twenty Grand (Brazil), L.L.C. (7730), Twenty Grand Marine Service, L.L.C. (7730), Zapata Gulf Marine, L.L.C. (5513), Tidewater GOM, Inc. (2799), Tidewater Subsea, L.L.C. (2022), Tidewater Subsea ROV, L.L.C. (3832), Tidewater Marine Fleet, L.L.C., Tidewater Marine Hulls, L.L.C., Tidewater Marine Ships, L.L.C., and Tidewater Marine.L.C. The Debtors' principal offices are located at 601 Poydras Street, Suite 1500, New Orleans, Louisiana 70130.

Robert Simons (admitted *pro hac vice*)
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222
Telephone: (412) 288-7294
Facsimile: (412) 288-3063
Email: rsimons@reedsmith.com

*Attorneys for PNC Equipment
Finance, LLC*

-and-

John M. Duck (admitted *pro hac vice*)
Francis V. Liantonio, Jr.
(admitted *pro hac vice*)
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
Email: john.duck@arlaw.com
Email: frank.liantonio@arlaw.com

-and-

David K. Bowsher (admitted *pro hac vice*)
ADAMS AND REESE LLP
1901 6th Avenue North, Suite 3000
Birmingham, Alabama 35203
Telephone: (205) 250-5000
Facsimile: (205) 250-5034
Email: david.bowsher@arlaw.com

*Attorneys for Regions Commercial
Equipment Finance, LLC*

Jamie W. Olinto
ADAMS AND REESE LLP
501 Riverside Avenue, 7th Floor
Jacksonville, Florida 32202
Telephone: (904) 355-1700
Facsimile: (904) 355-1797
Email: jamie.olinto@arlaw.com

*Attorneys for Regions Commercial
Equipment Finance, LLC*

-and-

Thomas O. Bean (admitted *pro hac vice*)
Roger A. Clement (admitted *pro hac vice*)
VERRILL DANA LLP
One Boston Place, Suite 1600
Boston, Massachusetts 02108
Telephone: (617) 309-2606
Facsimile: (617) 309-2601
Email: tbean@verrilldana.com
Email: rclement@verrilldana.com

*Attorneys for MassMutual Asset
Finance, LLC*

-and-

Richard Aguilar (admitted *pro hac vice*)
McGLINCHEY STAFFORD PLLC
601 Poydras Street, Suite 1200
New Orleans, Louisiana 70130
Telephone: (504) 596-2884
Facsimile: (504) 910-8371
Email: raguilar@mcglinchey.com

*Attorneys for BBVA Compass Financial
Corporation*

Dated: July 14, 2017

# TABLE OF CONTENTS

<strong>Page</strong>

NATURE AND STAGE OF THE PROCEEDING.................................................................. 1

SUMMARY OF ARGUMENT .............................................................................................. 2

STATEMENT OF FACTS .................................................................................................... 3

    A.     Debtors.................................................................................................................3

    B.     Lessors.................................................................................................................4

    C.     Debtors' Sale-Leaseback Transactions.................................................................4

    D.     Remedies Under the Bareboat Charter Agreements if an Event of Default
          Occurs .................................................................................................................6

    E.     SLV Determination..............................................................................................7

    F.     Guaranties ...........................................................................................................9

    G.     Declining Oil Market and Resulting Decrease in Vessel Value ..........................10

    H.     Event of Default by Debtors and Termination of the Bareboat Charter
          Agreements .........................................................................................................11

LEGAL ANALYSIS............................................................................................................. 11

    I.     LESSORS ARE ENTITLED TO RECOVER SLV AND OTHER DAMAGES
          UNDER THE "ABSOLUTE AND UNCONDITIONAL" GUARANTEES........12

          A.     The Issue of Unenforceability of the SLV Provisions Is Irrelevant to
               Tidewater's Liability under the Guaranties. ............................................. 12

          B.     The Rejection of the Lease Breaches the Guaranties.............................. 17

    II.     LESSORS ARE ENTITLED TO RECOVER SLV AND OTHER DAMAGES
          FOR DEBTORS' DEFAULT UNDER THE BAREBOAT CHARTER
          AGREEMENTS..............................................................................................18

          A.     The SLV Provisions in the Bareboat Charter Agreements Are
               Enforceable Under New York Law. ......................................................... 18

          B.     Debtors Cannot Meet Their Burden of Demonstrating the Liquidated
               Damages Provision of the Bareboat Charter Agreements is an
               Unenforceable Penalty. ........................................................................... 22

               1.     The Difference Between SLV and Future Charter Hire Payments
                    Does Not Demonstrate that the Liquidated Damages Provision is
                    Unenforceable. ............................................................................ 23

                    a.     Lost Residual Value...................................................... 24

                    b.     Lost Tax Benefits........................................................... 25

                    c.     Other Categories of Damages ....................................... 25

                    d.     Discount Rate................................................................. 26

                 2.     Cases Debtors Cite are Inapposite. .............................................. 28

          C.     Debtors' Argument Regarding Lack of Notice of Termination is
               Contrary to the Bareboat Charter Agreements and Applicable Law. ....... 31

          D.     Public Policy and Equity Support Enforcement of the SLV Provisions... 32

CONCLUSION..................................................................................................................... 34

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*,
    No. 1:13-CV-6285-GHW, 2015 U.S. Dist. LEXIS 34768 (S.D.N.Y.
    Mar. 19, 2015), *aff'd* 644 F. App'x. 10 (2d Cir. N.Y. 2016) ................................14, 15

*136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*,
    644 F. App'x. 10 (2d Cir. N.Y. 2016)....................................................................14, 15

*Abdulghani v. Virgin Islands Seaplane Shuttle, Inc.*,
    146 F. Supp. 583 (D.V.I. 1990) .......................................................................................27

*Acadia Woods Partners, LLC v. Signal Lake Fund LP*,
    957 N.Y.S.2d 862 (N.Y. App. Div. 1st Dep't 2013) ....................................................13

*In re Austin Dev. Co.*,
    19 F.3d 1077 (5th Cir. 1994) ..........................................................................................31

*Banco Do Estado De Sao Paulo, S.A. v. Mendes Junior Int'l Co.*,
    672 N.Y.S.2d 28 (N.Y. App. Div. 1st Dep't 1998) ......................................................14

*BNY Fin. Corp. v. Clare*,
    568 N.Y.S.2d 65 (N.Y. App. Div. 1st Dep't 1991) ......................................................14

*CIT Grp./Equip. Fin., Inc. v. Shapiro*,
    No. 09 CIV 409 (JPO), 2013 U.S. Dist. LEXIS 45870 (S.D.N.Y. Mar
    29, 2013) ...........................................................................................................................29

*Citibank, N.A. v. Plapinger*,
    485 N.E.2d 974, 495 N.Y.S.2d 309 (N.Y. Ct. App. 1985) .............................13, 16, 17

*In re Cool, Cool Water, LLC*,
    No. 05-24666 (DHS), Adv. No. 05-02318 (DHS), 2007 Bankr. LEXIS
    1202 (Bankr. D.N.J. Apr. 3, 2007)...............................................................................26

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., "Rabobank
    Intl.," N.Y. Branch v. Navarro*,
    36 N.E.3d 80, 15 N.Y.S.3d 277 (N.Y. 2015)....................................................13, 15, 16

*Danann Realty Corp. v. Harris*,
    157 N.E.2d 597, 184 N.Y.S.2d 599 (N.Y. 1959)....................................................16, 17

*ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*,
    662 F. App'x. 19 (2d Cir. N.Y. 2016)............................................................................12

*In re Emple Knitting Mills, Inc.*,
   123 B.R. 688 (Bankr. D. Me. 1991)..........................................................................31

*In re Federal-Mogul Global Inc.*,
   330 B.R. 133 (D. Del. 2005).....................................................................................27

*GE Capital Corp., LLC v. G. Howard Assocs.*,
   No. 09-CV-3923 (RRM) (JMA), 2010 U.S. Dist. LEXIS 63609
   (E.D.N.Y. May 14, 2010) .........................................................................................21

*Gen. Trading Co. v. A & D Food Corp.*,
   738 N.Y.S.2d 845 (N.Y. App. Div. 1st Dep't 2002) ..................................................14

*Grand Pac. Fin. Corp. v. 97-111 Hale, LLC*,
   935 N.Y.S.2d 17 (N.Y. App. Div. 1st Dep't 2011) ....................................................13

*Harbor Island Spa, Inc. v. Norwegian America Line A/S*,
   314 F. Supp. 471 (S.D.N.Y. 1970)............................................................................22

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1, 120 S. Ct. 1942 (2000)...........................................................................19

*In re Hayes Lemmerz Int'l, Inc.*,
   340 B.R. 461 (Bankr. D. Del. 2006) ........................................................................29

*J. Ray McDermott & Co. v. Vessel Morning Star*,
   457 F.2d 815 (5th Cir. 1972) ...................................................................................33

*Leroy v. Sayers*,
   635 N.Y.S.2d 217 (N.Y. App. Div. 1st Dep't 1995) ..................................................29

*LFR Collections LLC v. Blan Law Offices*,
   985 N.Y.S.2d 496 (N.Y. App. Div. 1st Dep't 2014) ..................................................13

*Matta v. Majestic Const., Inc.*,
   No. ST-07-CV-109, 2011 V.I. LEXIS 43 (V.I. Super. July 26, 2011).................26, 27

*In re Montgomery Ward Holding Corp.*,
   326 F.3d 383 (3d Cir. Del. 2003).......................................................................29, 30

*N. Fork Bank v. ABC Merch Servs., Inc.*,
   853 N.Y.S.2d 633 (N.Y. App. Div. 2d Dep't 2008) ..................................................14

*Penn Intermodal Leasing, Inc. v. Shipping Corp. of India*,
   No. 95-cv-10178 (SWK), 1997 U.S. Dist. LEXIS 11010 (S.D.N.Y.
   July 30, 1997)......................................................................................................31, 32

*Pyramid Ctrs. & Co. Ltd. v. Kinney Shoe Corp.*,
   663 N.Y.S.2d 711 (N.Y. App. Div. 3d Dep't 1997) ....................................................29

*Red Line Air, Inc. v. G. Howard Assocs.*,
   No. CV-09-3928 (RRM) (JMA), 2010 U.S. Dist. LEXIS 55955
   (E.D.N.Y. May 11, 2010) ....................................................................................21, 22

*Red Tulip, LLC v. Neiva*,
   842 N.Y.S.2d 1 (N.Y. App. Div. 1st Dep't 2007) .......................................................16

*In re Spansion Inc.*,
   No. 09-10690 (KJC), 2011 U.S. Dist. LEXIS 82829 (D. Del. July 28,
   2011) ............................................................................................................................31

*In re Taylor-Wharton Int'l*,
   No. 09-14089 (BLS), Adv. No. 10-52792, 2010 Bankr. LEXIS 3994
   (Bankr. D. Del. Nov. 23, 2010)....................................................................................31

*Torin Assoc. v. Perez*,
   No. 15 Civ. 8043 (NSR), 2016 U.S. Dist. LEXIS 156354 (S.D.N.Y.
   Nov. 10, 2016) .............................................................................................................12

*In re Trans World Airlines, Inc.*,
   145 F.3d 124 (3d Cir. Del. 1998).........................................................................28, 29

*Truck Rent-A-Ct., Inc. v. Puritan Farms 2nd, Inc.*,
   361 N.E.2d 1015, 393 N.Y.S.2d 365 (N.Y. 1977)......................................................29

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
   369 F.3d 34 (2d Cir. N.Y. 2004)..................................................................................29

*Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A.*,
   315 F. Supp. 2d 347 (S.D.N.Y. 2003)..........................................................................22

*Wilmington Trust Co. v. Aerovias de Mex., S.A. de C.V.*,
   893 F. Supp. 215 (S.D.N.Y. 1995)...............................................................................31

**Statutes**

11 U.S.C. § 365(g) ...........................................................................................................31

11 U.S.C. § 1110..............................................................................................................31

Internal Revenue Code Section 167(a) ...........................................................................25

N.Y. UCC Law § 2-A-102 (Consol. 2017)...............................................................18, 29

N.Y. UCC Law § 2-A-103(l) (Consol. 2017) .................................................................21

N.Y. UCC Law § 2-A-219 (Consol. 2017)...................................................................21, 28

N.Y. UCC Law § 2-A-504 (Consol. 2017)............................................................... *passim*

N.Y. UCC Law § 2-A-527 (Consol. 2017).......................................................................25

N.Y. UCC Law § 2-A-530 (Consol. 2017).......................................................................25

N.Y. UCC Law § 2-A-532 (Consol. 2017)...........................................................21, 24, 28

**Other Authorities**

Ian Shrank & Samuel Yim, *Liquidated Damages in Commercial Leases of Personalty—The Proper Analysis* 64 Bus. Law. 757 (May 2009) ..................20, 30, 32

Regions Commercial Equipment Finance, LLC ("RCEF"), PNC Equipment Finance, LLC ("PNCEF"), Fifth Third Equipment Finance Company ("Fifth Third"), Banc of America Leasing & Capital, LLC ("BALC"), Mass Mutual Asset Finance, LLC ("MMAF"), and BBVA Compass Financial Corporation ("BBVA") (collectively, "Lessors" and each individually a "Lessor"), by and through their respective undersigned counsel, submit this Response Memorandum in Support of Lessors' Damages Claims.

## NATURE AND STAGE OF THE PROCEEDING

On May 17, 2017, Tidewater Inc. ("Tidewater") and its affiliated debtors (collectively with Tidewater, "Debtors" and each individually a "Debtor") filed petitions under Chapter 11 of the United States Bankruptcy Code seeking approval of a Prepackaged Plan ("Plan") to re-organize Debtors.  (D.I. 1.)  Pursuant to the Order Approving Stipulation Among the Debtors and Lessors Related to Sale Leaseback Agreements (D.I. 129-1), Debtors reserved $323,594,746 under the Plan for Lessors' claims related to Debtors' planned rejection of sixteen separate vessel leases.

Also on May 17, 2017, Debtors filed a First Omnibus Motion (the "Objection") which, among other things, objects to the allowance of liquidated damages that Lessors are contractually entitled to recover under the leases.  (D.I. 14)  On June 13, 2017, this Court entered a Consent Order Establishing Schedule for Discovery and Determination of Debtors' Objection to Lessors' Damages Claims.[2]  (D.I. 217.)  Under the terms of that Order, Lessors are permitted to submit this Response Memorandum in Support of Lessors' Damages Claims.  A hearing on this dispute is scheduled for August 30, 2017.

---

[2] Discovery is not yet complete.  Accordingly, Lessors reserve the right to amend, supplement, or modify this Response.

## SUMMARY OF ARGUMENT

1.      Debtors are sophisticated parties that, through a series of sale-leaseback transactions involving complex tax and residual value issues, sold sixteen offshore supply vessels to Lessors for nearly $394 million and immediately thereafter chartered (i.e., leased) the vessels back for various terms.  These sale-leaseback transactions provided gains to Debtors in excess of $170 million.

2.      In addition to other negotiated, commercial terms, such as monthly charter hire payments and the term of charter, the Bareboat Charter Agreements contain stipulated loss value ("SLV") Tables ("SLV Tables"), which are commonplace in the leasing industry. Among other things, the parties used the SLV Tables to stipulate how much the vessel's lessee would pay to a Lessor if, through default, the charter ended before full term.

3.      Significantly, the above stipulated values were agreed to not only as damages in an event of default but also for early termination.  Debtors agreed to use the same table of values to govern payment to Lessors if: (1) Debtors determined that any vessels were surplus or uneconomic; (2) a total loss of any vessel(s) occurred, and, (3) in some instances, if Debtors exercised early buyout options; further evidencing agreement as to valuation of the vessels for more than just damages in the event of a default or early termination.

4.      Debtors are rejecting thirteen Bareboat Charter Agreements, and three Bareboat Charter Agreements were terminated prepetition, such that none of the charter terms will be completed.

5.      Rather than conceding that the amounts Debtors contractually agreed to pay Lessors in the event of a default—the stipulated loss value as of the premature end of

2

the charters—is the proper measure of damages, Debtors now claim that the SLV provisions constitute unenforceable penalties.

6.      Debtors' attempt to strike the SLV provisions from the Bareboat Charter Agreements ignores governing statutory law and misapplies existing case law.

7.      Independently, Lessors are also entitled to recover SLV from Tidewater, which unconditionally guaranteed the obligations of each of the affiliated Debtors that were parties to the applicable Bareboat Charter Agreements.  By their terms, Tidewater's unconditional Guaranties apply regardless of the enforceability of the provisions of the underlying Bareboat Charter Agreements or any lack of notice.

8.      Either through application of the express terms of the Bareboat Charter Agreements or application of the express terms of the unconditional Guaranties from Tidewater, Lessors are entitled to recover from Debtors the contractually agreed SLV, which represents a reasonable estimate of Lessors' damages in the event of a default, early termination, or breach of the Bareboat Charter Agreements.

## STATEMENT OF FACTS

### A.  Debtors

Tidewater is a Delaware corporation listed on the New York Stock Exchange. Debtors provide offshore service vessels and marine support services to the global offshore energy industry through a diversified fleet of marine service vessels that support all phases of offshore energy exploration, field development, and production.  With a fleet of ships over half the size of the United States Navy and more than twice the size of their nearest competitor, Debtors maintain a global footprint with operations in more than 60 countries.

## B.  Lessors

Lessors are equipment financing and leasing companies that provide short and long-term financing services to small businesses, middle market companies, and large corporations.  Lessors offer a variety of leasing options that allow their customers to improve liquidity, cash flow, and financial statement management as well as affording the opportunity for capital creation.  Lessors' lease offerings are generally tailored with terms and payment structures to meet their customers' budgetary and other needs while, at the same time, maintaining a yield acceptable to Lessors.  Lessors are not in the business of manufacturing, selling, or supplying any equipment, including offshore supply vessels; rather, Lessors provide financing for equipment purchases and leasing options that permit customers, including Debtors, to increase their equipment inventory through off-balance sheet financing arrangements, such as sale-leaseback transactions.  It is commonplace in leasing for the parties to agree—indeed stipulate—to loss values as one of the many commercial deal points.

## C.  Debtors' Sale-Leaseback Transactions

In 2000, Debtors embarked on an aggressive new building and acquisition program.  Over a fifteen year period, Debtors purchased or constructed 287 vessels at a total cost of approximately $4.9 billion.  From 2000 through 2016, Debtors also disposed of 713 vessels, resulting in proceeds of $795 million and pre-tax gains of $300 million.  One mechanism Debtors frequently used to fund the vessel program was sale-leaseback transactions under which Debtors would sell a vessel to an equipment financing and leasing company that would then lease the vessel back to Debtors at a monthly rental rate

(the "Charter Hire Payment").  The sale-leaseback transactions provided Debtors with off-balance sheet financing, permitted Debtors to record gains on their balance sheet, offered Debtors potential tax benefits, and generated substantial liquidity, all of which are important and substantial benefits to Debtors.  During fiscal years 2014 and 2015, Debtors entered into the sixteen sale-leaseback transactions at issue in this matter, which, according to Tidewater's 2016 10-K filed with the Securities and Exchange Commission, resulted in a gain to Debtors in excess of $170 million.[3]

The negotiation of the sale-leaseback transactions at issue in this matter all followed the same general process.  Debtors issued a request for proposal ("RFP")[4] seeking bids from Lessors, and other equipment financing and leasing companies, to purchase from a Debtor one or more specific vessels and then lease the vessel back to a Debtor as a "Charterer."  The proposals generally included Debtors' basic economic terms for the transaction including sales price for each vessel, term, buyout options, and favored rent structure.  The proposals also routinely included Debtors' form contract for acquisition and charter, and Debtors advised Lessors that any "strong changes to the structure or terms" should be identified in the proposal.  Through these form contracts, Debtors, including Tidewater, originally proposed utilizing SLV as a measure of liquidated damages.

Lessors and other equipment financing and leasing companies then submitted responses to Debtors' RFPs that contained general economic terms of an offer.  Once

---

[3] Excerpts from Tidewater's 2016 10-K are included as Exhibit A.  Exhibits referenced herein are included in the Appendix of Exhibits to Response Memorandum in Support of Lessors' Damages Claims filed contemporaneously.

[4] A copy of an RFP issued by Tidewater is included as Exhibit B.  For at least six of the transactions, Bank of Tokyo Mitsubishi assisted Debtors in identifying potential sources of financing.

Debtors selected a lessor with which to transact for a particular vessel, additional negotiation may have occurred regarding the deal's economic terms, such as the vessel purchase price (based on an appraisal obtained by Debtors), the Charter Hire Payment, the duration of the Bareboat Charter Agreement, early buyout options, and SLV. Following an agreement in principle with regard to the key economic terms, both parties, who were represented by sophisticated counsel, executed: (1) an "Agreement to Purchase and Charter," under which the Lessor would purchase the specific vessel from Debtors[5]; (2) a "Bareboat Charter Agreement," under which the Charterer would lease the specific vessel from the Lessor; and (3) a "Guaranty," under which Tidewater would absolutely and unconditionally guarantee the obligations of the Charterer under the Bareboat Charter Agreement.  These agreements were executed in connection with all sixteen sale-leaseback transactions at issue in this matter.[6]

### D.  Remedies Under the Bareboat Charter Agreements If an Event of Default Occurs

The Default and Remedies provisions contained in Section 16 of all of the negotiated Bareboat Charter Agreements are substantively the same and are based upon a form contract Debtors provided, generally as part of the RFP.  Section 16(a) defines "Events of Default," and Section 16(b) of the Bareboat Charter Agreements permits Lessors to "pursue all remedies available at law or in equity" against the Charterer and

---

[5] Note that the early termination option in the Bareboat Charter Agreements provides that, if Debtors determined the vessels to be surplus or uneconomic to their needs (while deriving an immediate financial gain in the form of accelerating the realization of the deferred tax gains), then the Debtors must pay Lessors SLV.  Here, Debtors de facto exercised this option by advising Lessors the Bareboat Charter Agreements are rejected. Since the parties anticipated this possibility at the time of entering into the Bareboat Charter Agreements, the Debtors are required to pay SLV.  (Bareboat Charter Agreement § 11(g)(ii).)

[6] Transaction documents for the sale-leaseback transactions of the vessels Pat Tillman and Dalfrey Tide are included as Exhibits C and D, respectively.  Transaction documents executed in connection with the sale-leaseback transactions for all sixteen vessels are substantively the same.

recites an available list of cumulative and non-exclusive remedies, including; termination of the Bareboat Charter Agreement; sale of the vessel; recovery of SLV;[7] recovery of costs and expenses incurred in connection with the retaking, sale and disposition of the vessel; and recovery of the costs and expenses, including attorneys' fees, incurred in connection with the enforcement and exercise of remedies under the Bareboat Charter Agreement.  However, imposition of SLV also does not result in a windfall to Lessors or a penalty to Debtors.  Rather, Section 16(b)(iv) of the Bareboat Charter Agreements provides a waterfall against which Lessors must apply the proceeds from any sale, charter or disposition of a vessel against the amounts due from the Charterer.  To the extent the proceeds from a disposition of a vessel exceed a Lessor's expenses associated with disposing of the Vessel and all sums due and owing from Charterer, the proceeds are applied to "any sums previously paid by the Charterer as liquidated damages."[8]

### E.  SLV Determination

Section 16(b)(iii) of the Bareboat Charter Agreements specifically provides that, upon the occurrence of an Event of Default, Lessors have the right to recover from the Charterer an amount equal to the SLV "calculated as of the Charter Hire Payment Date preceding the date that the event which resulted in the Event of Default occurred, as liquidated damages for loss of a bargain **and not as a penalty**." (emphasis added.) Attached to each Bareboat Charter Agreement is an SLV Table that lists SLV for each Charter Hire Payment Date as a percentage of the original vessel purchase price.  All

---

[7] Although the provisions are substantively the same as the other Bareboat Charter Agreements, the Bareboat Charter Agreements for some of the vessels use the term "Insured Value" rather than "Stipulated Loss Value."

[8] Alternatively, Section 16(c) permits the Charterer to take ownership of the vessel in the event that the Lessor recovers from Debtors SLV, the past due Charter Hire Payment from Debtors and associated collection costs.

SLV Tables show a declining percentage, which is calculated on a monthly basis, through the term of the Bareboat Charter Agreements. If an Event of Default occurs near the end of the charter term, the Lessor recovers a smaller SLV than if the Event of Default occurs earlier in the charter term. This method of allocating risk between a lessor and lessee is designed to suit the needs and risk tolerances of both parties.

To create the SLV Tables attached to their specific Bareboat Charter Agreements, Lessors' employed principles that are widely accepted across the commercial equipment finance and leasing industry and familiar to sophisticated lessees and charterers such as Debtors. Using their institutional knowledge and experience, industry data, and other outside sources—including appraisals Debtors provided that estimated the anticipated residual value of a vessel at different points of time during the term of the Bareboat Charter Agreements—Lessors utilized financial models to develop an SLV Table, taking into account: (i) the estimated residual value of the vessel; (ii) the future Charter Hire Payments that would be due; (iii) the anticipated tax consequences of an Event of Default or early termination; (iv) costs associated with negotiating and closing the sale-leaseback transactions; and (v) other appropriate costs if an Event of Default occurred or there was an early termination of the Bareboat Charter Agreements. The methodology was intended to provide a reasonable estimate, at the time the parties entered into the Bareboat Charter Agreements, of the probable harm to Lessors resulting from an Event of Default or early termination at any specific point in time during the term of the Bareboat Charter Agreements.

### F.  Guaranties

With each of the sale-leaseback transactions at issue, Tidewater executed a Guaranty under which it "unconditionally and irrevocably guarantees, as primary obligor and not merely as a surety," payment of all sums "imposed on or payable by the Charterer . . . by reason of any breach of or failure to perform or observe, or any other non-compliance with, any covenant, condition or agreement or other obligation to be performed by the Charterer under the Charter . . . ."[9]  (Bareboat Charter Agreement § 3.01.)  Section 3.01 of each Guaranty also provides that Tidewater's liability extends to all obligations that the defaulting Debtor would owe to the Lessor under the specific Bareboat Charter Agreement "but for the fact that they are unenforceable or are not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving the Charterer."

Pursuant to Section 3.02 of the Guaranties, Tidewater guarantees the obligations of the applicable Charterer will be "paid strictly in accordance with the terms of the Charter, regardless of any law, regulation or order . . . affecting any . . . rights of the Owner, the Guarantor or the Charterer . . . ."  Critically, the Guaranties further affirm that the liability of Tidewater "shall be absolute and unconditional irrespective of: (i) any lack of validity or enforceability of the Charter or any term thereof . . . [and] (vi) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Charterer or a guarantor thereof."   In short, the Guaranties expressly provide that Tidewater waives any defense to the obligations due under the Bareboat Charter

---

[9] PNCEF acquired the Brewster Tide directly from Tidewater.  The fifteen other vessels were acquired from an affiliated Debtor.

Agreements, including defenses that might be available to Charterers to avoid their contractual obligation to pay SLV to Lessors upon the occurrence of an Event of Default.

Pursuant to Section 3.03 of the Guaranties, Tidewater waived any notice "with respect to any of the Obligations [of the Charterer under the Charter] and this Guaranty and any requirement that the Owner . . . exhaust any right or take any action against the Charterer or any other person or entity or any collateral."  Tidewater affirmed that its obligations as the Guarantor "are absolute, present and continuing obligations which are not conditional upon the institution of suit . . . the exercise of any remedies against the Charterer . . . . or the taking of any other action with respect to the Charterer."

## G.  Declining Oil Market and Resulting Decrease in Vessel Value

Beginning in 2015, global oil prices experienced a dramatic and unanticipated decline, which resulted in massive cuts in capital expenditures and sharply shrinking cash flows in the energy industry.  The continued depressed level of oil prices through 2016 created uncertainty in the oil industry and led to significant reduction in offshore exploration, development, and production activity in nearly every geographic market and water depth of operation.  As a result of the depressed oil market, Debtors removed many of their offshore supply vessels from service and downsized their organization.  This downturn in the industry caused an oversupply and significant devaluing of offshore supply vessels, including the sixteen vessels leased to Debtors under the Bareboat Charter Agreements.  As counsel for Debtors noted at the May 19, 2017 hearing in this matter, no one, including Debtors, expected the severe and long-lasting downturn in the global oil industry that occurred.

**H.      Event of Default by Debtors and Termination of the Bareboat Charter Agreements**

On May 17, 2017, Debtors filed petitions for reorganization under the bankruptcy laws of the United States, and prior to that date, Debtors became insolvent—each of which is an Event of Default pursuant to Section 16(a)(vi) of each of the Bareboat Charter Agreements.  Debtors are rejecting each of the Bareboat Charter Agreements, thereby ceasing Charter Hire Payments to Lessors.   On or about April 17, 2017, as a result of the insolvency of Tidewater, BALC terminated its Bareboat Charter Agreements with Debtors in accordance with the terms of those agreements.  The other Bareboat Charter Agreements were, or soon will be, terminated in accordance with their terms (including Section 16(b)(i), which obviates the need for a termination notice in the event of a bankruptcy).[10]

## LEGAL ANALYSIS

Applying New York law,[11]   Tidewater is liable to Lessors for SLV under the Guaranties, and Debtors are liable to Lessors for SLV under the Bareboat Charter Agreements.  Consequently, the Court should award SLV to Lessors.   The proposed damages calculation Debtors have offered the Court not only disregards this obligation they agreed to accept, it also calls for a damages calculation—consisting of future Charter Hire Payment discounted to present value using a 9.5% discount rate— that significantly

---

[10] *See also infra* Section II.C.

[11] Debtors stated in their Objection that the issues raised in this matter in regard to Bareboat Charter Agreements are governed by New York law.  (D.I. 14 ¶ 34.)  Lessors agree with that assessment based upon the governing law provision of the Bareboat Charter Agreements that provides for the application of New York law to the extent that maritime law is inapplicable.  The Guaranties also contain a New York choice of law provision.

understates the amounts that Lessors would be able to recover if the Bareboat Charter Agreements did not contain SLV provisions.[12]

## I. LESSORS ARE ENTITLED TO RECOVER SLV AND OTHER DAMAGES UNDER THE "ABSOLUTE AND UNCONDITIONAL" GUARANTEES.

Under well-established New York law, the unenforceability of the SLV provisions against the Charterers is legally irrelevant to the liability of Tidewater under the "absolute and unconditional" Guaranties. Moreover, the post-petition rejection of the Bareboat Charter Agreements by Debtors gives rise to pre-petition claims against Tidewater for the full amount of its Guaranties.

### A. The Issue of Unenforceability of the SLV Provisions Is Irrelevant to Tidewater's Liability under the Guaranties.

Debtors' argument regarding the unenforceability of the SLV provisions of the Bareboat Charter Agreements is legally irrelevant to the liability of Tidewater under the Guaranties. As noted above, the Guaranties state that they are "absolute and unconditional" irrespective of any defense to the enforceability of the Bareboat Charter Agreements. The Guaranties explicitly waive any defense of "lack of validity or enforceability" to the obligations due under the Bareboat Charter Agreements, which would include SLV. New York courts have termed such guaranty agreements as "ironclad." *See Torin Assoc. v. Perez*, No. 15 Civ. 8043 (NSR), 2016 U.S. Dist. LEXIS 156354, *17 (S.D.N.Y. Nov. 10, 2016) (quoting *ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, 662 F. App'x. 19, 21 (2d Cir. N.Y. 2016)) (stating that guaranty agreements similar to the Guaranties are "'colloquially called ironclad'").

---

[12] Even assuming, *arguendo*, that Lessors are somehow not entitled to recover SLV, Lessors are, at a minimum, entitled to recover significantly more than the damages Debtors propose.

The New York Court of Appeals has unanimously held that the presence of such absolute and unconditional language in a guaranty is "sufficiently specific to foreclose as a matter of law . . . defenses and counterclaims based on fraud, negligence or failure to perform a condition precedent." *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974, 975, 495 N.Y.S.2d 309, 310 (N.Y. Ct. App. 1985); *see also Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A., "Rabobank Intl.," N.Y. Branch v. Navarro*, 36 N.E.3d 80, 86, 15 N.Y.S.3d 277, 283 (N.Y. 2015) (holding that a guarantor waived his right to assert a defense or counterclaim because the applicable guaranty contained language that the payment obligation was "absolute and unconditional," which was sufficient to "foreclose[] any challenge to the enforceability and validity of the documents which establish defendant's liability for payments arising under the Purchase Agreement."). New York courts routinely enforce waivers of the precise type Tidewater agreed to in which the guarantor waives any right to contest the "validity or enforceability" of the underlying debt triggering the guaranty. *See, e.g., Acadia Woods Partners, LLC v. Signal Lake Fund LP*, 957 N.Y.S.2d 862, 862 (N.Y. App. Div. 1st Dep't 2013) (rejecting defense alleging unenforceability of the underlying debt where "the guaranty explicitly disclaims defenses pertaining to the 'invalidity, irregularity or unenforceability' of the note"); *LFR Collections LLC v. Blan Law Offices*, 985 N.Y.S.2d 496, 496 (N.Y. App. Div. 1st Dep't 2014) (granting plaintiff's motion for summary judgment where "unconditional guarantee . . . waived the right to interpose a defense [and] stated that it would not be affected by any invalidity or unenforceability of the underlying obligation of the borrower"); *Grand Pac. Fin. Corp. v. 97-111 Hale, LLC*, 935 N.Y.S.2d 17, 18 (N.Y. App. Div. 1st Dep't 2011) (upholding summary judgment

where guaranty was absolute and unconditional "irrespective of any lack of validity or enforceability of any loan document"); *N. Fork Bank v. ABC Merch Servs., Inc.*, 853 N.Y.S.2d 633, 634 (N.Y. App. Div. 2d Dep't 2008) (barring fraud defense where guaranty was "absolute and unconditional regardless of the validity or enforceability of any other obligation").

New York courts have similarly enforced waivers like the one Tidewater agreed to, in which a guarantor agrees to waive any right to contest liability under a guaranty based upon "any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Charterer or a guarantor thereof." *See, e.g.*, *Gen. Trading Co. v. A & D Food Corp.*, 738 N.Y.S.2d 845, 845-46 (N.Y. App. Div. 1st Dep't 2002) (upholding summary judgment where unconditional guaranty waived all defenses); *Banco Do Estado De Sao Paulo, S.A. v. Mendes Junior Int'l Co.*, 672 N.Y.S.2d 28, 29 (N.Y. App. Div. 1st Dep't 1998) (fraud defense barred where guaranty was enforceable "irrespective of . . . any other circumstances which might constitute a defense"); *BNY Fin. Corp. v. Clare*, 568 N.Y.S.2d 65, 67 (N.Y. App. Div. 1st Dep't 1991) (awarding summary judgment on absolute and unconditional guaranty and rejecting fraud in the inducement as a defense to vary the terms of the written guaranty).

Based upon the foregoing plethora of New York case law, the United States District Court for the Southern District of New York, in a 2015 decision affirmed by the Second Circuit, specifically held that a lessor was entitled to recover liquidated damages under a guaranty that waived defenses to enforceability of the underlying lease obligations in spite of ongoing litigation regarding the enforceability of the liquidated damages provision in the underlying lease. *136 Field Point Circle Holding Co., LLC v.*

*Invar Int'l Holding, Inc.*, No. 1:13-CV-6285-GHW, 2015 U.S. Dist. LEXIS 34768 (S.D.N.Y. Mar. 19, 2015), *aff'd* 644 F. App'x. 10 (2d Cir. N.Y. 2016).  The *136 Field Point Circle Holding Co.* case involved a lease of real property with a monthly rental rate of $25,000 and a one-time liquidated damages payment of $1 million in the event the lessee held over after the lease term expired.  644 F. App'x. at 11.  Although the lessor challenged the liquidated damages provision on the ground of unenforceability in another action, the District Court held that the guarantor was liable for the $1,000,000 liquidated damages holdover payment.  2015 U.S. Dist. LEXIS 34768 at *9.  In granting summary judgment in favor of the lessor, the District Court stated that "the [g]uaranty unambiguously requires payment . . . ***even if the guaranteed obligation itself is unenforceable***."  *Id.* at *12-13 (emphasis added). The Court further noted that the guarantor's argument regarding the unenforceability of the underlying liquidated damages was "akin to a dishonest child's claim that her fingers were crossed behind her back when she made a promise."  *Id.* at *14-15.

In affirming the District Court's opinion, the Second Circuit Court of Appeals found that "where a guaranty provided that it is 'absolute and unconditional irrespective of . . . any lack of validity or enforceability of the agreement' . . . the guarantor is precluded from asserting a defense as to the 'existence of a valid underlying debt.'"  644 F. App'x. at 12 (quoting *Cooperatieve Centrale*, 36 N.E.3d at 86-87, 15 N.Y.S.3d at 283-84).  "[E]ven assuming the Lease's provision that required the [lessee] to pay [owner] $1,000,000 was an unenforceable penalty, [the guarantor] was foreclosed from challenging its obligation to ensure payment, and the district court thus did not err in granting summary judgment against it."  *Id.* at 13.

15

Also noteworthy are the decisions by the New York Court of Appeals in *Plapinger* and *Cooperatieve Centrale*. In *Plapinger*, the guarantors asserted a number of defenses to the lenders' motion for summary judgment, including fraudulent inducement. 485 N.E.2d at 974-75, 495 N.Y.S.2d at 309-10. The court held that even though the guarantors raised triable issues of fact as to alleged fraudulent inducement, the guaranty's waiver of defenses "**foreclose[d] as a matter of law**" the guarantors from pursuing any of the defenses asserted. *Id.* at 975, 495 N.Y.S.2d at 310 (emphasis added). In so holding, the New York Court of Appeals relied upon the language of the defendants' guaranty in which the defendants agreed, as Tidewater does here, that their obligations would remain unconditional irrespective of "any other circumstance which might otherwise constitute a defense" to the guaranty—identical language to Tidewater's waiver here. *See id.* at 977, 495 N.Y.S.2d at 312. The court held that the defendants' waiver precluded them from asserting any defenses including a defense of fraudulent inducement. *Id.* at 976-77, 495 N.Y.S.2d at 311-12 (citing *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 598-600, 184 N.Y.S.2d 599, 601-04 (N.Y. 1959)); *see also Red Tulip, LLC v. Neiva*, 842 N.Y.S.2d 1, 5 (N.Y. App. Div. 1st Dep't 2007) (waiver provision similar to Tidewater's posed an "insurmountable obstacle" to the guarantor's assertion of affirmative defenses).

Likewise in *Cooperatieve Centrale*, the guarantor argued that it was not liable for the underlying debt because the underlying debt was procured by collusion. 36 N.E.3d at 81, 15 N.Y.S.3d at 278. Relying upon language similar to that in the Guaranties, the New York Court of Appeals enforced the guaranty and stated that "a guarantor cannot seek to benefit from the guarantor's own fraudulent promise that the guaranty is 'absolute and

unconditional.'"  *Id.* at 87, 15 N.Y.S.3d at 284 (citing *Plapinger*, 485 N.E.2d 974, 495 N.Y.S.2d 309).  The New York Court of Appeals further noted that under New York law, similar waiver language had been held to preclude guarantors from asserting numerous defenses against the underlying debt, including release, discharge, statute of limitations, and fraud in the inducement.  *Id.* at 85-86, 15 N.Y.S.3d at 282-83 (citing cases).

These decisions from New York courts unequivocally demonstrate that when, as here, a guarantor agrees to pay the debt of another "absolutely and unconditionally," the guarantor foregoes its right to assert defenses to the enforceability of the underlying obligation, including the defense of unenforceability of a liquidated damages provision. There is no dispute that Tidewater—a sophisticated entity that executed the Guaranties only after full consultation with counsel of its choosing—absolutely and unconditionally guaranteed, *inter alia,* payment of all obligations under the Bareboat Charter Agreements, including the obligation to pay SLV.

Notably, Debtors have not addressed in their Objection, and cannot address, the application of New York law to the language of their "absolute and unconditional" Guaranties.  Consequently, this Court must follow the precedents of New York courts and find Tidewater liable for SLV under the Guaranties.  To do otherwise, would, as the *Plapinger* Court noted, "condone [Tidewater's] own fraud in 'deliberately misrepresenting [its] true intention' when putting [its] signature[] to [its] 'absolute and unconditional guarantee.'"  485 N.E.2d at 977, 495 N.Y.S.2d at 312 (quoting *Danann Realty Corp.*, 157 N.E.2d at 600, 184 N.Y.S.2d at 604).

### B.    The Rejection of the Lease Breaches the Guaranties.

Debtors' argument regarding lack notice to the Charterers is equally irrelevant to Tidewater's liability under the Guaranties.  Pursuant to the Guaranties, Tidewater

"unconditionally and irrevocably guarantee[d], as primary obligor and not merely as a surety" payment of all sums "imposed on or payable by the Charterer . . . by reason of any breach of or failure to perform or observe, or any other non-compliance with, any covenant, condition or agreement or other obligation to be performed by the Charterer under the Charter . . . ."  Pursuant to Section 3.03 of the Guaranties, Tidewater waived any notice "with respect to any of the Obligations and this Guaranty and any requirement that the Owner . . . exhaust any right or take any action against the Charterer or any other person or entity or any collateral . . . . [or take] any other action with respect to the Charterer."  Tidewater's obligations under the Agreement "are absolutely, present and continuing obligations which are not conditional upon the institution of suit or the exercise of any remedies against Charterer…."  Thus, the alleged failure to provide notice of an Event of Default or termination is immaterial.

## II.    LESSORS ARE ENTITLED TO RECOVER SLV AND OTHER DAMAGES FOR DEBTORS' DEFAULT UNDER THE BAREBOAT CHARTER AGREEMENTS.

Article 2-A of the New York Uniform Commercial Code ("UCC") "applies to any transaction, regardless of form, that creates a lease."  N.Y. UCC Law § 2-A-102 (Consol. 2017).  Application of the relevant provisions of Article 2-A of the UCC and case law relevant to the SLV provisions in the Bareboat Charter Agreements clearly indicate that the SLV provisions are enforceable under New York law.

### A.    The SLV Provisions in the Bareboat Charter Agreements Are Enforceable Under New York Law.

UCC § 2-A-504 provides that "[d]amages payable by either party for default, or any other act or omission, ***including indemnity for loss or diminution of anticipated tax benefits or loss or damage to lessor's residual interest***, may be liquidated in the lease

agreement but only at an amount or by a formula that is reasonable in light of the then anticipated harm caused by the default or other act or omission."  N.Y. UCC Law § 2-A-504 (Consol. 2017) (emphasis added).  New York's adoption of UCC § 2-A-504 did not codify New York's common law rules regarding the enforceability of liquidated damages provisions.  Rather, UCC § 2-A-504 eliminated some of the enforceability requirements of New York law applied to liquidated damages provisions in the sales context, namely "difficulties of proof of loss" and "inconvenience or nonfeasibility of otherwise obtaining an adequate remedy," thus creating "a revised rule that allows greater flexibility with respect to leases of goods" and that "should invite the parties to liquidate damages."  N.Y. UCC Law § 2-A-504 cmt. 1 & 4 (Consol. 2017).  Courts are required to enforce the New York Legislature's clear articulation of the appropriate standard for reviewing liquidated damages provisions in leases.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 3, 120 S. Ct. 1942, 1945 (2000) ("[W]hen a statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.").

Here, the SLV provisions agreed to at the time of contracting reflect several components: (a) the Charter Hire Payments that would not be paid after an early termination; (b) the anticipated residual value of the vessels; (c) any anticipated tax consequences resulting from an early termination of the Bareboat Charter Agreements; (d) costs associated with negotiating and closing the sale-leaseback transactions; and (e) other appropriate costs.[13]  The SLV Tables decrease on a monthly basis, thus recognizing

---

[13] As discussed in detail below, the damage components that are factored into SLV are also recoverable under UCC Article 2-A and the express terms of the Bareboat Charter Agreements.  However, the Bareboat
*(continued on next page)*

the Charter Hire Payment and tax benefit received by Lessors and the depreciation of the

vessels over time.  In effect, the SLV provisions provide Lessors with a guarantee by

Debtors that if the Bareboat Charter Agreements do not go to term, Lessors will

nonetheless receive their expected economic return from the sale-leaseback transactions,[14]

including the anticipated residual value of vessels.[15]

Looked at another way, the SLV provision shifts the risk of a decrease in market

value of the vessels from Lessors to Debtors during, and only during, the scheduled term

of the lease.  Shrank and Yim explain this clearly:

> Note that the inclusion of a residual value amount in the liquidated damage
> formula means that the lessee is in effect guaranteeing to the lessor that the lessor
> will receive the lessor's planned residual value of the property, and that the
> express inclusion in [S]ection 2[-]A-504(1) of a reference to residual value means
> the drafters intended this to be so. The residual value guaranty represents part of
> the central economic bargain the lessee makes with the lessor in such leases:  [I]f
> the lease goes to term, the lessor bears the risk of the property being worth less
> than it originally expected at the end of the term, but if the lease terminates early,
> this risk is borne by the lessee.

Ian Shrank & Samuel Yim, *Liquidated Damages in Commercial Leases of Personalty—*

*The Proper Analysis*, 64 Bus. Law. 757, 764 (May 2009) (footnotes omitted).[16]

Including these protections in the SLV provision is both common industry

practice and consistent with New York law.  As the comments to UCC § 2-A-504 state,

---

*(continued from previous page)*

Charter Agreements include a limitation of remedies that prevents double recovery in the event SLV is
recovered.

[14] Lessors generally analyze the economic return of a sale-leaseback transaction as a set of cash flows, the
scheduled rent under the initial lease followed by the sale (or re-lease) proceeds at the end of that lease and
the tax impact or benefits of the transaction.  "If the lessee defaults and the lessor therefore terminates the
lease early, the lessor is trying to 'get back' the expected cash flows."  *See* Shrank & Yim at 763.

[15] The SLV Tables are also applicable if a total loss of a vessel occurs or if a Debtor decides to terminate
the lease early due to the vessel becoming obsolete, surplus, or uneconomic.  Thus, regardless of the reason
for the termination, the owner's expected economic return is protected during the term of the lease.

[16] A copy of the Shrank & Yim article is included as Exhibit E.

"[a] liquidated damages formula that is common in leasing practice provides that the sum of lease payments past due, accelerated future lease payments, and the lessor's estimated residual interest, less the net proceeds of disposition (whether by sale or re-lease) of the leased goods is the lessor's damages."  N.Y. UCC Law § 2-A-504 cmt. 3 (Consol. 2017). Furthermore, UCC § 2-A-219 plainly states that risk of loss passes to the lessee in the case of a finance lease,[17] and UCC § 2-A-532 permits a lessor to recover from a lessee an amount that will fully compensate the lessor for any loss of the residual interest resulting from a lessee's default.  N.Y. UCC Law §§ 2-A-219 and 532 (Consol. 2017).

Two companion cases issued by the United States District Court for the Eastern District of New York demonstrate application of UCC § 2-A-504 in this context.  In *Red Line Air, Inc. v. G. Howard Assocs.*, No. CV-09-3928 (RRM) (JMA), 2010 U.S. Dist. LEXIS 55955, *8-13 (E.D.N.Y. May 11, 2010), and *GE Capital Corp., LLC v. G. Howard Assocs.*, No. 09-CV-3923 (RRM) (JMA), 2010 U.S. Dist. LEXIS 63609, *8-13 (E.D.N.Y. May 14, 2010), the District Court enforced a liquidated damages provision that allowed the aircraft owner to recover SLV calculated utilizing a formula that took into account the anticipated return, anticipated depreciation, and residual value of the aircraft. As in the Bareboat Charter Agreements, the SLV in both cases was shown as a percentage of the original cost of the aircraft in declining amounts at every monthly rental

---

[17] The Bareboat Charter Agreements plainly meet the definition of "finance lease" as that term is defined in UCC § 2-A-103(l), which requires that: (i) the lessor not select, manufacture, or supply the goods; (ii) the lessor acquires the goods in connection with the lease; and (iii) the lessee received a copy of the agreement by which the lessor acquired the goods.  *See* Exhibits C and D.  The fact that the Bareboat Charter Agreements were "finance leases" under UCC Article 2-A is not an indication that the Bareboat Charter Agreements are not "true leases."  The use of the term "finance lease" under Article 2-A does not make the rules of Article 9 regarding secured transactions applicable in this case.

payment date. *Red Line Air*, 2010 U.S. Dist. LEXIS 55955 at *13 n. 7; *GE Capital Corp.*, 2010 U.S. Dist. LEXIS 63609 at *13 n 9.

In *Red Line Air*, the District Court enforced the SLV calculated at payment 37, which was 97.865% of the original cost of the aircraft.  2010 U.S. Dist. LEXIS 55955 at *13 n. 7.  In comparison, the SLV Tables under the Bareboat Charter Agreements show SLV at payment 37 of between 80.9% and 92.0660%—significantly below the percentage of original cost that was found enforceable in *Red Line Air.*  Similarly, the SLV in *GE Capital Corp.* was calculated at payment 83 and was 85.655% of the original aircraft cost.  2010 U.S. Dist. LEXIS 63609 at *13 n. 9.  Again, the SLVs at payment 83 under the Bareboat Charter Agreements are significantly lower than the payments in *GE Capital Corp,* with a range of between 40.7% and 70.3660%.

These cases clearly demonstrate that under New York law, a liquidated damages provision that takes into account future unpaid rent, anticipated depreciation, residual value, and other appropriate costs is enforceable.  The SLV Tables were calculated by Lessors using a substantively identical methodology and, therefore, should be enforced.

### B.   Debtors Cannot Meet Their Burden of Demonstrating the Liquidated Damages Provision of the Bareboat Charter Agreements is an Unenforceable Penalty.

Debtors bear the burden of demonstrating that the SLV provisions are, in fact, an unenforceable penalty clause.  *See Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 350  (S.D.N.Y. 2003); *Harbor Island Spa, Inc. v. Norwegian America Line A/S*, 314 F. Supp. 471, 474 (S.D.N.Y. 1970) (stating "Charterers had the burden of proving that the liquidated damages clause was, in fact, a penalty clause").  Yet, the only support for the unenforceability of the SLV provisions that Debtors provided in their Objection was "the drastic disproportion between recovery

under the SLV liquidated damages provision and recovery of the Lessors' reasonable expectation damages."  (D.I. 14 ¶ 38.)  Even if there was such a drastic disproportion, which there is not, this fact would be insufficient under New York law to render the SLV provisions unenforceable.

> **1.    The Difference Between SLV and Future Charter Hire Payments Does Not Demonstrate that the Liquidated Damages Provision is Unenforceable.**

Importantly, to allow parties to liquidate amounts payable with respect to loss or diminution of anticipated tax benefit, UCC § 2-A-504 specifically excludes any statement that a term fixing unreasonably large liquidated damages is void as a penalty.  N.Y. UCC Law § 2-A-504 cmt. 4 (Consol. 2017).  Rather, assessment of the enforceability of a liquidated damages formula must be determined "in the context of each case by applying a standard of reasonableness *in light of the harm anticipated when the formula was agreed to.*"  N.Y. UCC Law § 2-A-504 cmt. 3 (Consol. 2017) (emphasis added).  Thus, even if there was a substantial disproportion between the amounts due under the SLV provisions and the total future Charter Hire Payments due under the Bareboat Charter Agreements, such disproportion is legally irrelevant.

Furthermore, even if Debtors were correct that this Court should consider the difference between future Charter Hire Payments and recovery under the SLV provision, Debtors' argument still fails.  At the time of contracting, the parties could rightfully anticipate there would be other damages that would arise from an Event of Default, including lost residual value and lost tax benefits.  However, Debtors ask this Court to totally disregard any consideration of recoverable damages other than future Charter Hire Payments and then, to add insult to injury, use an unreasonable discount rate as discussed

further below.  This self-serving math is insufficient to meet Debtors' burden of proof. Each of the types of damages arising from the Event of Default are discussed below.

### a.    Lost Residual Value

One reason for a disproportion between the amount due under the SLV provision and the total future Charter Hire Payments is that SLV also serves as a guarantee of residual value (which Debtors conveniently ignore).  The significant decline in the oil market resulted in a corresponding decline in the current market value of the vessels at issue, thereby increasing the amount recoverable from Debtors.  Under Section 16 of the Bareboat Charter Agreements, Debtors' payment of SLV entitles Debtors to receive a credit for any sale or re-lease of the vessels at the current market value.  Accordingly, the credit against SLV that Debtors will receive is significantly less than what was anticipated at the time the Bareboat Charter Agreements were executed.  However, Debtors' bargained-for assumption of market risk does not make the SLV provision unenforceable.  As discussed above, this shifting of the risk of market depreciation is expressly permitted under UCC Article 2-A, so the loss resulting from depreciation is recoverable by Lessors, either as part of an SLV calculation, or as a separate measure of damages under UCC § 2-A-532.

In effect, Debtors accepted the risk of asset depreciation when they signed the Bareboat Charter Agreements governed by the UCC.  Debtors accepted the risk that Debtors would not default and that, if an Event of Default did occur, the vessels would maintain their anticipated residual values;[18] Debtors lost on both counts.  New York law

---

[18] In exchange for accepting the risk of asset depreciation, Debtors were charged lower Charter Hire Payments and received a substantial cash infusion.  For Lessors to be able to charge lower Charter Hire Payments, Lessors had to structure the Bareboat Charter Agreements as "true leases" under the accounting *(continued on next page)*

and the Bareboat Charter Agreements are clear that loss of residual value must be considered when assessing the reasonableness (at the time of signing) of an SLV calculation.

### b.      Lost Tax Benefits

As the owner of the vessels, Lessors are entitled to depreciation deductions "provided by Section 167(a) of the Internal Revenue Code determined by using the 200% declining balance method, shifting to straight-line, using a recovery period of five (5) years, and zero salvage value." (Bareboat Charter Agreements Section 18(b)(iii).) As a result of Debtors' default under the Bareboat Charter Agreements, Lessors may lose the tax benefits afforded by Section 167(a) of the Internal Revenue Code if they are forced to sell the vessels in a depreciated market and may have to pay tax on the amounts paid by Debtors because of early termination of the Bareboat Charter Agreements. Debtors' proposed comparison of SLV recovery to future Charter Hire Payments fails to account for adverse tax impact to Lessors, even though such losses are, as discussed above, factored into SLV and are expressly permitted by New York law under UCC § 2-A-504.

### c.      Other Categories of Damages

Even if there is no SLV recovery, there are numerous other categories of damages that Lessors are explicitly entitled to recover under both Section 16(b) of the Bareboat Charter Agreements and New York law.[19] These categories of damages include insurance premiums, demurrage, dockage, anchorage charges, costs and expenses

---

*(continued from previous page)*

and tax rules applicable to leases. Such rules allow residual value to be guaranteed in the case of default, but not at the end of the term of the Bareboat Charter Agreements. The rate of return required by Lessors reflects the risk of losing money on the residual value at the end of the term, but not prior to that date.

[19] *See* N.Y. UCC Law §§ 2-A-527 and 2-A-530 (Consol. 2017).

associated with retaking the vessels, and costs and expenses incurred in connection with the enforcement of the Bareboat Charter Agreements. Yet, Debtors failed to address any of these costs when arguing that Lessors are only permitted to recover the future Charter Hire Payments. By limiting their argument to a comparison of SLV to future Charter Hire Payments, Debtors are blatantly ignoring applicable New York law and the clear language of the Bareboat Charter Agreements.

### d.    Discount Rate

Lastly, Debtors' analysis of the net present value of future Charter Hire Payments due under the Bareboat Charter Agreements uses a discount rate of 9.5%. Debtors claim this rate reflects "the midpoint weighted average cost of capital used for valuation underlying the Prepackaged Plan value and distributions thereunder." (D.I. 14 n. 7.) However, non-precedential Third Circuit caselaw suggests three approaches to reducing awards for future losses to present value: (1) the real interest rate approach; (2) the market interest rate approach; and (3) the total offset approach. *Matta v. Majestic Const., Inc.*, No. ST-07-CV-109, 2011 V.I. LEXIS 43, *4 (V.I. Super. July 26, 2011). This often leads to a battle of the experts.

The real interest rate approach was utilized by the court to reduce an award for future damages in *In re Cool, Cool Water, LLC*, No. 05-24666 (DHS), Adv. No. 05-02318 (DHS), 2007 Bankr. LEXIS 1202, *60-61 (Bankr. D.N.J. Apr. 3, 2007). There, the court applied the contract rate of 6%. *Id.* The court noted that the 6% discount rate was commercially reasonable because: (1) parties agreed to it; and (2) at the time the lessor executed the commercial lease agreement, a risk-free investment in U.S. Treasury notes yielded 2.91%. *Id.* Accordingly, the court concluded that a 6% rate for a high-risk investment was not unreasonable. *Id.* Under the market interest rate approach, "the

parties present experts who establish 'the effect of future inflation and market interest rates' and 'the jury is then instructed to make its own determination of the rate it must use to reduce future losses to their present value.'" *Matta*, 2011 V.I. LEXIS 43, at *4-5 (citing *Abdulghani v. Virgin Islands Seaplane Shuttle, Inc.*, 146 F. Supp. 583, 594 (D.V.I. 1990)). Finally, under the total offset approach, the value of future damages are simply calculated by employing a zero discount rate. *In re Federal-Mogul Global Inc.*, 330 B.R. 133, 163 (D. Del. 2005).

Lessors are still in the discovery period and have not yet determined the appropriate discount rate. However, it appears that Debtors' proposed discount rate is unreasonably high and improperly looks at the cost of capital at the present time, rather than considering the cost of capital at the time the Bareboat Charter Agreements were executed. Thus, Lessors do not concede that the net present value of future Charter Hire Payments using a 9.5% discount rate is the only appropriate component of damages. While further analysis must be performed, it is likely that even if this Court assumes Debtors' cost of capital is the appropriate discount rate, Debtors' cost of capital under a prepackaged bankruptcy plan will be higher than the cost of capital between 2013 and 2015, when the oil market and Debtors were both thriving.

In sum, Debtors erroneously ask this Court to make an apples to oranges comparison of SLV recovery and future Charter Hire Payments using an inflated discount rate and without including many of the categories of damages that Lessors are entitled to recover at law and under the express terms of the Bareboat Charter Agreements. In fact, a comparison of future Charter Hire Payments at an appropriate discount rate in addition to the lost residual value, lost tax benefits, and other categories of damages recoverable

under the Bareboat Charter Agreements will demonstrate that there is not a significant disproportion between recovery of SLV and Lessors' actual damages. Consequently, even if a comparison of SLV recovery to actual damages is appropriate to consider when assessing the enforceability of a liquidated damages provision under UCC § 2-A-504, which it is not, Debtors would fail to meet their burden of proving that the SLV provision is an unenforceable penalty.

### 2.    Cases Debtors Cite are Inapposite.

In support of their argument against enforcement of the SLV provision, Debtors rely upon cases that have been statutorily overruled or are factually irrelevant to the present dispute. Debtors rely principally on *In re Trans World Airlines, Inc.*, 145 F.3d 124 (3d Cir. Del. 1998). Importantly, that case interpreted a lease executed **before** New York adopted UCC Article 2-A. As Debtors note in their Objection, the court in *In re Trans World Airlines* ruled that the liquidated damages provision at issue in that case was unenforceable because: (1) the provision "was designed to protect the lessor from the potential of a depressed market by shifting risk of depreciation . . . from the owner to the lessee[;]" and (2) the actual damages were easily calculable. (D.I. 14 ¶ 36.) However, such reasoning is irrelevant following the adoption of UCC Article 2-A.

As noted above, Article 2-A expressly permits the shifting of depreciation risk to the lessee during the term of a lease. *See* N.Y. UCC Law § 2-A-504 (Consol. 2017) ("[L]oss or damage to lessor's residual interest[] may be liquidated."); N.Y. UCC Law § 2-A-219 (Consol. 2017) ("In the case of a finance lease, risk of loss passes to the lessee."); N.Y. UCC Law § 2-A-532 (Consol. 2017) ("[L]essor may recover from the lessee an amount that will fully compensate the lessor for any loss of or damage to the lessor's residual interest."). Furthermore, UCC § 2-A-504 eliminates the requirement

that damages be difficult to calculate for a liquidated damages provision to be enforceable. N.Y. UCC Law § 2-A-504 cmt. 4 (Consol. 2017). Thus, the holding of *In re Trans World Airlines* is irrelevant to this dispute as it relies on outdated and statutorily overruled law. Debtors' citation to *Truck Rent-A-Ct., Inc. v. Puritan Farms 2nd, Inc.*, 361 N.E.2d 1015, 393 N.Y.S.2d 365 (N.Y. 1977), is equally irrelevant because that decision also predates New York's adoption of UCC Article 2-A.

Debtors' reliance on *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34 (2d Cir. N.Y. 2004), *Leroy v. Sayers*, 635 N.Y.S.2d 217 (N.Y. App. Div. 1st Dep't 1995), and *Pyramid Ctrs. & Co. Ltd. v. Kinney Shoe Corp.*, 663 N.Y.S.2d 711 (N.Y. App. Div. 3d Dep't 1997) is also misplaced. *Braspetro Oil* is a suretyship case in the construction context while *Leroy* and *Pyramid Ctrs.* both relate to leases of real property. Because none of those cases involve a lease for goods, none of those cases are governed by UCC Article 2-A. N.Y. UCC Law § 2-A-102 cmt. 2 (Consol. 2017) (stating Article 2-A's application is limited to leases involving goods and fixtures).

Although *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461 (Bankr. D. Del. 2006), and *CIT Grp./Equip. Fin., Inc. v. Shapiro*, No. 09 CIV 409 (JPO), 2013 U.S. Dist. LEXIS 45870 (S.D.N.Y. Mar 29, 2013), involve leases of goods, neither involve the application of New York law or UCC § 2-A-504. Furthermore, *CIT Grp./Equip. Fin.* involved the attempted recovery of both future rent due under the lease and liquidated damages, which is not the case here. Thus, neither case is germane.

Lastly, *In re Montgomery Ward Holding Corp.*, 326 F.3d 383 (3d Cir. Del. 2003), involved an alleged application of § 2A-504 of the Illinois Commercial Code. However, at the time of the holding, as the Third Circuit expressly acknowledged, the Illinois courts

had "not yet taken occasion" to opine on a liquidated damages provision pursuant to § 2A-504 in a lease context. *Id.* at 388. The Third Circuit instead decided *Montgomery Ward* under traditional contractual tenets of Illinois law. *Id.* at 388-92. Accordingly, *Montgomery Ward* did not turn on either New York law or an analysis of Illinois precedent interpreting § 2A-504 of the Illinois Commercial Code.

Additionally, the SLV provision at issue in *Montgomery Ward* is readily distinguishable. Contrary to the present dispute, the SLV table at issue in that matter remained static on an annual basis, rather than declining monthly. *Id.* at 390-92. Moreover, the Court found it persuasive that the economic terms of the deal utilized a residual value inconsistent with the anticipated depreciation of the goods to achieve a lower monthly rent. *Id.* at 386-88. As a result, SLV was higher than it would have been if the lessor had included an appropriate depreciation factor. In contrast, here, Lessors used multiple sources, **including appraisals provided by Debtors** to determine the residual values that formed a component of the SLV Tables in the Bareboat Charter Agreements. Further, as Shrank and Yim explain in detail at pages 769-772 of their article, the *Montgomery Ward* panel wrongly ignored UCC § 2-A-504(1) and essentially rewrote the damages provisions of the relevant lease, without properly considering the actual harms suffered by the lessor as result of the breach by the lessee. *See* Shrank & Yim, at 769-72.

In short, Debtors' Objection does not cite to a single case that is controlling and factually relevant to the present dispute. This Court should reject any reliance upon the outdated and inapposite cases Debtors cited.

C.    **Debtors' Argument Regarding Lack of Notice of Termination is Contrary to the Bareboat Charter Agreements and Applicable Law.**[20]

As set forth above, Debtors are rejecting all of the Bareboat Charter Agreements, each of which has also been, or shortly will be, terminated.[21]    Upon rejection, a lessor may choose to terminate the rejected contract and may recover the damages which arise from the post-rejection termination.  *In re Spansion Inc.*, No. 09-10690 (KJC), 2011 U.S. Dist. LEXIS 82829, *15-17 and n. 2 (D. Del. July 28, 2011) (quoting *In re Austin Dev. Co.*, 19 F.3d 1077, 1082 (5th Cir. 1994) ("[T]he trustee may reject any of these contracts, but termination does not occur except at the other party's option."); *see also In re Emple Knitting Mills, Inc.*, 123 B.R. 688 (Bankr. D. Me. 1991) (concluding that the lessor of a rejected lease may terminate the lease and assert a claim against the bankruptcy estate for any damages suffered as a result of the termination).    Since the Bareboat Charter Agreements have each been rejected and terminated (or soon will be), Lessors may exercise the remedies set forth in Section 16(b) of the Bareboat Charter Agreements, including recovery of SLV specified in Section 16(b)(iii).  *See, e.g., Wilmington Trust Co. v. Aerovias de Mex., S.A. de C.V.*, 893 F. Supp. 215, 218 (S.D.N.Y. 1995) (upholding a stipulated loss value as an enforceable liquidated damages provision); *Penn Intermodal Leasing, Inc. v. Shipping Corp. of India*, No. 95-cv-10178 (SWK), 1997 U.S. Dist.

---

[20] BACL terminated prior to the filing of Debtors' petitions.  Therefore, Debtors have not asserted this argument as to BALC.

[21] In the Debtors' Objection filed on May 17, 2017, Debtors took the position that the Bareboat Charter Agreements had not been terminated and, therefore, Lessors could not make an election of remedies.  (D.I. 14 ¶ 32.)  Now, however, that Debtors are exercising their right to reject the Bareboat Charter Agreements that is no longer the case.  Under each of the Bareboat Charter Agreements, the applicable Lessor's right to elect SLV arose after the applicable Debtor's rejection, which constituted a breach, but not a recission or termination.  *In re Taylor-Wharton Int'l*, No. 09-14089 (BLS), Adv. No. 10-52792, 2010 Bankr. LEXIS 3994, *8 (Bankr. D. Del. Nov. 23, 2010) ("Section 365 further provides that "'the rejection of an executory contract . . . of the debtor constitutes a breach of such contract,'" 11 U.S.C. § 365(g), not the rescission of the contract.").

LEXIS 11010, *16-20 (S.D.N.Y. July 30, 1997) (also upholding a stipulated loss value as an enforceable liquidated damages provision).

### D. Public Policy and Equity Support Enforcement of the SLV Provisions.

Enforcing the SLV provision is supported by public policy and equitable considerations, especially in cases such as this, in which Lessors are not in the business of manufacturing, supplying, or selling the goods at issue and Debtors derived significant financial benefit from the transactions. *See generally Wilmington Trust Co.*, 893 F. Supp. at 218 (stating "the [l]ease cannot be divorced from the overall structure of the underlying transaction when analyzing the liquidated damages clause."). From a public policy perspective, enforcing the SLV provisions is important because the SLV provisions were calculated to include residual value protection so that Lessors could offer affordable Charter Hire Payments to Debtors. If such provisions are deemed unenforceable, then Lessors, both in this case and within the broader equipment financing and leasing industry operating in the United States, would be forced to significantly increase the scheduled rents under their lease or charter agreements to offset the greater market depreciation risk lessors would be required to take during the lease or charter term. Allowing lessors to shift the risk of market depreciation during the term of the lease in exchange for more affordable rent allows a lessee to improve its own liquidity, cash flow, and financial statement management and provides the opportunity for capital creation. In contrast, prohibiting such a shift of market risk would deny lessees these benefits and would have a stifling effect on commerce. *See* Shrank & Yim, at 770.

Furthermore, in this bankruptcy case, Debtors are returning the vessels to Lessors essentially because the vessels are surplus to Debtors' current needs. (D.I. 14 ¶¶ 17-18.)

32

Under Section 11(g) of the Bareboat Charter Agreements, a Charterer (i.e., a Debtor) may return a vessel if the vessel is surplus, obsolete, or uneconomic to the Charterer's needs; however, if the Charterer chooses to do so, the Lessor is entitled to recover SLV.  Here, Debtors are attempting to use the bankruptcy process and laws to wrongfully return the surplus vessels without paying the agreed-upon SLV.  Allowing Debtors to do so promotes other lessees to avoid their contractually-agreed termination obligations, to the detriment of a lessor, when early termination is economically beneficial to the lessee.  If the SLV provisions are declared unenforceable, the ripple effect on the equipment leasing industry, both with regard to the impact of early termination as well as insurance values that routinely utilize similar SLV calculation methodologies, will be monumental.[22]

It is also equitable to enforce the SLV provisions in this matter.  As discussed above, the sale-leaseback transactions required Lessors to make a capital investment of more than $394 million and provided Debtors with a financial gain in excess of $170 million.  Allowing Lessors to recoup their lost investment in the face of Debtors' significant windfall is not only contractually required, but also is fair.  If Debtors had not engaged in the sale-leaseback transactions at issue here, then Debtors would have incurred a significant loss from the depreciation of the vessels and, in many instances, would no longer reap the benefits of the tax benefits associated with ownership.  It would be inequitable to require Lessors to bear the overwhelming burden of Debtors' financial

---

[22] Additionally, enforcing the SLV provisions of the Bareboat Charter Agreements furthers Congress's intent to encourage the establishment of a strong U.S. merchant marine and protect the interests of financiers, like Lessors, of American vessels. *See J. Ray McDermott & Co. v. Vessel Morning Star*, 457 F.2d 815, 817 (5th Cir. 1972). Specifically, recognizing that vessels are expensive, mobile, and subject to rapid deterioration, but wanting to encourage continued financing of such vessels, Congress afforded special protections to marine vessel financiers ***and lessors*** in Chapter 11 bankruptcy cases. *See, e.g.*, 11 U.S.C. § 1110.

difficulties when Lessors provided a significant financial benefit to Debtors and obtained reasonable contractual terms intended to protect their investment against market depreciation during the term of the Bareboat Charter Agreements.

Finally, awarding Lessors SLV will have no impact whatsoever on Debtors in the context of this proceeding.  This is a "pot plan" as far as Class 3 creditors are concerned; the only stakeholders in the outcome of the SLV issue are Lessors, who are seeking to enforce the express terms of the Bareboat Charter Agreements, and other Class 3 creditors.  This is truly a "creditor vs. creditor" dispute, with the bank and noteholder creditors forcing Debtors to take the position that agreed-upon SLVs are suddenly now, in the context of a bankruptcy proceeding, an unenforceable penalty. Debtors had teams of accountants, tax advisors, and lawyers vetting competing sale-leaseback transaction proposals, which makes it implausible to conclude that the Bareboat Charter Agreements were either signed with the belief that the SLV provisions would be construed as an unenforceable penalty or that they did not fully comprehend the financial consequences—contractual liability for SLV—in the event of default or early termination.

## CONCLUSION

Debtors have defaulted under the Bareboat Charter Agreements, and pursuant to those agreements, Lessors are entitled to the contractually-mandated recovery of SLV. Despite UCC § 2-A-504(1)'s express sanctioning of other damage considerations, Debtors improperly view the anticipated harm of early termination of the Bareboat Charter Agreements exclusively in terms of missed Charter Hire Payments and argue that the recoverable SLV is inconsistent with the expectation damages that may be incurred by Lessors in an Event of Default.  From the outset, Debtors' argument is fatally flawed

because it wholly ignores, among other things, the anticipated adverse impact of early termination on Lessors when there is a reduced residual value of the vessels, adverse tax consequences, and other damages, all of which are recoverable under New York law and the Bareboat Charter Agreements.

Aside from their complete failure to consider UCC § 2-A-504, Debtors' argument is flawed because the dispute in this matter does not relate to a simple consumer boat lease.  The Bareboat Charter Agreements were executed in connection with complex sale-leaseback transactions in which Lessors purchased sixteen vessels at a cost of nearly $400 million, which resulted in a gain to Debtors in excess of $170 million.  Rental income, residual value, potential tax benefits, and other factors all would have been considered in the parties' determination of whether to take part in the sale-leaseback transaction.  The early termination of the Bareboat Charter Agreements affected all facets of the transactions, and the SLV Tables were designed to address these multiple aspects of the lease structure.

UCC § 2-A-504 requires this Court to determine whether the SLV Tables reflect the financial harm that the parties could reasonably have anticipated, at the inception of the Bareboat Charter Agreements, would arise from early termination.  *See* N.Y. UCC Law § 2-A-504(1) (Consol. 2017).  It was certainly reasonable for the parties to sale-leaseback transactions to establish an SLV in the Bareboat Charter Agreements at a level that contemplated the loss of rental income, the potential harm to the reasonably anticipated residual value of the vessels, adverse tax consequences, and other damages arising from an early termination of the Bareboat Charter Agreements.

Finally, even if this Court was inclined to award damages in a manner inconsistent with the express terms of the Bareboat Charter Agreements because the SLV provisions are unenforceable, Tidewater is nonetheless responsible for payment of SLV to each of the Lessors pursuant to the unconditional, ironclad Guaranties, which were a significant part of each sale-leaseback transaction.    Without the Guaranties from Tidewater there would be no sale-leaseback transactions.    Furthermore, as pointed out earlier in this response, an award of SLV to Lessors—in "bankruptcy" dollars—does no harm whatsoever to Debtors in the context of the proposed "pot plan."    Accordingly, Lessors urge this Court to enforce the provisions in the Bareboat Charter Agreements and award SLV as the proper measure of damages Lessors suffered as a result of Debtors' default.

Dated:  July 14, 2017
Wilmington, Delaware

Respectfully submitted,

By  /s/ Emily K. Devan

David L. Eades, Esquire
John A. Fagg, Jr., Esquire
Luis M. Lluberas, Esquire
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003
Telephone: (704) 331-1000
Facsimile: (704) 331-1159
davideades@mvalaw.com
johnfagg@mvalaw.com
luislluberas@mvalaw.com

*Attorneys for Banc of America
Leasing & Capital, LLC*

-and-

Robert Simons (admitted *pro hac vice*)
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222
Telephone: (412) 288-7294
Facsimile: (412) 288-3063
Email: rsimons@reedsmith.com

*Attorneys for PNC Equipment*

-and-

Kurt F. Gwynne (No. 3951)
Emily K. Devan (No. 6104)
REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Phone:  (302) 778-7500
Facsimile:  (302) 778-7575
kgwynne@reedsmith.com
edevan@reedsmith.com

*Counsel to Fifth Third Equipment Finance
Company and Local Counsel for all
Lessors*

-and-

Jamie W. Olinto
ADAMS AND REESE LLP
501 Riverside Avenue, 7th Floor
Jacksonville, FL 32202
Telephone:  (904) 355-1700
Facsimile (904) 355-1797
jamie.olinto@arlaw.com

*Attorneys for Regions Commercial
Equipment Finance, LLC*

-and-

John M. Duck (admitted *pro hac vice*)
Francis V. Liantonio, Jr.
(admitted *pro hac vice*)
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
Email: john.duck@arlaw.com
Email: frank.liantonio@arlaw.com

-and-

David K. Bowsher (admitted *pro hac vice*)
ADAMS AND REESE LLP
1901 6th Avenue North, Suite 3000
Birmingham, Alabama 35203
Telephone: (205) 250-5000
Facsimile: (205) 250-5034
Email: david.bowsher@arlaw.com

*Attorneys for Regions Commercial
Equipment Finance, LLC*

Thomas O. Bean (admitted *pro hac vice*)
Roger A. Clement (admitted *pro hac vice*)
VERRILL DANA LLP
One Boston Place, Suite 1600
Boston, Massachusetts 02108
Telephone: (617) 309-2606
Facsimile: (617) 309-2601
Email: tbean@verrilldana.com
Email: rclement@verrilldana.com

*Attorneys for MassMutual Asset
Finance, LLC*

-and-

Richard Aguilar (admitted *pro hac vice*)
McGLINCHEY STAFFORD PLLC
601 Poydras Street, Suite 1200
New Orleans, Louisiana 70130
Telephone: (504) 596-2884
Facsimile: (504) 910-8371
Email: raguilar@mcglinchey.com

*Attorneys for BBVA Compass Financial
Corporation*